# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | |
|---|---|
| CheckFree Corporation and CashEdge, Inc., | |
| Plaintiffs, | |
| v. | Case No.: |
| Metavante Corporation and Fidelity National Information Services, Inc., | Jury Trial Demanded |
| Defendants. | |

## PLAINTIFFS' COMPLAINT FOR PATENT INFRINGEMENT AND DEMAND FOR JURY TRIAL

Plaintiffs, CheckFree Corporation and CashEdge, Inc. (collectively, "Plaintiffs"), for their complaint for patent infringement against Defendants, Metavante Corporation and Fidelity National Information Services, Inc. (collectively, "Defendants"), state as follows:

### THE PARTIES

1.     CheckFree Corporation ("CheckFree") is a Delaware corporation with its principal place of business at 255 Fiserv Drive, Brookfield, Wisconsin 53045.

2.     CashEdge, Inc. ("CashEdge") is a Delaware corporation with its principal place of business at 215 Park Avenue South, Suite 1300, New York, New York 10003.

3.     CheckFree and CashEdge are wholly-owned subsidiaries of Fiserv, Inc. ("Fiserv"), which is a Wisconsin corporation with its principal place of business at 255 Fiserv Drive, Brookfield, Wisconsin 53045.

4.     Upon information and belief, Metavante Corporation ("Metavante") is a Wisconsin corporation with its principal place of business at 4900 West Brown Deer

Road, Milwaukee, Wisconsin 53223.

5.     Metavante may be served with process in Florida via its registered agent, C T Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

6.     Upon information and belief, Fidelity National Information Services, Inc. ("FNIS") is a Georgia corporation with its principal place of business at 601 Riverside Avenue, Jacksonville, Florida 32204.

7.     FNIS may be served with process in Florida via its registered agent, C T Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

8.     Upon information and belief, Metavante is a wholly-owned subsidiary of FNIS.

### JURISDICTION AND VENUE

9.     This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code, including at least Sections 271, 281, 283, 284, and 285.

10.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

11.     Upon information and belief, Defendants are subject to this court's specific and general personal jurisdiction pursuant to due process and/or the Florida Long Arm Statute, due at least to their substantial business in this forum, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in Florida and in this judicial district.

12. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b). Upon information and belief, Defendants reside in this district, have transacted business in this district, and have committed acts of patent infringement in this district.

### GENERAL ALLEGATIONS

13. Fiserv is a leading global provider of information management and electronic commerce systems for the financial services industry, driving innovation that transforms experiences for financial institutions and their customers. Fiserv became a leading global provider by devoting considerable resources – including a substantial monetary investment in research and development – to building and providing innovative technology solutions. Fiserv also became a leading global provider through strategic acquisitions of other technology innovators, such as CheckFree and CashEdge.

14. Fiserv acquired CheckFree in 2007. Pete Kight founded CheckFree in 1981 in his grandmother's basement, with a vision of providing electronic funds transfer services to businesses and consumers. That vision expanded into 27 years of growth as CheckFree played a leading role in the movement from paper to electronic processes in financial services. At the time Fiserv acquired CheckFree in 2007, CheckFree was a leading provider of electronic bill payment and presentment solutions, its divisions and business units had approximately 4,000 associates, and it had developed, marketed and supported software applications that were used by financial institutions to process more than 75 percent of the nearly 16 billion Automated Clearing House transactions in the United States.

15. Fiserv acquired CashEdge in 2011. CashEdge was founded by Sanjeev

Dheer in 1999. Mr. Dheer and his team quickly built CashEdge into a leading provider of account-to-account transfers, account opening and funding, data aggregation, small business payments, and person-to-person (P2P) payments. In 2009, for example, CashEdge gathered more than $4.5 billion in new assets for financial institution clients through its account opening and funding products, and it processed nearly $50 billion in online funds transfers. At the time Fiserv acquired CashEdge in 2011, CashEdge was the preeminent provider of online funds transfer services to financial institutions, employed more than 300 people worldwide, and provided services to more than 500 clients, including many of the nation's largest banks.

16. To protect their substantial investments and innovative technology solutions, Fiserv and its subsidiaries, CheckFree and CashEdge, have applied for and obtained numerous patents from the United States government. These patents are exclusive rights, allowing Fiserv and its subsidiaries to exclude others from making, using or selling their inventions during the life of the patents. The United States government will award a patent only if the experts at the United States Patent Office determine the invention is worthy of protection, including that the invention is new, useful, and non-obvious.

17. Of particular relevance to this case, the United States government has awarded CheckFree and CashEdge a number of patents for their contributions to the promotion of technology for electronic bill payment and presentment and account-to-account transfers.

18. CheckFree is the owner by assignment of United States Patent No. 7,792,749 ("the '749 Patent") entitled "Dynamic Biller List Generation." The '749

Patent issued on September 7, 2010. A true and correct copy of the '749 Patent is attached as Exhibit A.

19. CheckFree is also the owner by assignment of United States Patent No. 7,853,524 ("the '524 Patent") entitled "Systems and Methods for Risk Based Determination of a Form for Crediting a Payee on Behalf of a Payer." The '524 Patent issued on December 14, 2010. A true and correct copy of the '524 Patent is attached as Exhibit B.

20. CheckFree is also the owner by assignment of other United States patents, including at least the following: U.S. Patent Nos. 6,327,577; 7,107,244; 7,213,003; 7,240,031; 7,490,063; and 7,996,311.

21. CashEdge is the owner by assignment of United States Patent No. 7,383,223 ("the '223 Patent") entitled "Method and Apparatus for Managing Multiple Accounts." The '223 Patent issued on June 3, 2008. A true and correct copy of the '223 Patent is attached as Exhibit C.

22. CheckFree's and CashEdge's patents, including the patents listed in paragraphs 18 to 21 above, are a critical component of their ability to continue delivering and investing in cutting-edge solutions to meet the expanding needs of their clients.

23. Defendants compete directly with CheckFree and CashEdge for customers of financial and payment solutions. Those customers include financial institutions and online financial management solutions providers.

24. Instead of competing fairly, however, Defendants are exploiting the innovative technologies that CheckFree and CashEdge have worked hard to develop and protect through patents. For example, Defendants have infringed, and continue to

infringe, the '749 Patent, the '524 Patent, and the '223 Patent by providing customers financial and payment solutions that process payment instructions, provide electronic biller notifications, and/or process account-to-account funds transfer transactions, as claimed in the patents.

25.     In addition, Defendants may be infringing other patents owned by CheckFree or CashEdge, such as the patents listed in paragraph 20 above.  CheckFree and CashEdge may seek leave to add additional patents to this action after they have had an opportunity to conduct discovery into Defendants' systems and services.

26.     Fiserv, through CheckFree and CashEdge, filed this lawsuit because it has a responsibility to its investors and its employees to take all necessary actions to protect its valuable intellectual property from further infringement and exploitation.

**COUNT I**
**INFRINGEMENT OF U.S. PATENT NO. 7,792,749**

27.     Defendants have been and now are directly infringing the '749 Patent in this judicial district, and elsewhere in the United States, by making, using, offering for sale, and/or selling within the United States, and/or importing into the United States, their Electronic Payment and Presentment products and services, including at least their "Payment Manager" products.

28.     Defendants' Electronic Payment and Presentment products and services infringe the '749 Patent at least because the products and services comprise: (1) a communications interface associated with a bill presentment and payment central clearinghouse and operable to (i) receive a request that is not associated with electronic bill presentment, the request comprising information identifying a payee of a payor, and the request comprising one of (a) a payment request or (b) a request to add the payee to a

6

pick list associated with the payor, wherein the payor has not previously activated electronic bill presentment from the payee through the clearinghouse, and (ii) transmit a notification to the payor; and (2) at least one processor associated with the clearinghouse and operable to (i) receive the information identifying the payee from the communications interface, (ii) access, from at least one database utilizing at least a portion of the information identifying the payee, stored billing information, (iii) identify, from the accessed billing information, a bill presentment information associated with the payee, (iv) generate the notification to the payee, the notification including the identified bill presentment information, and (v) direct the communications interface to transmit the notification to the payor.  Defendants are thus liable for infringement of the '749 Patent pursuant to 35 U.S.C. § 271(a).

29.     Defendants' acts of infringement have been without express or implied license by CheckFree, are in violation of CheckFree's rights, and will continue unless enjoined by this Court.

30.     CheckFree has been damaged by Defendants' acts of infringement.

31.     CheckFree has been and will continue to be irreparably harmed by Defendants' infringement of the '749 Patent.

32.     Upon information and belief, one or more of the Defendants' acts of infringement have been or will be undertaken with knowledge of the '749 Patent.  Such acts constitute willful infringement and make this case exceptional pursuant to 35 U.S.C. §§ 284 and 285, and entitle CheckFree to enhanced damages and reasonable attorneys' fees.

## COUNT II
## INFRINGEMENT OF U.S. PATENT NO. 7,853,524

33.     Defendants have been and now are directly infringing the '524 Patent in this judicial district, and elsewhere in the United States, by making, using, offering for sale, and/or selling within the United States, and/or importing into the United States, their Electronic Payment and Presentment products and services, including at least their "Payment Manager" products.

34.     Defendants' Electronic Payment and Presentment products and services infringe the '524 Patent at least because the products and services comprise: (1) an interface to a network configured to receive a request to make a payment to a payee on behalf of a payer; and (2) a processor configured (i) to select, prior to a debiting of a financial account of the payer, a form for crediting the payee based on at least one of (a) a comparison of a payer account number associated with the payer and the payee to a merchant account scheme associated with the payee, or (b) a comparison of a payment amount associated with the received request to a merchant credit limit associated with the payee, and (ii) to direct issuance of a payment to the payee in accordance with the selected form for crediting.   Defendants are thus liable for infringement of the '524 Patent pursuant to 35 U.S.C. § 271(a).

35.     Defendants' acts of infringement have been without express or implied license by CheckFree, are in violation of CheckFree's rights, and will continue unless enjoined by this Court.

36.     CheckFree has been damaged by Defendants' acts of infringement.

37.     CheckFree has been and will continue to be irreparably harmed by Defendants' infringement of the '524 Patent.

8

38.    Upon information and belief, one or more of the Defendants' acts of infringement have been or will be undertaken with knowledge of the '524 Patent. Such acts constitute willful infringement and make this case exceptional pursuant to 35 U.S.C. §§ 284 and 285, and entitle CheckFree to enhanced damages and reasonable attorneys' fees.

## COUNT III
### INFRINGEMENT OF U.S. PATENT NO. 7,383,223

39.    Upon information and belief, Defendants have been and now are directly infringing the '223 Patent in this judicial district, and elsewhere in the United States, by making, using, offering for sale, and/or selling within the United States, and/or importing into the United States, their Account-to-Account Transfer system, including at least their "Payment Manager" products.

40.    Upon information and belief, Defendants infringe the '223 Patent at least because, through their Account-to-Account Transfer system, Defendants perform the steps of the claimed method for executing a funds transfer in response to a user input, the method comprising: (i) receiving an electronic funds transfer request from the user comprising an identification of a source account, an identification of a destination account and a transfer amount; (ii) in a first transaction, a third-party financial management system executing a debit transaction from the source account at a first financial institution, comprising withdrawing funds from the source account, wherein the source account is owned by the user, the third-party system having no financial relationship with the user, and depositing the funds from the debit transaction in an intermediate account, wherein the intermediate account is not owned by the user; and (iii) in a second transaction, the third-party system executing a debit transaction comprising

withdrawing the funds from the intermediate account, and depositing the funds in a second account owned by the user at the second financial institution, wherein the amount of funds deposited equals the transfer amount.   Defendants are thus liable for infringement of the '223 Patent pursuant to 35 U.S.C. § 271(a).

41.   Defendants' acts of infringement have been without express or implied license by CashEdge, are in violation of CashEdge's rights, and will continue unless enjoined by this Court.

42.   CashEdge has been damaged by Defendants' acts of infringement.

43.   CashEdge has been and will continue to be irreparably harmed by Defendants' infringement of the '223 Patent.

44.   Upon information and belief, one or more of the Defendants' acts of infringement have been or will be undertaken with knowledge of the '223 Patent.   Such acts constitute willful infringement and make this case exceptional pursuant to 35 U.S.C. §§ 284 and 285, and entitle CashEdge to enhanced damages and reasonable attorneys' fees.

## JURY DEMAND

45.   CheckFree and CashEdge, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, CheckFree and CashEdge respectfully requests that this Court enter:

A.   A judgment in favor of CheckFree and CashEdge that Defendants have directly infringed the '226 Patent, the '524 Patent, and the '223 Patent under 35 U.S.C. § 271(a);

B.      A permanent injunction enjoining Defendants and their officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in concert therewith from infringing the '226 Patent, the '524 Patent, and the '223 Patent, as provided under 35 U.S.C. § 283;

C.      A judgment and order requiring Defendants to pay CheckFree and CashEdge their damages, costs, expenses, and prejudgment and post-judgment interest for Defendants' infringement of the '226 Patent, the '524 Patent, and the '223 Patent, as provided under 35 U.S.C. § 284;

D.      A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 284 and 285 and awarding to CheckFree and CashEdge its reasonable attorneys' fees; and

E.      Any and all other relief to which CheckFree or CashEdge may show itself to be entitled.

Dated January 5, 2012

Respectfully submitted,

Rutledge R. Liles
Florida Bar No. 102805
Katie L. Dearing
Florida Bar No. 184632
LILES, GAVIN, COSTANTINO, GEORGE
   & DEARING
225 Water Street, Suite 1500
Jacksonville, FL 32202
T:  904-634-1100
F:  904-634-1234
Email:  rliles@lilesgavin.com
        kdearing@lilesgavin.com
TRIAL COUNSEL

-and-

Christopher J. Renk, Esq.
Illinois Bar No. 6199012
*Pro Hac Vice Admission Request to be filed*
Binal J. Patel, Esq.
Illinois Bar No. 6237843
*Pro Hac Vice Admission Request to be filed*
Michael J. Harris, Esq.
Illinois Bar No. 6280168
*Pro Hac Vice Admission Request to be filed*
Audra Eidem Heinze, Esq.
Illinois Bar No. 6299717
*Pro Hac Vice Admission Request to be filed*
BANNER & WITCOFF, LTD.
10 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
T: (312) 463-5000
F: (312) 463-5001
Email: crenk@bannerwitcoff.com
        bpatel@bannerwitcoff.com
        mharris@bannerwitcoff.com
        aheinze@bannerwitcoff.com

TRIAL COUNSEL

***Attorneys for Plaintiffs,
CheckFree Corporation and
CashEdge, Inc.***

# EXHIBIT A



US007792749B2

(12) **United States Patent**
Ganesan

(10) **Patent No.:** US 7,792,749 B2
(45) **Date of Patent:** Sep. 7, 2010

(54) **DYNAMIC BILLER LIST GENERATION**

(75) Inventor: **Rayi Ganesan**, Norcross, GA (US)

(73) Assignee: **CheckFree Corporation**, Norcross, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 2997 days.

(21) Appl. No.: **09/734,694**

(22) Filed: **Dec. 13, 2000**

(65) **Prior Publication Data**

US 2002/0013768 A1    Jan. 31, 2002

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/298,889, filed on Apr. 26, 1999, now abandoned.

(51) Int. Cl.
*G06Q 40/00*    (2006.01)
(52) U.S. Cl. ........................................ **705/40**; 705/39
(58) Field of Classification Search ................. 705/1, 705/40, 42, 35, 39, 44
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,852,571 | A | 12/1974 | Hall et al. |
| 4,701,601 | A | 10/1987 | Francini et al. |
| 4,734,564 | A | 3/1988 | Boston et al. |
| 4,734,858 | A | 3/1988 | Schlafly |
| 4,747,050 | A | 5/1988 | Brachtl et al. |
| 4,775,935 | A | 10/1988 | Yourick |
| 4,799,156 | A | 1/1989 | Shavit et al. |
| 4,812,628 | A | 3/1989 | Boston et al. |
| 4,822,985 | A | 4/1989 | Boggan et al. |
| 4,823,264 | A | 4/1989 | Deming |
| 4,947,028 | A | 8/1990 | Gorog |
| 4,961,142 | A | 10/1990 | Elliott et al. |
| 4,977,595 | A | 12/1990 | Ohta et al. |
| 4,992,940 | A | 2/1991 | Dworkin |
| 5,007,084 | A | 4/1991 | Materna et al. |
| 5,021,953 | A | 6/1991 | Webber et al. |
| 5,025,373 | A | 6/1991 | Keyser, Jr. et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    0542298    5/1993

(Continued)

OTHER PUBLICATIONS

Bielski, Lauren; "EBPP: a flat-lining market shows a pulse. (When Checkfree signed a deal with Bank of America to assume the bank's electronic billpay service this spring, some of the torpor surrounding the electronic bill payment market lifted) (Brief Article)"; ABA Banking Journal, v92, n9; Sep. 2000; pp. 1-7.*
Johnson, H.G.; "Understanding electronic banking"; Price Waterhouse Review, vol. 27, No. 1; 1983; p. 1.*
Business Wire; "TriSense Offers Bank-Controlled Electronic Bill Presentment Solution"; Mar. 25, 1998; pp. 1 and 2.*

(Continued)

*Primary Examiner*—Ella Colbert
(74) *Attorney, Agent, or Firm*—Sutherland Asbill & Brennan LLP

(57) **ABSTRACT**

A method, system and article of manufacture for processing bill payment information. Information identifying a payee is processed. The information is information identifying a payee to whom a payer intends to electronically direct payment. The processing determines if bills of the payee are available electronically. If the bills of the payee are available electronically, a notice is transmitted to the payer informing the payer that the bills from the payee are available electronically.

**60 Claims, 32 Drawing Sheets**



**US 7,792,749 B2**
Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,206,488 A | 4/1993 | Teicher |
| 5,220,501 A | 6/1993 | Lawlor et al. |
| 5,255,182 A | 10/1993 | Adams |
| 5,283,829 A | 2/1994 | Anderson |
| 5,287,270 A | 2/1994 | Hardy et al. |
| 5,319,542 A | 6/1994 | King, Jr. et al. |
| 5,325,290 A | 6/1994 | Cauffman et al. |
| 5,326,959 A | 7/1994 | Perazza |
| 5,336,870 A | 8/1994 | Hughes et al. |
| 5,383,113 A | 1/1995 | Kight et al. |
| 5,420,405 A | 5/1995 | Chasek |
| 5,428,684 A | 6/1995 | Akiyama et al. |
| 5,453,601 A | 9/1995 | Rosen |
| 5,455,407 A | 10/1995 | Rosen |
| 5,465,206 A | 11/1995 | Hilt et al. |
| 5,473,143 A | 12/1995 | Vajk et al. |
| 5,477,038 A | 12/1995 | Levine et al. |
| 5,483,445 A | 1/1996 | Pickering |
| 5,500,513 A | 3/1996 | Langhans et al. |
| 5,504,677 A | 4/1996 | Pollin |
| 5,557,516 A | 9/1996 | Hogan |
| 5,557,518 A | 9/1996 | Rosen |
| 5,590,197 A | 12/1996 | Chen et al. |
| 5,613,012 A | 3/1997 | Hoffman et al. |
| 5,649,117 A | 7/1997 | Landry |
| 5,655,089 A | 8/1997 | Bucci |
| 5,677,955 A | 10/1997 | Doggett et al. |
| 5,692,132 A | 11/1997 | Hogan |
| 5,699,528 A | 12/1997 | Hogan |
| 5,710,887 A | 1/1998 | Chelliah et al. |
| 5,710,889 A | 1/1998 | Clark et al. |
| 5,715,314 A | 2/1998 | Payne et al. |
| 5,717,989 A | 2/1998 | Tozzoli et al. |
| 5,724,424 A | 3/1998 | Gifford |
| 5,727,163 A | 3/1998 | Bezos |
| 5,727,249 A | 3/1998 | Pollin |
| 5,729,594 A | 3/1998 | Klingman |
| 5,732,400 A | 3/1998 | Mandler et al. |
| 5,794,221 A | 8/1998 | Egendorf |
| 5,832,460 A | 11/1998 | Bednar et al. |
| 5,870,456 A * | 2/1999 | Rogers .............. 379/91.01 |
| 5,873,072 A | 2/1999 | Kight et al. |
| 5,884,288 A | 3/1999 | Chang et al. |
| 5,920,847 A | 7/1999 | Kolling et al. |
| 5,920,848 A | 7/1999 | Schutzer et al. |
| 5,943,656 A | 8/1999 | Crooks et al. |
| 5,949,043 A | 9/1999 | Hayashida |
| 5,956,700 A | 9/1999 | Landry |
| 5,963,925 A | 10/1999 | Kolling et al. |
| 5,966,698 A | 10/1999 | Pollin |
| 5,970,475 A | 10/1999 | Barnes et al. |
| 5,974,146 A | 10/1999 | Randle et al. |
| 5,978,780 A | 11/1999 | Watson |
| 6,003,762 A | 12/1999 | Hayashida |
| 6,021,491 A | 2/2000 | Renaud |
| 6,029,150 A | 2/2000 | Kravitz |
| 6,032,133 A | 2/2000 | Hilt et al. |
| 6,035,281 A | 3/2000 | Crosskey et al. |
| 6,035,285 A | 3/2000 | Schlect et al. |
| 6,044,362 A | 3/2000 | Neely |
| 6,049,786 A | 4/2000 | Smorodinsky |
| 6,055,513 A | 4/2000 | Katz et al. |
| 6,055,567 A | 4/2000 | Ganesan et al. |
| 6,070,150 A | 5/2000 | Remington et al. |
| 6,078,907 A | 6/2000 | Lamm |
| 6,085,169 A | 7/2000 | Walker et al. |
| 6,098,053 A | 8/2000 | Slater |
| 6,125,349 A | 9/2000 | Maher |
| 6,128,603 A | 10/2000 | Dent et al. |
| 6,173,272 B1 * | 1/2001 | Thomas et al. .............. 705/42 |
| 6,188,994 B1 | 2/2001 | Egendorf |
| 6,195,420 B1 | 2/2001 | Tognazzini |
| 6,208,979 B1 | 3/2001 | Sinclair |
| 6,263,447 B1 | 7/2001 | French et al. |
| 6,285,991 B1 | 9/2001 | Powar |
| 6,289,322 B1 | 9/2001 | Kitchen et al. |
| 6,292,789 B1 | 9/2001 | Schutzer |
| 6,304,857 B1 | 10/2001 | Heindel et al. |
| 6,304,860 B1 * | 10/2001 | Martin et al. .............. 705/43 |
| 6,311,170 B1 | 10/2001 | Embrey |
| 6,317,745 B1 | 11/2001 | Thomas et al. |
| 6,374,229 B1 | 4/2002 | Lowrey et al. |
| 6,493,685 B1 * | 12/2002 | Ensel et al. .............. 705/40 |
| 6,618,708 B1 | 9/2003 | Sakamoto et al. |
| 6,711,682 B1 | 3/2004 | Capps |
| 6,721,716 B1 | 4/2004 | Gross |
| 6,856,974 B1 | 2/2005 | Ganesan et al. |
| 6,889,205 B1 | 5/2005 | Lamm |
| 6,934,691 B1 | 8/2005 | Simpson et al. |
| 6,947,908 B1 | 9/2005 | Slater |
| 6,952,770 B1 | 10/2005 | Mittal et al. |
| 7,107,249 B2 | 9/2006 | Dively et al. |
| 7,158,955 B2 | 1/2007 | Diveley et al. |
| 7,177,830 B2 | 2/2007 | Shields |
| 7,395,243 B1 | 7/2008 | Zielke et al. |
| 2001/0032181 A1 | 10/2001 | Jakstadt et al. |
| 2001/0037295 A1 | 11/2001 | Olsen |
| 2001/0044787 A1 | 11/2001 | Shwartz et al. |
| 2001/0054020 A1 | 12/2001 | Barth et al. |
| 2001/0056390 A1 | 12/2001 | Varadarajan et al. |
| 2002/0002536 A1 | 1/2002 | Braco |
| 2002/0007320 A1 | 1/2002 | Hogan et al. |
| 2002/0013768 A1 | 1/2002 | Ganesan |
| 2002/0019808 A1 | 2/2002 | Sharma |
| 2002/0023055 A1 | 2/2002 | Antognini et al. |
| 2002/0023059 A1 | 2/2002 | Bari et al. |
| 2002/0029249 A1 | 3/2002 | Cook et al. |
| 2002/0029249 A1 | 3/2002 | Campbell et al. |
| 2002/0046168 A1 | 4/2002 | Kitchen et al. |
| 2002/0055850 A1 | 5/2002 | Powell et al. |
| 2002/0059139 A1 | 5/2002 | Evans |
| 2002/0065772 A1 | 5/2002 | Saliba et al. |
| 2002/0069163 A1 | 6/2002 | Gilbert |
| 2002/0069168 A1 | 6/2002 | Lee et al. |
| 2002/0077889 A1 | 6/2002 | Kolls |
| 2002/0095387 A1 | 7/2002 | Sosa et al. |
| 2002/0120563 A1 | 8/2002 | McWilliam et al. |
| 2002/0120628 A1 | 8/2002 | Hitchcock et al. |
| 2002/0165936 A1 | 11/2002 | Alston et al. |
| 2003/0004384 A1 | 1/2003 | Yumazaki |
| 2003/0004867 A1 | 1/2003 | Kight et al. |
| 2003/0036930 A1 | 2/2003 | Matos et al. |
| 2003/0074269 A1 | 4/2003 | Viswanath |
| 2003/0139996 A1 | 7/2003 | D'Antoni et al. |
| 2003/0145018 A1 | 7/2003 | Hitchcock et al. |
| 2003/0167277 A1 | 9/2003 | Hejlsberg et al. |
| 2003/0208441 A1 | 11/2003 | Poplawski et al. |
| 2003/0212642 A1 | 11/2003 | Weller et al. |
| 2004/0064409 A1 | 4/2004 | Kight et al. |
| 2004/0078329 A1 | 4/2004 | Kight et al. |
| 2004/0083167 A1 | 4/2004 | Kight et al. |
| 2004/0083171 A1 | 4/2004 | Kight et al. |
| 2004/0088235 A1 | 5/2004 | Ziekle et al. |
| 2004/0133509 A1 | 7/2004 | McCoy et al. |
| 2004/0133514 A1 | 7/2004 | Zielke et al. |
| 2004/0139005 A1 | 7/2004 | Ganesan |
| 2004/0143548 A1 | 7/2004 | Meier et al. |
| 2004/0167853 A1 | 8/2004 | Sharma |
| 2004/0199574 A1 | 10/2004 | Franco et al. |
| 2004/0236584 A1 | 11/2004 | Kuebert et al. |
| 2005/0010523 A1 | 1/2005 | Myklebust et al. |
| 2005/0033690 A1 | 2/2005 | Antognini et al. |
| 2005/0119971 A1 | 2/2005 | Zito |
| 2005/0154649 A1 | 7/2005 | Jalili |

| 2005/0197957 A1 | 9/2005 | Keith et al. |
| 2005/0209965 A1 | 9/2005 | Ganesan |
| 2005/0222253 A1 | 10/2005 | Ganesan et al. |
| 2005/0246550 A1 | 11/2005 | Orbke et al. |
| 2006/0059107 A1 | 3/2006 | Elmore et al. |
| 2007/0022052 A1 | 1/2007 | Ganesan et al. |
| 2007/0225999 A1 | 9/2007 | Powell et al. |

### FOREIGN PATENT DOCUMENTS

| EP | 0745947 A2 * | 4/1996 |
| EP | 0745947 | 12/1996 |
| EP | 1043668 | 11/2000 |
| EP | 1049056 | 11/2000 |
| EP | 1136923 | 9/2001 |
| EP | 1361533 | 11/2003 |
| GB | 2102606 | 2/1983 |
| WO | 91/16691 | 10/1991 |
| WO | 9905628 | 2/1999 |
| WO | 9910823 | 3/1999 |
| WO | 0048103 | 8/2000 |
| WO | 0152142 | 7/2001 |
| WO | 0171973 | 9/2001 |
| WO | 0186558 | 11/2001 |

### OTHER PUBLICATIONS

PR Newswire; "CheckFree Names Ravi Ganesan Vice Chairman"; Jun. 20, 2000; pp. 1 and 2.*

Koprowski, Gene; "The money changers: digital cash innovators talk banks, bits, bytes, and bucks. (interviews with Intuit CEO Scott Cook, Digicash CEO David Chaun, Sholom Rosen, vp, Citibank, Federal Reserve Board Gov Larry Lindsey, Rep Mike Castle and U.S. Treasury Dept comptroller Eugene Ludwig)"; Forbes; Aug. 26, 1996; pp. 1-7.*

Corporate EFT Report; Online Banking To Offer Retail, Wholesale Options: Payment Processors, Vans Discuss Connection; Mar. 4, 1998; Repo vol. 18, Issue 4; pp. 1-3.*

Bank Technology News; New Directions: Mar. 1998; pp. 1-11.*

American Banker; Barbara K. Williamson; Transfer Systems, Cash Management to Undergo Changes: Regulatory and Fed Changes Revolutionize Systems; Nov. 19, 1982; pp. 1-4.*

Levine, Shira. "Billing with an Attitude." America's Network, p. 78. (Dialog File 6, 05424287).

Notice of Allowance mailed Mar. 18, 2008 for related U.S. Appl. No. 10/285,662, filed Nov. 1, 2002.

Non-Final Office Action mailed Dec. 13, 2007 for related U.S. Appl. No. 10/285,663, filed Nov. 1, 2002.

Final Office Action mailed Jan. 28, 2008 for related U.S. Appl. No. 10/285,664, filed Nov. 1, 2002.

Final Office Action mailed Jan. 22, 2008 for related U.S. Appl. No. 10/285,691, filed Nov. 1, 2002.

Final Office Action mailed Jan. 10, 2008 for related U.S. Appl. No. 10/285,706, filed Nov. 1, 2002.

Final Office Action mailed Mar. 20, 2008 for related U.S. Appl. No. 10/285,708, filed Nov. 1, 2002.

Final Office Action mailed Nov. 6, 2007 for related U.S. Appl. No. 10/397,836, filed Mar. 27, 2003 which is a continuation-in-part of U.S. Appl. No. 10/285,691, filed Nov. 1, 2002.

Non-Final Office Action mailed Dec. 31, 2007 for related U.S. Appl. No. 10/400,081, filed Mar. 27, 2003 which is a continuation-in-part of U.S. Appl. No. 10/285,706, filed Nov. 1, 2002.

Non-Final Office Action mailed Apr. 3, 2008 for related U.S. Appl. No. 10/879,712, filed Jun. 30, 2004 which is a continuation-in-part of U.S. Appl. No. 10/285,691, filed Nov. 1, 2002.

Disclosure Under 37 C.F.R. 1.56.

Business Task Force of NACHA's Council for Electronic Billing and Payment. "An Overview of Electronic Bill Presentment and Payment Operating Models." Apr. 9, 1999, pp. 1-12.

"CheckFree and Equifax Launch Electronic Billing and Payment—More Than 50 Financial Institutions Rollout Service." PR Newswire, Aug. 25, 1999, p. 1.

Coulter, Cuan. "E-Business: Account Aggregation." Dec. 31, 2001, pp. 1-6.

Council for Electronic Billing and Payment of the National Automated Clearing House Association (NACHA). "Electronic Bill Payment/Presentment Business Practices." Dec. 7, 1999, vol. 2.0.

"European Search Report," European Patent App. No. 04006976, European Patent Office, Mar. 2, 2005.

"European Search Report," European Patent App. No. 04009973, European Patent Office, Sep. 8, 2004.

"European Search Report," European Patent App. No. 04009974, European Patent Office, Oct. 22, 2004.

"European Search Report," European Patent App. No. 04009975, European Patent Office, Oct. 28, 2004.

"European Search Report," European Patent App. No. 04009976, European Patent Office, Nov. 24, 2004.

"European Search Report," European Patent App. No. 04010334, European Patent Office, Feb. 2, 2005.

"European Search Report," European Patent App. No. 04010336, European Patent Office, Feb. 28, 2005.

"Eview Security Overview." AmeriComm website, 2005, pp. 1-2, AmeriComm, Chesapeake, VA. <http://americomm.net/EBPP_ESP. asp?topic=security>.

Fay, D. "An Architecture for Distributed Applications on the Internet: Overview of Microsoft's .NET Platform." Proceedings of the International Parallel and Distributed Processing Symposium, Apr. 22, 2003, pp. 90-96.

"Frequently Asked Questions." Zip Merchant—The Commerce Tools website, 2002, pp. 1-5, CheckFree Corporation, Norcross, GA. <http://www.zipmerchant.com/products/TransactSecure/FAQ/cfm>.

Gralla, Preston. "How the Internet Works." Que, Sep. 7, 2001, 6th ed., pp. 148-151.

"Harris Bill Payment & Presentment Enrollment Help." CheckFree website, 2002, pp. 1-5, CheckFree Corporation, Norcross, GA. <http://www.thevalidnetwork.com>.

"Interactive Financial Exchange." Business Method Specification, IFX Forum, Inc., Jun. 2, 2002, pp. 8-1-8-21.

"Open Financial Exchange Bill Presentment." Open Financial Exchange Specification. Collaborative work of CheckFree Corp., Microsoft Corp. and Intuit, Inc., Jun. 12, 1997, pp. 312-356.

Osberg, Sharon. "Wells Fargo, Standards-based Electronic Bill Presentment and Payment (EBPP)." Sun Microsystems, Nov. 1999.

"Microsoft Tries for Lead in Billing." Phillips Business Information, Feb. 27, 1998, vol. 3, issue 4, pp. 1-3.

Non-Final Office Action mailed May 29, 2008 for U.S. Appl. No. 11/139,627, filed May 31, 2005 which is a divisional of U.S. Appl. No. 09/734,694.

Non-Final Office Action mailed Jul. 20, 2009 for U.S. Appl. No. 11/139,627, filed May 31, 2005 which is a divisional of U.S. Appl. No. 09/734,694.

Non-Final Office Action mailed Aug. 13, 2008 for U.S. Appl. No. 10/285,706, filed Nov. 1, 2002.

Final Office Action mailed Oct. 6, 2008 for U.S. Patent Application No. 10/879,712, filed Jun. 30, 2004 which is a continuation-in-part of U.S. Appl. No. 10/285,691.

Notice of Allowance mailed Dec. 9, 2008 for U.S. Appl. No. 10/285,706, filed Nov. 1, 2002.

Non-Final Office Action mailed Feb. 20, 2009 for U.S. Appl. No. 10/879,712, filed Jun. 30, 2004 which is a continuation-in-part of U.S. Appl. No. 10/285,691.

Non-Final Office Action mailed Jul. 9, 2009 for U.S. Appl. No. 10/397,834, filed Mar. 27, 2003 which is a continuation-in-part of U.S. Appl. No. 10/285,691.

Non-Final Office Action mailed Sep. 2, 2009 for U.S. Appl. No. 10/879,712, filed Jun. 30, 2004 which is a continuation-in-part of U.S. Appl. No. 10/285,691.

Non-Final Office Action mailed Dec. 24, 2009 for U.S. Appl. No. 10/397,834, filed Mar. 27, 2003 which is a continuation-in-part of U.S. Appl. No. 10/285,706.

Notice of Allowance mailed Jan. 26, 2010 for U.S. Appl. No. 10/879,712, filed Jun. 30, 2004 which is a continuation-in-part of U.S. Appl. No. 10/285,691.

Final Office Action mailed Feb. 5, 2010 for U.S. Appl. No. 11/139,627, filed May 31, 2005 which is a divisional of U.S. Appl. No. 09/734,694.

* cited by examiner



FIG. 1



FIG. 2



**FIG. 3**



**FIG. 4**



**FIG. 5**



FIG. 6



**FIG. 7**



| Payee/Payer Identifies | Reg | FI Identifier | | Billing Information | Remittance Information |
|---|---|---|---|---|---|
| A | Y | I | PA DA | YES | YES |
| B | Y | J | PA | NO | NO |
| C | Y | K | PA DA | YES | NO |
| D | N | UNKNOWN | | YES | NO |
| E | Y | L | DA PA | NO | YES |
| F | N | UNKNOWN | | NO | YES |
| G | N | UNKNOWN | | YES | YES |
| H | Y | K | PA DA | YES | YES |
| I | Y | I | PA DA | YES | YES |
| J | Y | J | PA DA | YES | YES |
| K | Y | K | PA DA | YES | YES |
| L | Y | L | PA DA | YES | YES |
| | | | | | |
| | | | | | |
| n | | | | | |

805   810   815   820   825

# FIG. 8

| Registered User/Biller Identifiers | Billing Information |
|---|---|
| User A | Yes |
| User E | Yes |
| User H | Yes |
| User I | Yes |
| User J | Yes |
| User K | Yes |
| User L | Yes |
|  |  |
|  |  |
| ↓ | ↓ |
| n | n |

905   910

# FIG. 9



**FIG. 10**

1105          1110

| Registered User/Customer Identifiers | Billing Information |
|---|---|
| User A | Yes |
| User C | Yes |
| User G | Yes |
| User H | Yes |
| User I | Yes |
| User K | Yes |
| User L | Yes |
| | |
| | |
| ↓ | ↓ |
| n | n |

# FIG. 11



**FIG. 12**

| Unregistered User/Customer Identifiers | Billing Information |
|---|---|
| User D | Yes |
| User G | Yes |
|  |  |
|  |  |
| ↓ | ↓ |
| n | n |

1305    1310

# FIG. 13



**FIG. 14**

| Payee Identifier | Street Address | City | State | Zip Code | Payee Phone Number | Consumer Account Number |
|---|---|---|---|---|---|---|
| Payee 1 | 1216 Morning Glory | Bridgeport | CO | 11112-2222 | (555) 555-0000 | 55897B7-4A |
| Payee 2 | 1311 1st Street | Central City | CA | 00000-0001 | (555) 555-5568 | 4586-58C-433 |
| Payee 3 | 748 Elm Place | Townson | OR | 00200-1256 | (555) 555-7896 | None |
| Payee 4 | 7868 Business Rd. | Dallas | TX | 00620-8989 | (555) 555-0004 | 585DB-7 |

1501   1502   1503   1504   1505   1506   1507

**FIG. 15**



**FIG. 16**



**FIG. 17**



1801

Transmit Payee Pick-List to User

1810

User Selects Payee and Transmits
Selection to Central Processor

1820

Receive Transmitted Selection

To Step 705 of
Figure 7

# FIG. 18



**FIG. 19**



FIG. 20



**FIG. 21**



2201

Access Payee Pick-List Database and
Registered User/Biller Database

2210

Determine Common Entries

2220

Store Indication of Electronic Biller
in Payee Pick-List Database

# FIG. 22



**FIG. 23**



**FIG. 24**



FIG. 25



**FIG. 26**

| Payee Identifier | Street Address | City | State | Zip Code | Payee Phone Number | Users |
|---|---|---|---|---|---|---|
| | 2711 | 2712 | 2713 | 2714 | 2715 | 2710 |
| Payee 1 | 1216 Morning Glory | Bridgeport | CO | 11112-2222 | (555) 555-0000 | A, B, H |
| Payee 2 | 1311 1st Street | Central City | CA | 00000-0001 | (555) 555-5568 | B, C |
| Payee 3 | 748 Elm Place | Townson | OR | 00200-1256 | (555) 555-7896 | B |
| Payee 4 | 7868 Business Rd. | Dallas | TX | 00620-8989 | (555) 555-0004 | B, E |
| Payee 5 | 55 Hurst | Topeka | KY | 002588-4444 | (555) 555-4444 | B |
| | | | | | | |
| | | | | | | |
| n | n | n | n | n | n | n |

2701

**FIG. 27**



**FIG. 28**



**FIG. 29**



**FIG. 30**



**FIG. 31**



**FIG. 32**

US 7,792,749 B2

1

# DYNAMIC BILLER LIST GENERATION

## RELATED APPLICATIONS

This application is a continuation-in-part of U.S. patent application Ser. No. 09/298,889, filed Apr. 26, 1999 now abandoned, and entitled Electronic Bill Presentment and/or Payment Clearinghouse.

## TECHNICAL FIELD

The present invention relates generally to electronic bill presentment and/or payment. More specifically, the present invention relates to notifying users of the availability of electronic bill information.

## BACKGROUND ART

Over the past several years an international network of networks known as the Internet has become increasingly popular. The Internet allows millions of users throughout the world to communicate with each other. To provide users with easier access to information available on the Internet, a World Wide Web has been established. The World Wide Web allows information to be organized, searched and presented on the Internet using hypertext. Thus, using the World Wide Web a user can submit a query for information and be linked electronically to information of interest which has been stored at web locations on the Internet. Using hypertext, a user can also communicate information to other users of the Internet. Hence, the Web has made it relatively easy for virtually anyone having access to a personal computer or other device connected to the Internet to communicate with others who are also connected to the internet.

With the proliferation of Internet users, numerous services are now provided over the Internet. One of the first such services to be offered was electronic banking. Electronic banking allows banking customers to access their account information and execute banking transactions, e.g. the transfer of funds from a savings to checking account, by simply linking to a bank server using the Internet to access account information and communicate transfer instructions.

More recently, it has become possible to electronically pay bills by communicating instructions, via the Internet, to a financial institute maintaining deposited or credited funds of a pre-registered payer, or to a representative of the financial institute. The payments are then made to the payee by the financial institute or its representative. Funds from the payer's deposit or credit account, i.e. the payer's account, are debited by the financial institute to cover the payment. The payment by the financial institute or its representative to the payee can be made in any number of ways.

For example, the financial institute or representative may electronically transfer funds from the payer's account to the payee's account, may electronically transfer funds from a financial institute/representative's deposit or credit account, to the payee's account, may prepare a paper draft on the financial institute/representative account and mail it to the payee, may prepare an electronically printed paper check on the payer's account and mail it to the payee, or may make a wire transfer from either the financial institute/representative account or payer's account.

If the funds transferred to the payee are drawn from the financial institute/representative account, funds from the payer's account are electronically or otherwise transferred by the financial institute to the financial institute/representative account to cover the payment. Further, if the payment will be

2

made from funds in the financial institute/representative account, the payment will preferably be consolidated with payments being made to the same payee on behalf of other payers.

Accordingly, such electronic bill payment systems eliminate the need for a payer to write or print paper checks and then forward them by mail to the payee. This makes it easier and more efficient for the payer to make payments. Payees receiving consolidated payments no longer have to deal with checks from each payee and therefore can process payments more efficiently. The making of payments by the electronic or wire transfer of funds provides even further efficiencies in payment processing by payees, and it is well recognized that making payments electronically can significantly reduce the cost of processing payments for both the payer and payee.

The number of users of electronic bill payment services has grown dramatically since introduction by CheckFree Corporation, the assignee of the present application. However, not been integrated with the electronic payment process, many potential users remained reluctant to utilize the service.

More particularly, until the offering by CheckFree Corporation, electronic bill payment systems were operated independent of the bill presentment process. Still today, most conventional electronic bill payment systems generally require that the payee receive a conventional paper bill from a merchant or other billing entity, the exception being for certain bill payments, such as mortgage payments, which can be pre-authorized by the payee. Thus, for most bill payments, it is only after the paper bill has been received that the payee can connect to the electronic bill payment system via the Internet and provide a payment instruction.

Using CheckFree's fully integrated electronic bill presentment and payment system, registered merchants and other payers can electronically present bills to registered consumers and other payees by communicating bills via the Internet, to the electronic presentment/payment service provider, which could be a financial institute/representative or some other service provider. Typically, the bill is stored centrally on the electronic presentment/payment system server. The service provider notifies the payer, for example by Internet email, of the availability of the bill and the bill can then be accessed by the payer by connecting to the system server or some other server, via the Internet, to retrieve the bill. Once connected to the system server, the payer can also communicate a payment instruction to the server and the payment can then be made to the payee as previously described.

Accordingly, CheckFree's electronic bill presentment and payment system eliminates the need for a payee to print paper bills and then forward them by mail to the payer. This makes it easier and more efficient for the payee to issue bills. Payers receiving electronic bills no longer have to deal with paper bills from each payer. The combination of electronic presentment and payment of bills has provided even further efficiencies and cost reductions in billing and payment processing by both payers and payees.

Although electronic bill presentment and particularly integrated electronic bill presentment and payment have received broad user acceptance from both payers and payees, there remains a significant number of payers using electronic bill presentment and payment services who are not taking full advantage of the benefits of the electronic bill presentment facet of the services. These payers may not electronically receive all of their bills which are available in the electronic presentment form. Instead, these payers continue to receive some bills in paper form and make payments in either elec-

US 7,792,749 B2

3

tronic or paper form. Oftentimes this is because the electronic payers are unaware that a particular payee offers electronic presentment.

One reason a payer may be unaware of the availability of electronic bills from a particular payee is that the community of payees who offer electronic bill presentment is ever-growing. These new-to-electronic-bill-presentment payees often have not informed their customers in a timely manner that electronic bill presentment is available. There is also a segment of the users of integrated electronic bill payment and presentment services who are unaware that any of their payees offer electronic bill presentment.

Accordingly, a need exists for a technique to inform bill presentment and payment service users that electronic bill presentment is available, whether these customers are already taking advantage of electronic bill presentment to some extent, or whether they simply use the payment side of the service, to increase usage of electronic bill presentment.

As described above, electronic bill presentment offers significant benefits to payees. However, to gain these benefits, a payee who offers electronic bill presentment must be able to identify those payers who might wish to utilize electronic bill presentment. Currently, the only way for payees to identify a payer for electronic bill presentment is to receive a request for electronic bill presentment from that payer. The payee might also identify a payer for electronic bill presentment based on knowledge that a payer currently makes payments electronically to that payee.

By being able to identify consumers who utilize electronic bill presentment and payment services for purposes unrelated to receiving or paying a payee's bill, a payee could efficiently focus its efforts to recruit new payers into the payee's electronic bill presentment and payment community of users. Accordingly, a need exists for a technique which will allow electronic billers to identify payers who may be amenable to electronic bill presentment and/or payment, to increase usage of electronic bill presentment and/or payment.

OBJECTIVES OF THE INVENTION

It is accordingly an objective of the present invention to provide a technique which will facilitate increased usage of electronic bill presentment.

Additional objects, advantages, novel features of the present invention will become apparent to those skilled in the art from this disclosure, including the following detailed description, as well as by practice of the invention. While the invention is described below with reference to preferred embodiment(s), it should be understood that the invention is not limited thereto. Those of ordinary skill in the art having access to the teachings herein will recognize additional implementations, modifications, and embodiments, as well as other fields of use, which are within the scope of the invention as disclosed and claimed herein and with respect to which the invention could be of significant utility.

SUMMARY DISCLOSURE OF THE INVENTION

The present invention provides a system and method for processing bill payment information. The system includes at least one processor, a memory for storing data, and a communications port for transmitting and receiving information, including bill payment information. The processor may be any type processor, such as a personal computer, high powered workstation, or sophisticated main-frame processor. The memory also may be a type of memory capable of storing data, including random access memory, floppy or hard magnetic disk, or optical disk. Data stored in the memory and data processed by the processor are exchanged between the processor and the memory. The data can include bill payment information and operating instructions for controlling the operations of the processor. The communications port may be connected to a network configured to transmit electronic or optical data. The network can include a public or private telephone network, the Internet, or any other type network. Bill payment information can include directions to pay a bill, information identifying payers, payees, billers, customers, financial institutions, and/or data representing accounts maintained at financial institutions. The bill payment information could also, or alternatively, include information identifying parties to financial transactions that may or may not take place in the future.

In accordance with the invention, the processor processes information identifying a payee to whom a payer intends to electronically direct payment. This identifying information may be information stored in the memory, it may be information received via the communications port, or it may be information received by the processor in some other manner. The information may be information received from the payer and processed prior to storage in the memory, or it may be processed subsequent to storage in the memory. The information could, if desired, be received, processed in a manner unrelated to bill payment, stored, and then retrieved and processed again. The information identifying the payee could be, but preferably is not, associated with a directive to make a payment to that payee.

The processor processes the information to determine if bills of the payee are available electronically. That is, are bills issued by the payee, also sometimes referred to as a biller, available in electronic format as opposed to a traditional format in which bills are presented on paper to a payee, also sometimes referred to as a customer.

If the processor determines that bills issued by the identified payee are available electronically, i.e. are either already available in electronic form or could be made available in electronic form, the processor directs that a notice be transmitted to the payer notifying the payer that the bills of the payee are available electronically. This notice may be transmitted via any network of computers, any telephone network, or even via traditional mail.

Beneficially, the processor directs that information identifying the payee be transmitted to the payer along with notice that bills from this payee are available electronically.

Advantageously, the system also can include several different databases stored in the memory. For example, a database for storing information identifying a payee to whom a payer intends to electronically make payment may be stored. This database is referred to as a payee pick-list. The payee pick-list database can include information identifying more than one payee. As discussed above, the information identifying the payee may be processed either after storage, which could, in this case be storage in the payee pick-list database, or prior to storage in the payee pick-list database.

Preferably, the memory stores a plurality of payee pick-lists. Each of the payee pick-lists is associated with a different payer. Each payee pick-list can also include information indicating which of the included payees offers electronic bill presentment, as well as the availability of electronic bill information.

In accordance with a particularly preferred aspect of the invention, the information identifying the payee may be processed by the processor more than once. If initial processing determines that the bills of the payee are not available electronically, the processor will subsequently process the infor-

5

6

mation again. If this subsequent processing determines that the bills of the payee are available electronically, the payer is then informed as discussed above. This subsequent processing may be performed periodically or based on a triggering event so that information regarding availability is updated routinely.

Another of the databases which may be stored in the memory is a database storing information identifying payees that offer electronic bill presentment. The processor can be configured to access this database to determine if a payee is included in this database.

Yet another of the databases which may be stored in the memory is a database storing information identifying payees that have presented one or more electronic bills. This database is sometimes referred to as a biller database. The processor can be configured to access this database and determine if a payee is included in this database.

Still another of the databases which may be stored in the memory is a database storing electronic billing information. The electronic billing information may relate to payers who have paid a bill electronically, payers who have received a bill electronically, payees who have presented a bill electronically, payees who presently present bills electronically, stored electronic bills, and may include other information associated with a bill. The processor can be configured to access this database and determine if information associated with a payee is included in this database. Preferably, the processor is also configured to access this database and determine if a stored electronic bill for a payer and associated with the payee is stored in the database. If so, the processor directs a further notice be transmitted to the payer notifying the payer that the stored electronic bill is available.

In another beneficial aspect of the invention, a processor, such as a user computer, can be configured to receive, responsive to the transmitted notice, an inputted request from the payer to receive the bills of the payee electronically. If desired, the processor can, responsive to receipt of the inputted request, cause the request to be transmitted to the payee via, for example, a hyper-link, batch transfer or other communication.

Still another of the databases which may be stored in the memory is a database storing information identifying payers having stored electronic bills in the database storing electronic billing information. This database is sometimes referred to as a customer database. The processor may be configured to access this database to determine if a payer is included in this database before accessing the database storing electronic billing information to determine if a stored electronic bill for the payer and associated with a payee is stored in that database. If the payer is not included in the customer database, the processor need not access the database storing electronic billing information.

Preferably, the processor is also configured to receive an electronic bill, which could be in the form of full or summary bill information in any format, from a payee directed to a payer. The processor processes this electronic bill to determine if the payee is included in the database storing information identifying those payees having presented at least one electronic bill, discussed above and referred to as the biller database. If not, information identifying the payee is added to this database.

If information identifying the payee is not included in the biller database, then an indication that the payee offers electronic bill presentment will not be stored in any payee pick-list. Beneficially, to keep each pick-list current, if the payee is not included in the biller database the processor can be configured to identify the payee pick-lists in which the payee is identified and store information identifying the payee as a payee offering electronic bill presentment in each of the identified payee pick-lists.

Another of the databases that can be stored in the memory is sometimes referred to as a master payee pick-list. The master payee pick-list includes information identifying every payee included in each of the individual payee pick-lists for each payer. The master payee pick-list may also include information identifying each payer having identified a payee in an individual payee pick-list. In which case, each payee is associated with each respective identified payer.

The processor is optionally configured to access the master payee pick-list and to determine, if the payee is not included in the biller database, if that payee is included in the master payee pick-list. If so, the processor determines which of the payers are associated with the payee. The processor then stores information identifying the payee as a payee that offers electronic bill presentment in each individual payee pick-list associated with an identified payer.

The processor may additionally be configured to store a received electronic bill. Beneficially, the processor can also be configured to transmit a notice to a payer that the electronic bill is available. As with the above-discussed notice, the transmission may take on any of several forms.

In accordance with another particularly preferable aspect of the invention, the processor is configured to determine if a payer is associated with an individual payee pick-list. If so, the processor can determine if a payee is included in that payer's individual payee-pick list. And, if so, the processor stores an indication of available electronic billing information from the payee in that payer's individual payee pick-list. This processing ensures that the payee's individual payee pick-list is kept current as to availability of any stored electronic billing information.

To keep the customer database current, the processor may be configured to access the customer database and determine if a payer is included. If not, information identifying the payer can be stored in the customer database.

The processor may also be configured to determine if a payee is included in the master payee pick-list, even if the payee is included in the biller database. If a payee is included in the master payee pick-list, the processor can determine if a payer is associated with that payee in the master payee pick-list. If so, the processor stores an indication of available electronic billing information from that payee in that payer's individual payee pick-list.

In another embodiment of the invention, computer programming is stored on a computer readable medium. The computer readable medium is readable by a computer to cause the computer to operate as discussed above. That is, the programming stored on the computer readable medium causes a computer to perform each desired aspect of the invention discussed above.

In another aspect of the invention, information is received which identifies a person, a deposit account associated with the person, and a financial institution at which the deposit account is maintained. Information identifying the person need never have been received before. Electronic billing information is stored in a first database. Other information identifying unregistered persons having electronic billing information stored in the first database is stored in a second database. A determination is made as to whether the other information stored in the second database identifies the person. If so, the person is notified of the availability of stored electronic billing information which identifies the person. Thus, a person who is unregistered can be notified of stored billing information immediately upon becoming registered.

US 7,792,749 B2

7

In yet another aspect of the invention, a method for notifying a payer of the availability of electronic bill presentment is disclosed. An instruction to pay a bill of a payee is received via a network. A database is accessed which contains information identifying payees who offer electronic bill presentment. A determination is made as to whether the payee is included in the database. If so, the payer is notified that the payee offers electronic bill presentment.

Advantageously, a request to receive electronic bills from the payee is received from the payer. The payee is notified that the payer requests to receive the electronic bills. The notification to the payer may be via a hyper-link, batch transfer or other communication. Beneficially, electronic bill presentment options may be transmitted to the payer. A request from the payer is input to select one of the options. This inputted request is transmitted to the payee.

Another database may be accessed which stores information identifying stored electronic billing information. If it is determined that electronic billing information for the payer is stored in this other database, the payee is notified of the availability of the stored electronic billing information. A request from the payer to access the stored information may be entered by the payer. A hyper-link can be activated responsive to receipt of the request and the stored information may be transmitted to the payer via the hyper-link.

BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 depicts an electronic bill presentation and payment network in accordance with the present invention.

FIG. 2 depicts the communications between various network stations depicted in FIG. 1, in accordance with the present invention.

FIG. 3 is a flow chart showing the operations which are performed by the network stations of FIG. 2, in accordance with the present invention.

FIG. 4 depicts the communications between various network stations depicted in FIG. 1 to direct payers to electronic bills, in accordance with the present invention.

FIG. 5 is a flow chart showing the operations which are performed by the network stations in FIG. 4, in accordance with the present invention.

FIG. 6 depicts the communications between various network stations depicted in FIG. 1 to pay paper bills, in accordance with the present invention.

FIG. 7 is a flow chart showing the operations which are performed by the network stations in FIG. 6, in accordance with the present invention.

FIG. 8 is a simplified depiction of a central database for storing electronic billing and remittance information, in accordance with the present invention.

FIG. 9 is a simplified depiction of a registered user/biller database for storing a list of registered users who are electronic billers, in accordance with the present invention.

FIG. 10 is a flow chart showing the operations which are performed by the central clearinghouse station processor to maintain a registered user/biller database.

FIG. 11 is a simplified depiction of a registered user/customer database for storing a list of registered users who are customers, in accordance with the present invention.

FIG. 12 is a flow chart showing the operations which are performed by the central clearinghouse station processor to maintain a registered user/customer database.

FIG. 13 is a simplified depiction of an unregistered user/customer database for storing a list of unregistered users who are customers, in accordance with the present invention.

8

FIG. 14 is a flow chart showing the operations which are performed by the central clearinghouse station processor to maintain a unregistered user/customer database.

FIG. 15 is a simplified depiction of an individual payee pick-list for storing information identifying payees a user may plan to pay electronically.

FIG. 16 depicts the communications between various network stations depicted in FIG. 1 to maintain an individual user's payee pick-list.

FIG. 17 is a flow chart showing the operations which are performed by the network stations in FIG. 16, to maintain an individual user's payee pick-list in accordance with the present invention.

FIG. 18 is a flow chart showing the operations which are performed by the network stations of FIG. 16 to utilize an individual user's payee pick-list.

FIG. 19 is a simplified depiction of an individual payee pick-list as presented to a user via a network connection to select a payee for payment.

FIG. 20 is a simplified depiction of a payment screen as presented to a user via a network connection to make a payment.

FIG. 21 is a simplified depiction of a sign-up screen as presented to a user via a network connection to sign-up for electronic bill presentment.

FIG. 22 is a flow chart showing the operations which are performed by the network stations of FIG. 16 to indicate electronic bill presentment availability.

FIG. 23 is a flow chart showing the operations which are performed by the network stations of FIG. 16 to indicate stored billing information availability.

FIG. 24 is a flow chart showing alternative operations which are performed by the network stations of FIG. 16 to indicate both availability of electronic bill presentment and availability of stored billing information.

FIG. 25 presents alternative communications between various network stations depicted in FIG. 1 to maintain an individual user's payee pick-list, a master payee pick-list, and to include additional information in an individual payee pick-list.

FIG. 26 is a flow chart showing alternative operations which are performed by the network stations of FIG. 25 to maintain individual payee pick-lists and to indicate availability of additional information.

FIG. 27 is a simplified depiction of a master payee pick-list for storing information identifying every payee identified by at least one user for inclusion in an individual user's payee pick-list.

FIG. 28 is a flow chart showing operations performed by the network stations of FIG. 25 to maintain a master payee pick-list.

FIG. 29 is a flow chart showing alternative operations performed by the network stations of FIG. 25 to determine if a new registered user/biller is included in a payee pick-list.

FIG. 30 is a flow chart showing operations performed by the network stations of FIG. 25 to determine if a new registered user/customer has included the biller in its payee pick-list.

FIG. 31 is a flow chart showing alternative operations performed by the network stations of FIG. 25 to determine if a new registered user/customer has included the biller in its payee pick-list.

FIG. 32 is a flow chart showing operations performed by the network stations of FIG. 1 to register a previously unregistered user.

US 7,792,749 B2

9

## BEST MODE FOR CARRYING OUT THE INVENTION

As shown in FIG. 1, a bill presentment and payment network 100 includes a large number of user stations represented as payee and payer user stations 110A-110H, respectively representing payees and payers A-H. It will be recognized that the network 100 preferably includes many thousands if not millions of user stations. The user stations are capable of communicating via the Internet 150, although it will be understood that some other communications network could be utilized in lieu of the Internet.

Also included in the network 100 are a large number of financial institute (FI) user stations 130A-130D, respectively representing financial institutes I-L. The FI stations 130A-130D are capable of connecting to a communications network 160 which could be the Internet and/or a more secure communications network such as the conventional ACH communications network or some other inter-bank communications network. Additionally included in the network 100 is a central clearinghouse station 140. Station 140 includes a processor 140A and memory 140B. The memory 140B stores databases 140B3-140B5 for storing user-class information, as will be discussed below, databases 140B6 and 140B7 for storing payee information, as will be discussed below, and programmed instructions 140B1. The memory 140B also stores a relational database 140B2 for storing billing and remittance information. Each user A-H has a deposit and/or payment account, each to be called an account herein, maintained at one of the financial institutes I-L.

Although, as shown, each of the user stations 110A-110H can communicate with the central clearinghouse station 140 via the Internet 150, for purposes of the following description, only certain of users A-H are registered to electronically present and/or pay bills on network 150, see FIGS. 8, 9, 11 and 13. More particularly, for purposes of the following discussion, users D, F and G are unregistered users of network 100. Further, user A is an individual and users B and H are small business entities. User E is a large business entity.

To facilitate the use of the electronic bill presentment and payment services, the central clearinghouse station 140 operates in accordance with instructions 140B1, to perform a registration process. For some users, the registration process may require only that the user provide its identification, its account number and an identification of a financial institute at which its account is maintained. In any event, this information is stored in the relational database 140B2 in association with a user identifier and an identifier indicating that the user is a registered user. Having this information, the central clearinghouse station processor 140A can now direct payments, preferably by electronic fund transfer, to the account of a registered user. The central clearinghouse station processor 140A can also now directs payments, preferably by electronic fund transfer, from the account of a registered user to make a payment directed by that registered user.

The central clearinghouse station processor 140A also operates to generate remittance information for each payment directed to a user, registered or unregistered, as will be further described below, and to direct the storage of such information in the relational databases 140B2 in association with the user identifier. Thus, the database 140B2 serves as a temporary depository for remittance information corresponding to any payment directed to a user on behalf of registered network users.

To central clearinghouse station 140, individuals, small businesses, and large businesses appear the same. The central processor 140A also functions to generate user-class infor-

10

mation for each bill received from a registered user for electronic presentment, as will be discussed below.

The central processor 140A also operates to generate billing information for each bill, whether including full or summary information, received from a registered user for payment by another user and to direct the storage of such information in the relational database 140B2 in association with the other user's identifier. Thus, the relational database 140B2 serves as a temporary depository for billing information which may be provided by any of the registered users. Registered users who provide electronic bills for payment by other users are also known as billers. Users to whom received electronic bills are directed are also known as customers.

The central processor 140A preferably further functions to electronically receive bills from registered billers in the form output by any commonly used standard invoicing software packages, such as Quickbooks, Peachtree and other off-the-shelf invoicing software, or alternatively in ASCII or other formats and, if necessary, to convert the received bill into standard format billing information for storage in the database 140B2 in relationship with the applicable customer identifier for subsequent presentment to the applicable user station 10A-H. Accordingly, registered billers need not modify their existing invoicing software or substantially modify their existing procedures, other than to transmit the bill output from their existing invoicing software via the Internet 150 to the central clearinghouse station 140, to have their bills electronically presented to the applicable customer.

The central clearinghouse station processor 140A is also preferably capable of generating remittance information in multiple standard formats, compatible with all the commonly used accounts receivable or invoicing software, and in ASCII or other formats. The central processor 140A directs the storage of the formatted remittance information in the database 140B2 of memory 140B in association with the applicable user identifier. The remittance information can be generated and stored in all the above mentioned formats. Alternatively, the applicable biller can select, or otherwise identify, a particular one of the formats in which it wishes to receive remittance information. Using this later alternative, the remittance information is formatted and stored only in the requested format. Accordingly, registered billers can obtain remittance advice by simply using a browser to contact the central clearinghouse station 140 and requesting the stored remittance information. Responsive to the request, the central clearinghouse station processor 140A retrieves the applicable remittance information from the database 140B2 and transmits the information via the Internet 150 to the applicable user station. Because the information will typically be received in at least one format usable by the biller's standard invoicing software, this information can be directly input to the accounts receivable system and processed in the conventional manner.

FIG. 2 depicts the communications between various network stations to electronically present and pay bills. Turning to FIGS. 2 and 3, user A and user H are registered in step 300 of FIG. 3. User H, who is also a biller and represented by user station 110H, generates, in step 310 in FIG. 3, a bill to user A, represented by station 110A. The bill may be generated by a standard software package or otherwise. The output of the software, which represents the bill, is transmitted in communication 205 from the user station 110H to the central clearinghouse station 140, as indicated in step 315 of FIG. 3. The central clearinghouse station processor 140A, in accordance with programmed instructions 140B1, processes the received bill to generate standard format billing information in step 320.

US 7,792,749 B2

11

The central processor 140A also determines if user A is a registered user, as indicated in step 321. If so, as is the case here, the central processor 140A, in communication 210A, directs the storage of the billing information in the relational database 140B2 of the memory 140B in association with the user A identifier. as shown in step 325.

Additionally, central processor 140A may optionally generate and transmit a notification to user station 110H notifying user station 110H of the registration status of user A, as indicated by communication 280 and step 328. Biller H may then inform the customer, perhaps in correspondence enclosed with a paper copy of the bill mailed to user A, that billing and/or payment is available electronically, thereby motivating the registered user to utilize electronic bill payment and/or presentment.

The central processor 140A may also optionally generate and transmit a notification to the user station 110A of the availability of stored billing information, as indicated by communication 215 and step 330, if the user to whom the bill is directed is a registered user.

If the bill were for unregistered user D rather than registered user A, central processor 140A determines if a user D identifier is stored in database 140B2 at step 322. If unregistered user D has previously been paid by a registered user, or if a registered user has submitted an electronic bill for payment by user D, an identifier for user D will already be stored in database 140B2. If so, operations continue with step 325. If not, a user D identifier is generated based upon the billing information and stored in database 140B2, as indicated by communication 285 and step 323. Next, the generated billing information is stored in the database 140B2 in association with the user identifier, as indicated by communication 210B and step 325. Thus, after completion of step 323, operation continue as described above and depicted beginning at step 325.

A request for the billing information, as indicated in step 335, is received via communication 220 at the central clearinghouse station 140 from station 110A. The central processor 140A determines whether or not the request is from a registered user in step 337. If the request were from unregistered user D rather than registered user A, the central processor 140A would transmit a query to station 110D, as shown in FIG. 1, to determine if user D desires to register and thereby obtain access to its billing information which is stored on database 140B2. Optionally, an unregistered customer could be provided with limited access to its stored electronic billing information to sample electronic bill presentment based upon providing sufficient information to verify the customer's identity, but without the need to provide an account number and associated financial institute information.

Thus, it should be understood that the central clearinghouse station 140 operates to generate and direct the storage of billing information in association with registered and unregistered user identifiers, as may be desired by a registered user. If billing information for an unregistered user is stored in database 140B2, the biller may inform the unregistered customer, perhaps in correspondence enclosed with a paper copy of the bill mailed to the unregistered user, that the bill is available and payable electronically and can be accessed by contacting the central clearinghouse station 140 at its Internet web site, thereby motivating the unregistered user to register for electronic bill presentment and/or payment services. Preferably, the non-registered requesting user is registered via communications 222 in step 340. It will of course be noted that although communications 222 are shown in FIG. 2 for completeness, since user A has pre-registered, these commu-

12

nication would not actually occur with station 110A but would be required, for example, with station 110D in order to register user D.

As indicated in step 345, the central processor 140A retrieves the applicable billing information from the database 140B2 of memory 140B responsive to the access request from station 110A, as indicated by communication 225. The retrieved information is then communicated via processor 140, as directed by central processor 140A, to the user station 110A via communication 230, as indicated in step 350. In step 355, the central processor 140A receives a payment instruction via communication 235 from the user station 110A. Based upon the instruction, the central processor 140A generates remittance information in step 360 and directs the storage of the remittance information in the database 140B2 of memory 140B in association with the user H identifier via the communication 240, as indicated in step 365. Remittance information may include such information as the name of the payer, the payer's address, phone number, and account number with the payee, among other information. Generated and stored remittance information is particularly beneficial in those situations in which the central station 140 stores bill information for an unregistered user who becomes registered and electronically pays the bill represented by the stored bill information. The remittance information informs the biller that the bill has been paid and that the customer is now a registered user.

The central processor 140A also generates a pay directive in step 370. In step 375, the generated pay directive is transmitted.

discussed above, payment may be accomplished in various ways. However, preferably the directive is to the financial institute I, represented by station 130A, which maintains an account for the user A. The directive is transmitted via communication 245 to the FI station 130A and the payment funds are transferred electronically in communication 270, for deposit in the user H account maintained at financial institute K, represented by FI station 130C. Of course, the payment directive may not be electronic, it may be a paper directive, such as a draft or check.

And, the payment directive, whether electronic or paper, may direct that funds from the payer's account be transferred to, electronically or otherwise, an account associated with the central clearinghouse station 140. The financial institute K may, if desired, notify user H via communication 275 to station 110H, of the receipt of the deposit, as indicated in step 377. It should be understood that the generation and storage of the remittance information and the generation and/or transmission of the pay directive may occur substantially simultaneously or at different times, as will be described further below.

Optionally, although not preferably, an email or other notice is sent via communication 250 to the user station 110H, to notify the user of the availability of the stored remittance information, as indicated in step 380. In step 385, a request for remittance information is transmitted in communication 255 from the user station 110H and received by the central station 140. Communications 260, between central processor 140A and memory 140B, result in the retrieval of the remittance information from the database 140B2 in response to the request, as indicated in step 390. The retrieved information is transmitted from the central station 140, as directed by processor 140A, to the user station 110H via communication 265, as indicated in step 395.

User A can also communicate with financial institute I, preferably via central station 140, to electronically confirm the transfer of the payment amount from its account and the

13

user H can also communicate with financial institute K, preferably via central station 140, to electronically confirm the transfer of payment amount to its account, as will be understood by those skilled in the art.

As introduced above, electronic billing information may be stored in the database 140B2 of memory 140B even for those customers who are not registered with the central station 140. Further, electronic billing information may be stored in database 140B2 for registered user has not requested electronic bill presentment. Accordingly, the central station 140 operates to direct registered users who contact the central station 140 to make payments on the basis of paper bills to the electronic billing information available on the database 140B2 of memory 140B, as will be discussed below.

FIG. 4 is similar to FIG. 2 except that communications 215 and 220 are replaced by communications 400, 405, and 410, which will be described below. The remaining communications shown in FIG. 4, such as communications 205, 210A, 210B, 222, 225, 230, 235, 240, 245, 250, 255, 260, 265, 270, 275, 280, and 285 may be similar to those described above with reference to FIG. 2. Additionally, the various entities and/or components illustrated in FIG. 4, such as the central station 140, the central station processor 140A, the central station memory 140B, the biller user station 110H, and the financial institution user stations 130A, 130C may be similar to those illustrated in FIGS. 1. As shown in FIGS. 4 and 5, a payment instruction, to pay a paper bill received in the mail by a registered user C, is transmitted by communication 400 from the user station associated with user C, such as user station 110C illustrated in FIG. 1, to the central station 140, and received by the central station processor 140A, as indicated by step 500. In communication 405, the central station 140, directed by the central processor 140A, notifies the applicable user station 110C, of the availability of electronic billing information which is stored in the database 140B2 of memory 140B in association with the user C identifier, as reflected in step 505. The central station processor 140A generates an inquiry to the user C, inquiring if the user C wishes to receive the billing information. The inquiry is also transmitted from central station 140 to user station 110C in communication 410. The user C responds to the query in communication 410 from the payer 110C to central station 140, as indicated in step 510. If the user C responds in the affirmative, i.e. indicating a desire to access to the billing information stored in the database 140B2, operations continue as previously described beginning with step 345 of FIG. 3. If the user C responds in the negative, operations continue as previously described beginning with step 360 of FIG. 3.

A registered user may pay any person or entity via the network 100 illustrated in FIG. 1. Thus, a user may direct that payment be made to a registered user, whether or not that user is also an electronic biller. Also, a user may also direct payment to an unregistered user who has no established relationship with network 100. FIG. 6 depicts the communications necessary to perform electronic bill payment of a paper bill received by a registered user via mail delivery from an unregistered user. Certain components illustrated in FIG. 6, such as the central station 140, the central station processor 140A, the central station memory 140B, the payer user station 110B, and the payee user station 110F, may be similar to those components illustrated and described above with reference to FIG. 1. Communications illustrated in FIG. 6 will be described in conjunction with FIG. 7. In communication 600, a payment instruction, to pay the paper bill received by mail by registered user B, is transmitted from user station 110B to central station 140. The instruction is received by the central

14

station processor 140A, as indicated in step 700. The central station processor 140A, in step 705, makes a determination as to whether or not payee F is registered. If payee F is determined to be a registered user, processing continues with step 360 of FIG. 3.

If payee F is determined to be unregistered, central station processor 140A, in step 706, makes a determination as to whether or not payee F is included in database 140B2. If payee F is not included, in step 707, the central station processor generates and stores a user identifier for payee F in database 140B2. Operations continue with step 710. If payee F is included in database 140B2, operations proceed directly to step 710.

The central processor 140A generates remittance information in step 710. The generated remittance information is preferably identical to that generated in step 360 of FIG. 3, but could be in a somewhat modified form particularly suitable for paper remittance if so desired. Optionally, the generated remittance information may be stored in database 140B2 at step 715 and via communication 601. In step 718 the central station processor 140A generates check/draft information. The generated remittance and check/draft information is transmitted in communication 605 to a printer 650 which, in step 720, prints a paper check/draft and associated remittance information which form a payment document and associated remittance document 655. The payment document 655 is delivered to payee F.

Preferably, the central processor 140A also drives the printer 650 to print additional information notifying payee F of the availability of electronic bill presentation and payment services through the central station 140. As payee F receives more and more payments via the central station 140, payee F will become more and more motivated to present its bills and hence to become a registered user of the network 100, and receive its payments electronically over the network 100, as depicted at step 715. If, as stored in database 140B2, the remittance information has been also include notifying the payee F of the availability of the stored remittance information and inviting payee F to view inghouse station 140 via the network 100.

FIG. 8 shows a somewhat simplified depiction of a relational database 800 suitable for use as database 140B2 illustrated and discussed above with reference to FIG. 1. FIG. 8 will be helpful in understanding the robustness of the central station 140 of FIG. 1.

As indicated above, preferably each user for whom billing or remittance information is generated, whether or not a registered user, is identified with a user identifier. That is, all of the user identifiers are associated with users that have either registered, been paid through the central station 140 at the request of a registered user or have billing information which is stored at the central database 140B2 at the request of a registered user.

As shown in FIG. 8, the user identifiers are stored in column 805 of the relational database 800. The registration status of each identified user is stored in column 810, in association with the applicable identifier. As shown, the users A–C, E, and H–L are registered users, while users D, F and G are unregistered users. It should be noted that each of the financial institutes I–L are shown to be registered and hence have the ability to electronically present and pay bills, in addition to their previously described functions. The applicable financial institutes identifiers are also stored in column 815 for each of the registered users. Along with the financial institute identifiers are stored applicable payment account numbers (PA) and/or debit account numbers (DA) in column 815. The credit account and the debit account may be the

US 7,792,749 B2

15

same account. In column 820 billing information can be temporarily stored for each user. As shown, billing information is currently stored for certain registered users as well as certain unregistered users. In column 825 remittance information can be temporarily stored for each user.

As shown, remittance information is currently stored for certain registered users as well as certain unregistered users.

In an especially preferred feature of the invention and as shown in FIG. 1, individual user-class databases, in addition to database 140B2, are maintained by central processor 140A and stored in memory 140B. Additionally, as shown in FIG. 1, one or more other databases, such as databases 140B3-B7, may be stored in memory 140B. Database 140B3 is a list of registered users/billers, registered users who have electronically presented a bill. Database 140B4 is a list of registered users/customers, registered users who have had a bill electronically posted to central station 140 by a registered user/biller for payment. Database 140B5 is a database of unregistered users/customers, unregistered users who have had a bill electronically posted to central station 140 by a registered user/biller for payment. As should be understood, a registered user can appear in one or both of databases 140B3-140B4. Central processor 140A generates the information stored in these databases each time billing information is transmitted to central station 140A by a registered user.

FIG. 9 shows a simplified exemplary depiction of a registered users/billers database, such as database 140B3 illustrated in FIG. 1. This database can include, in addition to information identifying the included registered users/billers 905, billing information 910 about the bills each user has electronically presented through a central station, such as the central station 140 illustrated in FIG. 1. FIG. 10 depicts the processing steps necessary to maintain this database. Following step 325 of FIG. 3, in step 1010, a central processor, such as central processor 140A shown in FIG. 1, accesses database 140B3 to determine if the registered user/biller is included in database 140B3. If the registered user/biller electronically presenting the bill has previously electronically presented a bill, the user will already be included in the database. If yes, billing information for the current bill can be stored in database 140B3 and associated with the registered user/biller identifier in steps 1015. Operations then continue with step 328 of FIG. 3. If the registered user/biller is not included in database 140B3, information identifying the user is added to the database in step 1020. Operations then continue with step 1015.

This database serves to dynamically maintain a list of users who are electronic billers. As a user becomes an electronic biller, whether a new user or an existing user adopting electronic billing, that user is added to this database. Thus, database 140B3 always contains an accurate and current list of users who are electronic billers. The operator of the central clearinghouse station, such as station 140 shown in FIG. 1, at all times knows which of the users are electronic billers. Thus, this database may be used in notifying a registered user that a payee to whom the user is directing payment is an electronic biller, as discussed above. Also, this database may be used in determining if the payee to whom the user is directing payment has electronically presented a bill for this user.

FIG. 11 shows a simplified exemplary depiction of a database of registered users who have had a bill electronically posted to a central clearinghouse station, such as database 140B4 associated with the central station 140 shown in FIG. 1. This database can include, in addition to information identifying the included registered users/customers 1105, billing information about each of the bills posted to central station 140 for the user, 1110. FIG. 12 depicts the processing steps

16

necessary to maintain this database. Following an affirmative decision in step 321, in step 1210, a central processor associated with the central station 140, such as central processor 140A shown in FIG. 1, accesses database 140B4 to determine if the registered user/customer to whom the electronic bill is directed is included in database 140B4. If the registered user/customer has previously had an electronic bill posted for payment by a registered user, the user/customer will already be included in the database. If yes, billing information for the current electronic bill is stored in database 140B4 and associated with the registered user/customer identifier in step 1215. Operations then continue with step 325 of FIG. 3. If the registered user/customer is not included in database 140B4, information identifying the user is added to the database in step 1220. Operations then continue with step 1215.

This database serves to dynamically maintain a list of all customers for whom billing information is stored at central station 140. This database may be used in notifying a user that electronic billing information is stored at central station 140, as discussed above.

As should be understood, the operations depicted in FIGS. 10 and 12 may take place simultaneously, or the operations depicted in FIG. 10 may take place before those depicted in FIG. 12, or vice-versa.

FIG. 13 shows a simplified exemplary depiction of a database of unregistered users/customers who have had a bill electronically posted to a central station by a registered user/biller, such as database 140B5 associated with the central station 140 shown in FIG. 1. This database can include, in addition to information identifying the included unregistered users/customers 1305, billing information about each of the bills posted to central station 140 for the unregistered users 1310 by a registered user. FIG. 14 depicts the processing steps necessary to maintain this database. Following a negative determination in step 321 of FIG. 3, in step 1410 central processor 140A accesses database 140B5 to determine if the unregistered user/customer to whom the electronic bill is directed is included in database 140B5. If the unregistered user/customer has previously had an electronic bill posted for payment by a registered user, the user/customer will already be included in the database. If yes, billing information for the current electronic bill is stored in database 140B5 and associated with the unregistered user/customer identifier in step 1415. Operations then continue with step 322 of FIG. 3. If the unregistered user/customer is not included in database 140B5, information identifying the user is added to the database in step 1420. Operations then continue with step 1415.

A beneficial feature of the invention is that a registered user can store at a central clearinghouse station, such as the central clearinghouse station 140 illustrated in FIG. 1, a list of payees the user may plan to pay electronically. Each user's individual list is stored in the form of yet another database in a memory associated with the central clearinghouse station 140, such as memory 140B shown in FIG. 1, or some other storage device (not shown) connected to a processor associated with the central clearinghouse station 140, such as the central processor 140A shown in FIG. 1. FIG. 15 is a simplified exemplary depiction of a database containing a list of payees for user B, and may be similar to database 140B6 illustrated in FIG. 1. This database is known as a payee pick-list. A payee pick-list may include payee identifiers 1501, street addresses 1502, cities 1503, states 1504, zip codes 1505, phone numbers 1506, and the users' consumer account numbers 1507 with the payee, among other information. The payee pick-list can include payees who are both registered users and unregistered users.

US 7,792,749 B2

17

FIGS. 16 and 17 depict the communications and steps necessary to maintain a payee pick-list for registered user B. Certain components illustrated in FIG. 16, such as the user station 110B, the central station processor 140A, and the central station memory 140B, may be similar to those components illustrated and discussed above with reference to FIG. 1. With reference to FIG. 16, communication 1601 depicts a communication over which user B transmits information identifying a payee for inclusion in a payee pick-list for user B. In FIG. 17, at step 1701, the transmitted information is received at the central station 140. Central processor 140A accesses database 140B2 and determines if a user identifier identifying the payee is stored in a relational database, such as 140B2 of memory 140B via communication 1610 at step 1707. If the payee is in memory 140B, at step 1710, the payee's user identifier is stored in registered user B's payee pick-list via communication 1620A. If a user identifier is not stored in memory 140B, at step 1715 a user identifier is generated for the payee. Then, at step 1710, the user identifier is stored in a payee pick-list database, such as database 140B6 illustrated in FIG. 1, via communication 1620B. The payee pick-list may be established at registration, or any time after registration. Also, at any time, a registered user may add to, delete from or update information in its payee pick-list.

A registered user may establish a communications session with central station 140 at any time. FIG. 18 depicts exemplary operations during such a communications session. Central station transmits, at step 1801, user B's payee pick-list to user B via communication 1602. User B may then select, at step 1810, a payee from its payee pick-list to which payment is to be directed. This selection, and associated payment instructions, are transmitted to central station 140 via communication 1603 and received at step 1820. Thereafter, operations continue with step 705 of FIG. 7.

It should be understood that multiple payees may be selected from the payee pick-list. Also, it should be understood that user B may at all times pay a payee not included in his or her payee pick-list.

FIG. 19 shows a simplified exemplary depiction of a payee pick-list screen 1900 transmitted to user B and displayed on a computer display. In a particularly preferred aspect of the invention, the payee pick-list transmitted to a registered user will include other information beyond that identifying the included payees 1915A-D. The payee pick-list can include one or more hyper-links 1920A-D selectable to cause a central processor, such as processor 140A shown as a component of the central clearinghouse station 140 in FIG. 1, to transmit to user B a pay directive screen to be displayed on computer display 1900 which includes all necessary information to make a payment, as shown in exemplary payment screen 2000 of FIG. 20. This screen includes the payee name 2001, billing address information 2010, and a payment amount to be completed by the user 2015.

Preferably, the payee pick-list transmitted to user B includes an indication that an electronic bill from a payee, or payees, is stored in a database, such as database 140B2 shown in FIG. 1, for user B, as discussed above and depicted here at 1905A and 1905B. Payer B, also as discussed above, may select to view the stored electronic bill or bills. The indication that an electronic bill is stored at the central clearinghouse station 140 can be a hyper-link selectable by user B to cause central processor 140A to transmit the stored billing information to user station 10B.

The payee pick-list transmitted to user B also can include an indication that a payee included in user B's payee pick-list offers electronic bill presentment, whether or not billing information from that particular payee for user B is currently

18

stored in memory 140B, 1910A and 1910B. The indication that an included payee offers electronic bill presentment may be a hyper-link selectable by user B to cause central processor 140A to inform the selected payee that user B has selected electronic bill presentment for future bills. Central clearinghouse station 140 may inform the payee of the selection by a network communication or by traditional mail or telephonic communication. Or, selection of the hyper-link may cause central processor 140A to transmit to user B a screen 2100 for display which includes electronic billing options, as shown in simplified exemplary FIG. 21. As shown, the options can include receiving both an electronic bill and a paper copy of the bill 2104, or receiving electronic bills only 2105. Also, a user can select to receive electronic bills and paper bills for a period of time, and thereafter receive only electronic bills, perhaps for one billing cycle or for three months 2108A and 2108B. It should be understood that the period can be any period. The user can also sign-up for a trial subscription of electronic billing 2110. That is, a user will receive a limited number of electronic bills along with paper bills, then billing will revert back to exclusively paper billing. Yet another option is to receive an e-mail notification of any future stored billing information being available at central clearinghouse station 140, 2115. It should be understood by one skilled in the art that other options are possible, though not depicted in FIG. 21.

FIGS. 22 and 23 present operations of a central processor, such as processor 140A shown in FIG. 1, in compiling the information to be presented to a user along with the payees included in the user's payee pick-list. After user B has established a communication with a central clearinghouse station, such as central clearinghouse station 140 illustrated in FIG. 1, at step 2201, central processor 140A accesses user B's payee pick-list database, which may be similar to database 140B6 shown in FIG. 1, and the registered user/biller database, which may be similar to database 140B3 shown in FIG. 1. At step 2210, central processor 140A determines the common entries between the two databases. For any common entry, central processor 140A stores an indication in the user B payee pick-list database associated with the user identifier for the common entry that the payee is an electronic biller, as depicted at step 2220.

At step 2301, central processor 140A accesses user B's stored payee pick-list database 140B6 and a database of unregistered customers who have had a bill posted to the central clearinghouse station 140, such as database 140B5 illustrated in FIG. 1. As shown in step 2310, central processor 140A determines if any of the user B payee pick-list payees also have stored billing information for user B at the central clearinghouse station 140. For any payees having stored billing information for user B at the central station, central processor 140A stores an indication in the user B payee pick-list database associated with the user identifier for the payee having stored the bill at the central clearinghouse station 140 at step 2315.

It should be understood that database 140B2 may be accessed in place of either of or both of a database of registered users/billers who have electronically presented a bill and a database of registered users/customers who have had a bill electronically posted to the central station 140, such databases 140B3 and 140B4 illustrated in FIG. 1, as depicted in steps 2201 and 2301. However, processing is most efficient when accessing databases 140B3 and/or 140B4, as database 140B2 contains a greater volume of information than either of these databases.

It should also be understood that the steps in FIGS. 22 and 23 may take place simultaneously, or the steps of FIG. 22 may

US 7,792,749 B2

19

follow the steps of FIG. 23, or vice versa. In any event, the steps discussed and shown further reveal the robustness of central processing station 140. The central processor 140A functions to dynamically indicate availability of electronic bill presentment and availability of stored billing information. Prior to each transmission of a user's payee pick-list, the central processor 140A determines which of the payees are electronic billers and which of those have submitted billing information to the central processor 140A. Since, as described above, each electronic biller is included in the user/biller database, and since that database is updated every time an electronic bill is submitted, each time central processor 140A determines the common entries between the user/biller database and a user payee pick-list database, the results of that determination are accurate and up-to-date.

FIG. 24 depicts an alternative implementation of the present invention. Due to the billing information stored associated with the user identifier for each registered user/biller in a database of registered users/billers who have electronically presented a bill, such as database 140B3 shown in FIG. 1, the steps of FIGS. 22 and 23 can be combined. At step 2401, a central processor, such as central processor 140A shown in FIG. 1, accesses both the payee pick-list database for user B, which may be similar to database 140B6 illustrated in FIG. 1, and the registered user/biller database 140B3. The central processor 140A determines any common user identifiers between the two databases at step 2410. With the billing information being stored in database 140B3, central processor 140A next determines if any of the billing information stored in association with a common entry is for a bill directed to user B, as depicted at step 2420. An indication that a payee is an electronic biller and an indication for any stored billing formation is added to user is payee pick-list associated with the user identifier of the electronically presenting user at step 2425 for any common entries and any of the common entries with stored billing information directed to user B.

In yet another implementation, the processing necessary to include further information beyond payee identifiers presented with a user's payee pick-list can occur in a different manner from that described above. FIGS. 25 and 26 depict alternative communications and operations in storing a payee in user Ws payee pick-list database. As discussed above, prior to any transmission 1602 of user B's pick-list to user B 110B (such as a transmission 1602 in response to a request 1601 received from user B), a determination is made by a central processor, such as processor 140A shown in FIG. 1, as to the electronic billing status of each included payee. This electronic billing status includes determining if the payee is an electronic biller and if the payee has billing information for the user stored in memory, such as memory 140B shown in FIG. 1. Alternatively, this determination can be made whenever user B adds a payee to its payee pick-list, whenever a new electronic biller is added to a registered user/biller database, such as database 140B3 illustrated in FIG. 1, and whenever a new payee is added to the registered user/customer database, such as database 140B4 illustrated in FIG. 1. As desired user B 110B may then communicate a selection 1603 of a payee from the payee pick-list for receipt by the central processor 140A.

Following steps 1701 of FIG. 17, the processing to add a payee to the payee pick-list is somewhat different than described above. As shown in FIG. 26, if central processor 140A determines that the payee is not included in memory 140B at step 2606, processing continues as described above with steps 1715 and 1710 shown in FIG. 17. However, if central processor 140A determines that the payee is included in memory 140B, operations continue with step 2607. Central

20

processor 140A stores the payee's user identifier in user B's payee pick-list. At step 2610, central processor 140A accesses database 140B3 via communication 2505 of FIG. 25 to determine if the payee is a registered user/biller. If not, operations end. If the payee is a registered user/biller, an indication is added to a database containing a list of payees for user B, such as database 140B6 illustrated in FIG. 1, via communication 2510 that the payee is a registered user/biller at step 2615.

Operations continue with step 2620. Via communication 2515, central processor 140A accesses database 140B4 to determine if the payee has stored billing information for user B in this database. If not, operations end. If so, an indication is added to database 140B6 via communication 2520 and at step 2625 that billing information is stored for user B. As a result of the processing depicted in steps 2610, 2615, 2620, and 2625, whenever a user adds a payee to its payee pick-list, an accurate and current indication of electronic billing status is included in the payee pick-list for that payee.

It should be understood that the processing depicted in steps 2610, 2615, 2620, and 2625 is similar to that depicted in steps 2201, 2210, and 220 of FIG. 22 and steps 2301, 2310, and 2325 of FIG. 23. Thus, the alternative use of database 140B2 discussed above in relation to these steps also applies to the processing depicted in steps 2610, 2615, 2620, and 2625.

When the indication of electronic billing status is created at initial storage of a payee identifier in an individual payee pick-list instead of prior to each transmission of the list to the user, each individual payee pick-list is kept up current the following processing. This processing is necessary, as a user may payee may become an electronic biller subsequent to that user/payee being added to an individual payee pick-list. Also, an electronic biller may post billing information to the central station 140 for an individual user subsequent to that user adding that user/payee to its individual payee pick-list.

Central processor 140A serves to maintain yet another database, known as a master payee pick-list. This database is also stored in memory 140B as database 140B7, as shown in FIG. 1. The master payee pick-list is a list of every payee which appears on at least one individual payee pick-list. FIG. 27 is a simplified exemplary depiction of the database. In addition to user identifiers for each payee appearing in an individual payee pick-list 2701, the database also contains an indication of each user on whose individual payee pick-list the payee appears 2710, and the payee street address 2711, city 2712, state 2713, zip code 2714, and phone number 2715. The master payee pick-list is kept current by the following processing depicted in FIGS. 28 and 29.

Whenever a registered user adds a payee to its individual payee pick-list, following step 1701 of FIG. 17, at step 2801 of FIG. 28 and via communication 2525, central processor 140A determines if the payee is included in the master payee pick-list.

If not, the user identifier for the payee, along with the other information described above, is stored in the master payee pick-list at step 2805 and via communication 2530. Operations continue with step 2810. If the payee is included in the master payee pick-list, at step 2810, the user identifier identifying the individual user adding the payee to its individual payee pick-list is stored in the master payee pick-list associated with the payee identifier, via communication 2535.

Whenever central processor 140A adds a new registered user/biller to a database of registered billers, such as database 140B3 illustrated in FIG. 1, central processor 140A also determines if the added registered user/biller is included in a master payee pick-list database, such as database 140B7 illus-

21

trated in FIG. 1, as depicted in FIG. 29, step 2901 and via communication 2540. Step 2901 follows step 1015 of FIG. 10. If the new registered user/biller is not included in the master payee pick-list database 140B7, operations continue with step 328 of FIG. 3. If the new registered user/biller appears in the master payee pick-list, operations continue with step 2910. The central processor 140A adds an indication to each individual payee pick-list database in which the new registered user/biller appears as a payee that the new registered user/biller is an electronic bill presenter via communication 2545. Due to the processing depicted in steps 2901 and 2910, each individual payee pick-list is kept current as to which of the included payees are electronic bill presenters.

Whenever central processor 140A adds a new registered user/customer to database 140B4, central processor 140A also determines if the new registered user/customer maintains a payee pick-list at central clearinghouse station 140. As depicted in FIG. 30 following step 1215 of FIG. 12, at step 3001 and via communication 2550, central processor 140A determines if the new registered user/customer maintains a payee pick-list. If the new registered user/customer does not have a payee pick-list, operations continue with step 325 of FIG. 3. On the other hand, if the new registered user/customer does have a payee pick-list, central processor 140A determines if the biller presenting the electronic bill is included in the individual payee pick-list at step 3005 and via communication 2555. If not, operations continue with step 325 of FIG. 3. If the biller is included in the individual payee pick-list, an indication is added to the individual payee pick-list that there is stored electronic billing information available, as depicted in step 3010 and communication 2560. Operations continue with step 325 of FIG. 3. Because central processor 140A determines, for each new entry into the registered user/customer database, if a customer maintains a payee pick-list and if pick-list contains information identifying the payee electronically presenting the bill, central processor 140A is able to keep the electronic billing status information in each individual payee pick-list current.

Central processor 140A can determine if each new entry into the registered user/customer database 140B4 maintains a payee pick-list and if the biller is included in the individual payee pick-list by accessing the master payee-pick list, as depicted in FIG. 31. The following processing replaces the processing depicted at steps 3001 and 3005 of FIG. 30. Central processor 140A accesses the master payee pick-list, as depicted in step 3101. The central processor 140A next determines if the new user/customer is included in the master payee pick-list, at step 3105. If not, operations continue with step 325 of FIG. 3. If the new user/customer is included in the master payee pick-list, central processor 140A determines if the customer is associated with the biller in the master payee-pick list, step 3110. If not, operations continue with step 325 of FIG. 3. If yes, operations continue with step 3010 of FIG. 30.

Because central processor 140A maintains user-class databases for not only registered users, but also for unregistered users, central processor 140A can notify a newly registered user of any existing stored billing information for the newly registered user.

FIG. 32 depicts the steps necessary to inform a newly registered user of the existence of stored billing information. At step 3201, a central processor, such as central processor 140A shown in FIG. 1, receives registration information. This information, along with a user identifier, is stored in a relational database, such as database 140B2 illustrated in FIG. 1, as depicted in step 3202. Central station 140A accesses the

22

unregistered user/customer database, which may be similar to database 140B5 shown in FIG. 1, as depicted in step 3205, and determines if the newly registered user is included in the database. If the new registered user is included in the database, the newly registered user is optionally notified of the stored billing information at step 3210. After optional notification, and at step 3215, the stored billing information is removed from the unregistered user/customer database 140B5 and stored in the registered user/customer database, which may be similar to database 140B4 shown in FIG. 1, keeping both the unregistered and registered user/customer databases current.

It will also be recognized by those skilled in the art that, while the invention has been described above in terms of one or more preferred embodiments, it is not limited thereto. Various features and aspects of the above described invention may be used individually or jointly. Further, although the invention has been described in the context of its implementation in a particular environment and for particular purposes, e.g. electronic bill presentment and/or payment, those skilled in the art will recognize that its usefulness is not limited thereto and that the present invention can be beneficially utilized in any number of environments and implementations. Accordingly, the claims set forth below should be construed in view of the full breath and spirit of the invention as disclosed herein.

I claim:

1. A method, comprising:

executing computer-implemented instructions performed by one or more processors for:

receiving, by a bill presentment and payment central clearinghouse, a request that is not associated with electronic bill presentment, the request comprising information identifying a payee of a payor, and the request comprising one of (i) a payment request or (ii) a request to add the payee to a pick list associated with the payor, wherein the payor has not previously activated electronic bill presentment from the payee through the clearinghouse;

accessing, from at least one database by the clearinghouse utilizing at least a portion of the received information identifying the payee, stored billing information;

identifying, by the clearinghouse from the accessed billing information, a bill presentment information associated with the payee;

generating, by the clearinghouse, a notification of the identified bill presentment information associated with the payee; and

transmitting, by the clearinghouse to the payor, the generated notification.

2. The method of claim 1, wherein identifying a bill presentment information associated with the payee comprises:

matching the at least a portion of the received information identifying the payee to at least a portion of the billing information; and

determining, subsequent to the matching, that the bill presentment information is available in the billing information.

3. The method of claim 1, wherein identifying a bill presentment information associated with the payee comprises identifying an indication that the payee is an electronic biller capable of providing electronic bill presentment to the payor through the clearinghouse.

4. The method of claim 3, further comprising executing computer-implemented instructions performed by the one or more processors for:

23

receiving, by the clearinghouse from the payor, a request to activate electronic bill presentment of bills for the payor from the payee through the clearinghouse; and

initiating activation of electronic bill presentment in response to the received request.

5. The method of claim 4, wherein initiating activation of electronic bill presentment comprises:

transmitting, by the clearinghouse to the payee, a notification of the request to activate electronic bill presentment.

6. The method of claim 1, wherein identifying a bill presentment information associated with the payee comprises identifying an indication that an electronic bill from the payee for the payor is available through the clearinghouse.

7. The method of claim 6, further comprising executing computer-implemented instructions performed by the one or more processors for:

receiving, by the clearinghouse from the payor, a request to receive the electronic bill; and

transmitting, by the clearinghouse to the payor, information associated with the electronic bill.

8. The method of claim 7, further comprising executing computer-implemented instructions performed by the one or more processors for:

transmitting, by the clearinghouse to the payee, a notification of the request to receive the electronic bill.

9. The method of claim 7, further comprising executing computer-implemented instructions performed by the one or more processors for:

receiving, by the clearinghouse from the payor, a request to pay the electronic bill; and

remitting, by the clearinghouse to the payee, a payment for the electronic bill.

10. The method of claim 1, wherein the information identifying the payee comprises first information identifying the payee, and further comprising executing computer-implemented instructions performed by the one or more processors for:

identifying, by the clearinghouse, second information identifying the payee; and

transmitting, by the clearinghouse to the payor, the second information identifying the payee,

wherein the notification is transmitted to the payer with the second information identifying the payee.

11. The method of claim 1, further comprising executing computer-implemented instructions performed by the one or more processors for:

storing, by the clearinghouse in the at least one database, the information identifying the payee,

wherein identifying a bill presentment information comprises identifying a bill presentment information (i) subsequent to storing the information identifying the payee, or (ii) prior to storing the information identifying the payee.

12. The method of claim 1, wherein the accessed billing information comprises first bill information, and further comprising executing computer-implemented instructions performed by the one or more processors for:

receiving, by the clearinghouse from the payee, second bill information associated with bills of the payee;

identifying, by the clearinghouse from at least a portion of the second bill information, an electronic bill of the payee that is available for the payor through the clearinghouse; and

transmitting, by the clearinghouse to the payor, a notification of the available electronic bill of the payee.

24

13. The method of claim 12, wherein the second bill information is received subsequent to the receipt of the information identifying the payee.

14. The method of claim 1, wherein the identified bill presentment information comprises first bill presentment information, wherein the generated notification comprises a first notification, and further comprising executing computer-implemented instructions performed by the one or more processors for:

determining, by the clearinghouse, information identifying the payor;

accessing, from the at least one database by the clearinghouse utilizing at least a portion of the determined information identifying the payor, stored electronic billing information for the payor;

identifying, by the clearinghouse from the accessed electronic billing information for the payor, an electronic bill for the payor that is available to the payor through the clearinghouse;

generating, by the clearinghouse based at least in part on the identification of the electronic bill for the payor, a second notification of a second bill presentment information; and

transmitting, by the clearinghouse to the payor, the second notification.

15. The method of claim 14, wherein the payee comprises a first payee, and

wherein the identified electronic bill for the payor comprises an electronic bill that is a bill of a second payee different than the first payee.

16. The method of claim 15, wherein the generated second notification comprises an indication that the second payee is an electronic biller capable of providing electronic bill presentment to the payor through the clearinghouse.

17. The method of claim 15, wherein the generated second notification comprises an indication that the electronic bill from the second payee for the payor is available through the clearinghouse.

18. The method of claim 1, further comprising executing computer-implemented instructions performed by the one or more processors for:

storing an indication of the identified payee in the pick list associated with the payor.

19. The method of claim 18, wherein the pick list comprises multiple payees identified by the payor, and further comprising executing computer-implemented instructions performed by the one or more processors for:

transmitting, by the clearinghouse to the payor, a presentation of the pick list, wherein the presentation includes the generated notification of the bill presentment information.

20. A system, comprising:

a communications interface associated with a bill presentment and payment central clearinghouse and operable to (i) receive a request that is not associated with electronic bill presentment, the request comprising information identifying a payee of a payor, and the request comprising one of (a) a payment request or (b) a request to add the payee to a pick list associated with the payor, wherein the payor has not previously activated electronic bill presentment from the payee through the clearinghouse, and (ii) transmit a notification to the payor; and

at least one processor associated with the clearinghouse and operable to (i) receive the information identifying the payee from the communications interface, (ii) access, from at least one database utilizing at least a

25

portion of the information identifying the payee, stored billing information, (iii) identify, from the accessed billing information, a bill presentment information associated with the payee, (iv) generate the notification to the payee, the notification including the identified bill presentment information, and (v) direct the communications interface to transmit the notification to the payor.

**21.** The system of claim **20**, wherein the processor is operable to identify the bill presentment information associated with the payee by:

matching the at least a portion of the received information identifying the payee to at least a portion of the billing information; and

determining, subsequent to the matching, that the bill presentment information is available in the billing information.

**22.** The system of claim **20**, wherein the bill presentment information associated with the payee comprises an indication that the payee is an electronic biller capable of providing electronic bill presentment to the payor through the clearinghouse.

**23.** The system of claim **22**, wherein:

the communications interface is further operable to receive, from the payor, a request to activate electronic bill presentment of bills for the payor from the payee through the clearinghouse; and

the at least one processor is further operable to initiate the activation of electronic bill presentment in response to the received request.

**24.** The system of claim **23**, wherein the processor is further operable to direct the transmission, to the payee, of a notification of the request to activate electronic bill presentment.

**25.** The system of claim **20**, wherein the bill presentment information associated with the payee comprises an indication that an electronic bill from the payee for the payor is available through the clearinghouse.

**26.** The system of claim **25**, wherein:

the communications interface is further operable to receive, from the payor, a request to receive the electronic bill; and

the at least one processor is further operable to direct the transmission of information associated with the electronic bill to the payor.

**27.** The system of claim **26**, wherein the at least one processor is further operable to direct the transmission of a notification of the request to receive the electronic bill to the payee.

**28.** The system of claim **26**, wherein:

the communications interface is further operable to receive, from the payor, a request to pay the electronic bill; and

the at least one processor is further operable to direct the remittance, to the payee, of a payment for the electronic bill.

**29.** The system of claim **20**, wherein:

the information identifying the payee is first information identifying the payee,

the at least one processor is further operable to identify second information identifying the payee, and

the communications interface is further operable to transmit, to the payor, the second information identifying the payee with the notification.

**30.** The system of claim **20**, wherein the at least one processor is further operable to store, in at least one database, the information identifying the payee, and

26

wherein the identification of the bill presentment information by the at least one processor occurs one of (i) subsequent to storing the information identifying the payee, or (ii) prior to the storing the information identifying the payee.

**31.** The system of claim **20**, wherein:

the billing information includes first bill information,

the communications interface is further operable to receive, from the payee, second bill information associated with bills of the payee, and

the at least one processor is further operable to (i) identify, from the second bill information, an electronic bill of the payee that is available for the payor through the clearinghouse and (ii) direct the transmission, to the payor, of a notification of the available electronic bill of the payee.

**32.** The system of claim **31**, wherein the second bill information associated with bills of the payee is received by the communications interface subsequent to the receipt of the information identifying the payee.

**33.** The system of claim **20**, wherein:

the bill presentment information is a first bill presentment information,

wherein the notification is a first notification,

wherein the at least one processor is further operable to (i) determine information identifying the payor, (ii) access, from the at least one database utilizing at least a portion of the determined information identifying the payor, stored electronic billing information for the payor, (iii) identify, from the accessed electronic billing information for the payor, an electronic bill for the payor that is available to the payor through the clearinghouse, (iv) generate, based at least in part on the identification of the electronic bill for the payor, a second notification of a second bill presentment information, and (v) direct the transmission, to the payor, of the second notification.

**34.** The system of claim **33**, wherein the payee is a first payee, and

wherein the electronic bill for the payor is a bill of a second payee different than the first payee.

**35.** The system of claim **34**, wherein the second bill presentment information comprises an indication that the second payee is an electronic biller capable of providing electronic bill presentment to the payor through the clearinghouse.

**36.** The system of claim **34**, wherein the second bill presentment information comprises an indication that the electronic bill from the second payee for the payor is available through the clearinghouse.

**37.** The system of claim **20**, wherein the at least one processor is further operable to direct the storage of an indication of the identified payee in the pick list associated with the payor.

**38.** The system of claim **37**, wherein:

the pick list comprises multiple payees identified by the payor,

the at least one processor is further operable to direct the communications interface to transmit a presentation of the pick list to the payor, and

the communications interface is further operable to transmit the presentation to the payor, wherein the presentation includes the generated notification.

**39.** The system of claim **38**, wherein the presentation includes the bill presentment information.

**40.** A computer program product, comprising a computer usable medium having a computer readable program code embodied therein, the computer readable program code configured to be executed to facilitate:

US 7,792,749 B2

27

receiving, by a bill presentment and payment central clear-
inghouse, a request that is not associated with electronic
bill presentment, the request comprising information
identifying a payee of a payor, and the request compris-
ing one of (i) a payment request or (ii) a request to add
the payee to a pick list associated with the payor,
wherein the payor has not previously activated elec-
tronic bill presentment from the payee through the clear-
inghouse;

accessing, from at least one database by the clearinghouse
utilizing at least a portion of the received information
identifying the payee, stored billing information;

identifying, by the clearinghouse from the accessed billing
information, a bill presentment information associated
with the payee;

generating, by the clearinghouse, a notification of the iden-
tified bill presentment information associated with the
payee; and

transmitting, by the clearinghouse, to the payor, the gener-
ated notification.

41. The computer program product of claim 40, wherein
the bill presentment information associated with the payee is
identified by:

matching the at least a portion of the received information
identifying the payee to at least a portion of the billing
information; and

determining, subsequent to the matching, that the bill pre-
sentment information is available in the billing informa-
tion.

42. The computer program product of claim 40, wherein
the bill presentment information associated with the payee is
identified by identifying an indication that the payee is an
electronic biller capable of providing electronic bill present-
ment to the payor through the clearinghouse.

43. The computer program product of claim 42, wherein
the computer readable program code is further configured to
be executed to facilitate:

receiving, by the clearinghouse from the payor, a request to
activate electronic bill presentment of bills for the payor
from the payee through the clearinghouse; and

initiating activation of electronic bill presentment in
response to the received request.

44. The computer program product of claim 43, wherein
the computer readable program code is further configured to
be executed to facilitate:

transmitting, by the clearinghouse to the payee, a notifica-
tion of the request to activate electronic bill presentment.

45. The computer program product of claim 40, wherein
the bill presentment information associated with the payee is
identified by identifying an indication that an electronic bill
from the payee for the payor is available through the clear-
inghouse.

46. The computer program product of claim 45, wherein
the computer readable program code is further configured to
be executed to facilitate:

receiving, by the clearinghouse from the payor, a request to
receive the electronic bill; and

transmitting, by the clearinghouse to the payor, informa-
tion associated with the electronic bill.

47. The computer program product of claim 46, wherein
the computer readable program code is further configured to
be executed to facilitate:

transmitting, by the clearinghouse to the payee, a notifica-
tion of the request to receive the electronic bill.

48. The computer program product of claim 46, wherein
the computer readable program code is further configured to
be executed to facilitate:

28

receiving, by the clearinghouse from the payor, a request to
pay the electronic bill; and

remitting, by the clearinghouse to the payee, a payment for
the electronic bill.

49. The computer program product of claim 40, wherein
the information identifying the payee comprises first infor-
mation identifying the payee, and wherein the computer read-
able program code is further configured to be executed to
facilitate:

identifying, by the clearinghouse, second information
identifying the payee; and

transmitting, by the clearinghouse to the payor, the second
information identifying the payee,

wherein the notification is transmitted to the payor with the
second information identifying the payee.

50. The computer program product of claim 40, wherein
the computer readable program code is further configured to
be executed to facilitate:

storing, by the clearinghouse in the at least one database,
the information identifying the payee,

wherein the bill presentment information is identified (i)
subsequent to storing the information identifying the
payee, or (ii) prior to storing the information identifying
the payee.

51. The computer program product of claim 40, wherein
the accessed billing information comprises first bill informa-
tion, and wherein the computer readable program code is
further configured to be executed to facilitate:

receiving, by the clearinghouse from the payee, second bill
information associated with bills of the payee;

identifying, by the clearinghouse from at least a portion of
the second bill information, an electronic bill of the
payee that is available for the payor through the clear-
inghouse; and

transmitting, by the clearinghouse to the payor, a notifica-
tion of the available electronic bill of the payee.

52. The computer program product of claim 51, wherein
the second bill information is received subsequent to the
receipt of the information identifying the payee.

53. The computer program product of claim 40, wherein
the identified bill presentment information comprises first bill
presentment information, wherein the generated notification
comprises a first notification, and wherein the computer read-
able program code is further configured to be executed to
facilitate:

determining, by the clearinghouse, information identifying
the payor;

accessing, from the at least one database by the clearing-
house utilizing at least a portion of the determined infor-
mation identifying the payor, stored electronic billing
information for the payor;

identifying, by the clearinghouse from the accessed elec-
tronic billing information for the payor, an electronic bill
for the payor that is available to the payor through the
clearinghouse;

generating, by the clearinghouse based at least in part on
the identification of the electronic bill for the payor, a
second notification of a second bill presentment infor-
mation; and

transmitting, by the clearinghouse to the payor, the second
notification.

54. The computer program product of claim 53, wherein
the payee comprises a first payee, and

wherein the identified electronic bill for the payor com-
prises an electronic bill that is a bill of a second payee
different than the first payee.

US 7,792,749 B2

55. The computer program product of claim 54, wherein the generated second notification comprises an indication that the second payee is an electronic biller capable of providing electronic bill presentment to the payor through the clearinghouse.

56. The computer program product of claim 54, wherein the generated second notification comprises an indication that the electronic bill from the second payee for the payor is available through the clearinghouse.

57. The computer program product of claim 40, wherein the computer readable program code is further configured to be executed to facilitate:

storing an indication of the identified payee in the pick list associated with the payor.

58. The computer program product of claim 57, wherein the pick list comprises multiple payees identified by the payor, and wherein the computer readable program code is further configured to be executed to facilitate:

transmitting, by the clearinghouse to the payor, a presentation of the pick list, wherein the presentation includes the generated notification of the bill presentment information.

59. A method, comprising:

executing computer-implemented instructions performed by one or more processors for: receiving, by a bill presentment and payment central clearinghouse, a request that is not associated with electronic bill presentment, the request comprising information identifying a payee of a payor, wherein the payor has not previously activated electronic bill presentment from the payee through the clearinghouse;

storing an indication of the identified payee in a payee pick list associated with the payor, the payee pick list comprising one or more payees identified by the payor;

accessing, from at least one database by the clearinghouse utilizing at least a portion of the received information identifying the payee, stored billing information;

identifying, by the clearinghouse from the accessed billing information, a bill presentment information associated with the payee;

generating, by the clearinghouse, a notification of the identified bill presentment information associated with the payee; and

transmitting, by the clearinghouse to the payor, a presentation of the payee pick list, the presentation comprising the generated notification.

60. A system, comprising:

a communications interface associated with a bill presentment and payment central clearinghouse and operable to

(i) receive a request that is not associated with electronic bill presentment, the request comprising information identifying a payee of a payor,

wherein the payor has not previously activated electronic bill presentment from the payee through the clearinghouse, and (ii) transmit a presentation to the payor; and

at least one processor associated with the clearinghouse and operable to (i) receive the information identifying the payee from the communications interface, (ii) store an indication of the identified payee in a payee pick list associated with the payor, the payee pick list comprising one or more payees identified by the payor, (iii) access, from at least one database utilizing at least a portion of the information identifying the payee, stored billing information, (iv) identify, from the accessed billing information, a bill presentment information associated with the payee, (v) generate the notification to the payee, the notification including the identified bill presentment information, and (vi) direct the communications interface to transmit the presentation, the presentation comprising the payee pick list and the generated notification.

*    *    *    *    *

# EXHIBIT B

US007853524B2

(12) **United States Patent**
Kight et al.

(10) Patent No.: **US 7,853,524 B2**
(45) Date of Patent: **\*Dec. 14, 2010**

(54) **SYSTEMS AND METHODS FOR RISK BASED DETERMINATION OF A FORM FOR CREDITING A PAYEE ON BEHALF OF A PAYER**

(75) Inventors: **Peter J. Kight**, Dublin, OH (US); **Mark A. Johnson**, Dublin, OH (US); **Tamara K. Christenson**, Gahanna, OH (US); **Regina Lach**, Galena, OH (US); **Philip Pointer**, Columbus, OH (US); **Kenneth Cook**, Gahanna, OH (US)

(73) Assignee: **CheckFree Corporation**, Norcross, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 2741 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/025,897**

(22) Filed: **Dec. 26, 2001**

(65) **Prior Publication Data**

US 2002/0062282 A1    May 23, 2002

**Related U.S. Application Data**

(63) Continuation of application No. 08/372,620, filed on Jan. 13, 1995, now Pat. No. 5,873,072, which is a continuation of application No. 07/736,071, filed on Jul. 25, 1991, now Pat. No. 5,383,113.

(51) Int. Cl.
G06Q 40/00    (2006.01)

(52) U.S. Cl. ............................ **705/40**; 705/39; 705/34

(58) Field of Classification Search ................. 705/30, 705/34, 40, 41, 45, 42, 35, 39; 235/375, 235/380, 379
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 3,761,682 A | 9/1973 | Barnes et al. |
| 3,833,885 A | 9/1974 | Gentile et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| JP | 401195573 A | 8/1989 |

(Continued)

OTHER PUBLICATIONS

Brown, Jim "Ways to pay. (point-of-sale networks) (includes related article on ATMs)" Aug. 29, 1988, Network World, v5n35, p. 28.*

(Continued)

*Primary Examiner*—Kelly Campen
(74) *Attorney, Agent, or Firm*—Sutherland Asbill & Brennan LLP

(57)    **ABSTRACT**

Systems and methods for selecting a form for crediting a payee by a payment service provider include receiving a request to pay a payee on behalf of a payer. A form for crediting the payee is selected based on at least one of a comparison of a payer account number associated with the payer and the payee to a merchant account scheme associated with the payee or a comparison of a payment amount associated with the received request to a merchant credit limit associated with the payee. A payment is directed to the payee in accordance with the selected form for crediting.

**21 Claims, 7 Drawing Sheets**



**US 7,853,524 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,876,864 | A | 4/1975 | Clark et al. |
| 3,949,364 | A | 4/1976 | Clark et al. |
| 4,270,042 | A | 5/1981 | Case |
| 4,321,672 | A | 3/1982 | Braun et al. |
| 4,484,328 | A | 11/1984 | Schlafly |
| 4,642,767 | A | 2/1987 | Lerner |
| 4,649,563 | A | 3/1987 | Riskin |
| 4,734,858 | A | 3/1988 | Schlafly |
| 4,745,559 | A | 5/1988 | Willis et al. |
| 4,758,714 | A | 7/1988 | Carlson et al. |
| 4,791,561 | A | 12/1988 | Huber |
| 4,799,156 | A | 1/1989 | Shavit et al. |
| 4,823,264 | A | 4/1989 | Deming |
| 4,882,675 | A | 11/1989 | Nichtberger et al. |
| 4,926,325 | A | 5/1990 | Benton et al. |
| 4,929,818 | A | 5/1990 | Bradbury et al. |
| 4,947,028 | A | 8/1990 | Gorog |
| 4,948,174 | A | 8/1990 | Thomson et al. |
| 4,960,981 | A | 10/1990 | Benton et al. |
| 4,961,139 | A | 10/1990 | Hong et al. |
| 4,974,878 | A | 12/1990 | Josephson |
| 5,007,084 | A | 4/1991 | Materna et al. |
| 5,025,373 | A | 6/1991 | Keyser, Jr. et al. |
| 5,093,787 | A | 3/1992 | Simmons |
| 5,097,115 | A | 3/1992 | Ogasawara et al. |
| 5,111,395 | A | 5/1992 | Smith et al. |
| 5,121,945 | A | 6/1992 | Thomson et al. |
| 5,177,342 | A | 1/1993 | Adams |
| 5,220,501 | A | 6/1993 | Lawlor et al. |
| 5,237,159 | A | 8/1993 | Stephens et al. |
| 5,265,008 | A | 11/1993 | Benton et al. |
| 5,283,829 | A | 2/1994 | Anderson |
| 5,303,149 | A | 4/1994 | Janigian |
| 5,326,959 | A | 7/1994 | Perazza |
| 5,336,870 | A | 8/1994 | Hughes et al. |
| 5,383,113 | A | 1/1995 | Kight et al. |
| 5,420,405 | A | 5/1995 | Chasek |
| 5,465,206 | A | 11/1995 | Hilt et al. |
| 5,496,991 | A | 3/1996 | Delfer, III et al. |
| 5,504,677 | A | 4/1996 | Pollin |
| 5,652,786 | A | 7/1997 | Rogers |
| 5,677,955 | A | 10/1997 | Doggett et al. |
| 5,699,528 | A | 12/1997 | Hogan |
| 5,710,889 | A | 1/1998 | Clark et al. |
| 5,727,249 | A | 3/1998 | Pollin |
| 5,794,221 | A | 8/1998 | Egendorf |
| 5,873,072 | A | 2/1999 | Kight et al. |
| 5,884,288 | A | 3/1999 | Chang et al. |
| 5,920,847 | A | 7/1999 | Kolling et al. |
| 5,920,848 | A | 7/1999 | Schutzer et al. |
| 5,956,700 | A | 9/1999 | Landry |
| 5,966,698 | A | 10/1999 | Pollin |
| 5,974,146 | A | 10/1999 | Randle et al. |
| 5,978,780 | A | 11/1999 | Watson |
| 6,029,150 | A | 2/2000 | Kravitz |
| 6,032,133 | A | 2/2000 | Hilt et al. |
| 6,044,362 | A | 3/2000 | Neely |
| 6,098,053 | A | 8/2000 | Slater |
| 6,188,994 | B1 | 2/2001 | Egendorf |
| 6,311,170 | B1 | 10/2001 | Embrey |
| 6,317,745 | B1 | 11/2001 | Thomas et al. |
| 7,107,244 | B2 | 9/2006 | Kight et al. |
| 2001/0037295 | A1 | 11/2001 | Olsen |
| 2002/0002537 | A1 | 1/2002 | Bastiansen |
| 2002/0116331 | A1 | 8/2002 | Cataline et al. |
| 2003/0208445 | A1 | 11/2003 | Compiano |
| 2004/0015413 | A1 | 1/2004 | Abu-Hejleh et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 91/09370 | 6/1999 |

## OTHER PUBLICATIONS

Kight, Peter ""Send check" (CheckFree electronic funds transfer service)" May 15, 1989 Soft-Letter, v7 , n1 , p. 2(2).*
Supplemental Information Disclosure Statement including declaration by Mark Johnson.
Merriam-Webster's Collegiate Dictionary, 10th edition; p. 293, word, "database" (1962); and p. 929, word, "processing" (1532).
White, et al., "4-in-1 Accounting: The Basics from Real-World," PC Magazine, vol. 4, No. 20, p. 167-168, extracted on Internet from Dialog file 47, Accession #02746427 on Dec. 19, 2003.
Streeter, Bill, "The Future is Here and It's on TV," ABA Banking Journal, Nov. 1980, extracted from Internet from Corporate business source database on Jan. 28, 2003.
Blattberg, Robert C., Deighton, John, "Interactive Marketing: Exploiting the Age of Addressability," Sloan Management Review, vol. 13, No. 1, Fall 1991, p. 5-14.
Press Release, Federal Reserve System Regulation CC CFR Part 2 29 Availability of Funds and Collection of Checks; American Banker (pre-1997 Fulltext); New York; N.Y. Oct. 27, 1988; vol. 153, Issue. 211; extracted on Internet on Feb. 2, 2005.
Paschal, Jan; "New Edition of Rand McNally Bankers Directory Available"; Journal Record; Oklahoma City; Fe. 11, 1987, extracted on the Internet from http://proquest.umi.com on Jan. 27, 2003.
Huiyong, et al., "Harcourt Brace Considers Sale of Some Assets—Chief Says Firm Discussing Potential Transactions; Thomson May Play Role", Wall Street Journal; New York; Apr. 26, 1990, extracted on the Internet from http://proquest.umi.com on Jan. 27, 2003.
Tripp, Julie, "How to Lend Uncle Sam Your Money" p. B1, The Oregonian; Portland, OR; Oct. 28, 1990), extracted from http://proquest.umi.com Jul. 16, 2002.
Excerpts "Routing Symbol and Transit Number", p. 109, Chapter 6-The Payment Function by Francis et al., published by American Bankers Association in 1998, 1997, 1996, 1995, and 1994.
Official Routing Number Registrar —Routing Number Policy formulated jointly by American Bankers Association and the Federal Reserve System in 1976, pp. 1-22.
"ABA Routing numbers", web pages from www.aba.com.
Gullo, Karen, "Reistad Continues Quest for the 'Checkless Society' Series: 8," American Banker; New York, NY, Jul. 16, 1991, vol. 156, Issue 135.
Anonymous, "Is Video Banking Poised to Take Off (Again)?", CTS Accounting Software Survey; Jun. 1990, vol. 20, Issue 1.
Tyson, David O., "Princeton Telecom Addresses Problems of On-Line Bill Payment," American Baker; New York, NY. Aug. 9, 1989. Unknown, Excerpt from The Bankers Magazine, Jul.-Aug. 1985 p. 54-55.
Press Release, Banks, Credit Unions Join Utilities to Expand Bill Payment Plan; [Sunrise Edition] Omaha World-Herald; Omaha, Nebraska, Aug. 30, 1989, p. 19.
Howard, Bill, "The Best of 1989," PC Magazine, Jan. 16, 1990 (excerpt).
Dunkin, Amy, "Personal Business: Software Have a PC? Now, You Can Chuck Your Checkbook," Business Week, Sep. 3, 1990.
Churbuck, David C., "Let your Fingers do the Banking," Forbes, Aug. 19, 1991.
Shipley, Chris, "CheckFree's Payment System," PC Computing, Aug. 1, 1991.
Shipley, Chris, "Electronic Bill Paying Just Got a Lot Easier," PC Computing, May 1, 1991.
Magid, Lawrence, "How to Put PC to Work Paying Bills," Los Angeles Times, Jul. 25, 1991.
Advertisement "As seen in PC Computing" with purchase order form (1989- Reprinted from PC Magazine, Nov. 14, 1989).
Eliason, A.L., Online Business Computer Applications: 2nd Edition Science Research Associates, 1987 HF5542.2E427, pp. 18-19 and 69-71.

# US 7,853,524 B2

Page 3

Kight, Patricia, Declaration Under 37 CFR 1.132, Feb. 6, 2007.

Article, "Pay your Bills the PC way", ST. Louis Post Dispatch (SL0-Monday, Jul. 31 1989; Magid, Lawrence J; Five Star section; Monday's Business Section; p. 18; extracted on Internet from Dialog database.

Crossman , Craig, Herald Columnist; "Paying Bills can be an Electronic Task"; Miami Herald; Mar. 12, 1990; extracted on Internet from Dialog database, accession #05520522.

Shipley, Chris; "I threw away my checkbook"; PC-Computing, v3, n11, p. 112 (7), Nov. 1990; extracted on Internet from Dialog database, accession #01379643.

Steinberg, Jeffrey A.; "Checkfree"; MacUser, v6, n8, p. 68 (3), Aug. 1990; extracted on Internet from Dialog database, accession #01376772 .

Lewis, Peter H.; "Personal Computers; Managing Your Money",•New York times, Late Edition; Final ED, col. 5, p. 8, Aug. 29, 1989; extracted on Internet from Dialog database, accession #01871726.

Malnig, Anita, "Roundup of Financial Software: Home Accountant", pp. 73-74, II Computing, vol. 1 No. 3, Feb. 1986.

Rue, Sharon Gamble, "Electronic Checkbook", Macintosh Buyer's Guide, p. 128/1, 5/85, Abstract from Microsearch AN: 85-028312.

Hines, Tracie Forman, "The Check is in the Modem"; MacUser vol. 1. No. 1 p. 6815; 10185 Abstract from Microsearch AN: 85-028676.

"Myte Myke Business System: Order- Entry Billing", Product Literature; Abstract from Microsearch file of Orbit, AN: 87-039522;.

"Home Banking: A Case Study", Robert B. Willemstad pp. 4R 55, Banker's Magazine Nov.-Dec. 1984.

Disclosure under 37 C.F.R. §1.56.

Non-Final Office Action dated Jan. 30, 2008 for related U.S. Appl. No. 09/540,900, (filed Mar. 31, 2000) which is a continuation of U.S. Appl. No. 09/250,675.

Restriction Requirement dated Mar. 03, 2008 for related U.S. Appl. No. 10/697,114, (filed Oct. 31, 2003) which is a continuation of U.S. Appl. No. 08/372,620, (U.S. Patent No. 5,873,072), which is a continuation of U.S. Appl. No. 07/736,071, (U.S. Patent No. 5,383,113).

* cited by examiner



*Fig. 1*



*Fig. 2*



*Fig. 3*



Fig. 4B

Fig. 4A



Fig.4C



*Fig. 5*



*Fig. 6*

US 7,853,524 B2

1

# SYSTEMS AND METHODS FOR RISK BASED DETERMINATION OF A FORM FOR CREDITING A PAYEE ON BEHALF OF A PAYER

## RELATED APPLICATIONS

This is a continuation of Application for U.S. patent Ser. No. 08/372,620, filed Jan. 13, 1995, which will issue as U.S. Pat. No. 5,873,072 on Feb. 16, 1999, which was a continuation of application for U.S. patent Ser. No. 07/736,071, filed on Jul. 25, 1991, which issued as U.S. Pat. No. 5,383,113 on Jan. 17, 1995, each having the common assignee of the present invention and each incorporated herein by reference for all purposes.

## BACKGROUND AND SUMMARY OF THE INVENTION

The present invention relates generally to apparatus and methods for paying bills. More particularly, the present invention is a computerized system for paying bills whereby a consumer may contact a single source from a remote location via a telephone, a computer terminal with modem, or other electronic means, to direct the single source to pay the consumer's bills instead of the consumer writing checks for each bill. A microfiche appendix has been submitted with the parent case of this application Ser. No. 07/736,071, which issued as U.S. Pat. No. 5,383,113 on Jan. 17, 1995, which contains the program code of the present invention and which in its entirety is incorporated herein by reference. An additional hard copy of the appendix is attached as Exhibit A.

It has been common for many years for consumers to pay monthly bills by way of a personal check written by the consumer and sent by mail to the entity from which the bill or invoice was received. Consumers have used other ways to pay bills, including personally visiting the billing entity to make a cash payment. In today's economy, it is not unusual for a consumer to have several regular monthly invoices to pay. Writing individual checks to pay each invoice can be time-consuming and costly due to postage and other related expenses.

A need exists for a method whereby a consumer can contact a single source and inform the source to pay various bills of the consumer, to have the source adjust the consumer's account with the consumer's financial institution (i.e., bank, credit union, savings and loan association, etc.) to reflect a bill payment, and to actually pay the billing entity a specified amount by a particular time. The system should be efficient and not unreasonably expensive and relatively simple for a consumer to interact with. Some banks have attempted to provide a service for making payment to a few billing entities to which the banks have established relations. The banks that do provide that type of service are limited in that they provide the service only for their own customers since the banks have not developed a system for accurately acquiring and processing account numbers and balances of customers of all other banking institutions and coordinating that information with bill payment. Furthermore, banks have not developed a system for managing the risks involved in providing such a service and the inherent complexities of providing the service to consumers other than the bank's own customers. Therefore, a need exists for a single source bill payment system that would be available to any consumer, regardless of where the consumer banks and regardless of what bills are to be paid.

The present invention is designed to fulfill the above listed needs. The invention provides a universal bill payment sys-

2

tem that works regardless of the consumer's financial institution and bill to be paid. The present invention provides a computerized system by which a consumer may pay bills utilizing the telephone, a computer terminal, or other electronic, data transmission means. Transactions are recorded against the consumer's account wherever he or she banks. The consumer may be an individual or a business, large or small. The present invention works regardless of where the consumer banks.

The method of the present invention includes: gathering consumer information and creating a master file with banking information and routing codes; inputting payment instructions by the consumer at a convenient location (e.g., at home), typically remote from the payment service provider, by using an input terminal such as a push-button telephone; applying the payment instructions to the consumer's file; using computer software of the present invention to examine various files to determine such things as what is the appropriate form of payment based on variables involving banking institutions and merchants; comparing each transaction against a dynamic credit file and routing based on set parameters; and, if the payment system determines that everything is ready for payment to be made, adjusting the consumer's account (usually by debiting) and making payment directly to the billing entity. The single source service provider for consumer bill payment could be any entity with the capability to practice the invention as described hereinafter. The foregoing and other objects and advantages will become more apparent when viewed in light of the accompanying drawings and following detailed description.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a diagrammatical representation of the creation of a consumer database;

FIG. 2 is a diagrammatical representation of the establishment of a merchant's (billing entities) database and the making of payments;

FIG. 3 is a diagrammatical representation of the creation of a consumer pay table;

FIGS. 4a is a diagrammatical representation of a payment processing cycle;

FIG. 4b is a continuation of the diagram of FIG. 4a;

FIG. 4c is a continuation of the diagram of FIG. 4b;

FIG. 5 is a diagrammatical representation of a computer hardware system that may be used for accomplishing the present invention; and

FIG. 6 is a diagrammatical representation of another computer hardware system that may be used for accomplishing the present invention.

## DESCRIPTION OF PREFERRED EMBODIMENT(S)

Referring now to the drawings, FIG. 1 illustrates the steps in the creation of a consumer database for use with the present invention. The first step in the process is to establish a consumer's data records on the system. This may be accomplished by the consumer completing an authorization form 20 which would contain the needed information to input into the system concerning the consumer. This information may include the consumer's name, address, telephone number and other applicable information. The consumer would also provide a voided check from the consumer's personal checking account. The consumer's information may then be manually input via a keyboard 52 into the consumer database record 22. Default amounts may be set for an individual credit line

US 7,853,524 B2

**3**

parameter and for a total month-to-date parameter. These amounts establish the maximum unqualified credit risk exposure the service provider is willing to accept for an individual transaction and for the collective month-to-date transactions of a consumer. As explained hereinafter, the service provider may be at risk when paying a consumer's bills by a check written on the service provider's account.

From the voided check, the consumer's bank routing transit and individual account numbers at an institution are input into the computer system. This information may be edited against an internal financial institutions file (FIF) database 24 of the present invention. FIF 24 is a database of financial institutions' identification codes and account information for the consumer. This file edits the accuracy of the routing transit number and the bank account number. If the numbers do not correspond with the correct routing and bank numbers, they are rejected and the data entry is done again. FIF 24 in conjunction with the software of the present invention also updates the consumer database 22 for both electronic and paper draft routing and account information. The needed information may be obtained from each banking institution and each consumer.

The consumer is notified by the service provider of his or her local phone number access and personal security code for informing the service provider that a bill is to be paid. This information may be stored in a phone access table 26. The personal security code may be much like an ATM machine four digit code. In addition, to comply with federal law, an electronic pre-note 28 will be created to be sent to the consumer's bank to inform the bank that the service provider is authorized to debit the consumer's account. For further security to the service provider, a consumer credit report 30 may be obtained. The default credit limit amounts over which the service provider may be unwilling to assume financial risk may be modified based on the information obtained from the credit report 30.

In FIG. 2 the steps are shown for establishing merchants to be paid and the making of a payment. The consumer must inform the service provider or processor of a merchant's name, address, phone number and the consumer's account number with the merchant 32. The term "merchant" as used herein is intended to pertain to any person or entity that the consumer wishes to pay and is not to be limited to the usual merchants most consumers pay, such as the electric company, a home mortgage lender, etc. This information is put into a merchant master file database 42 (MMF). The consumer may also indicate whether the merchant is a variable or fixed merchant. A variable merchant is one in which the date and amount of payment will vary each month. A fixed merchant is one in which the date and amount remain the same each month. If the merchant is fixed, the frequency of payment may be other than monthly, such as weekly, quarterly, etc. The consumer should inform the service provider of the date on which the merchant is to be paid and the amount to be paid.

Through a telecommunications terminal 34 (e.g., a push-button telephone or computer terminal), a consumer may initiate payment of bills. Through the terminal, the consumer may access his merchant list and input the payment date and amount. The system may be provided with a payment date editor 36 to insure that the date is valid and logical (i.e., payment dates already in the past or possibly a year or more into the future would be questioned). As payments are initiated, a consumer "checkbook register" may be created and automatically updated to reflect this activity. The merchant list can be visible on the consumer's personal computer screen. On a personal computer a consumer may enter mer-

**4**

chant payment amounts and payment dates on the computer screen and then transmit this information to the service provider.

By telephone, the list may be presented by programmed voice. The voice may be programmed to ask the consumer if a particular merchant (selected from the consumer's MMF, which may be updated from time to time) is to be paid and to tell the consumer to press 1 if yes, or press 2 if no. If yes, the voice may instruct the consumer to enter the amount to be paid by pressing the numbers on a touch tone phone. The asterisk button could be used as a decimal point. After the amount is entered, the voice may ask the consumer to enter the date on which payment is to be made to the merchant. This may be accomplished by assigning each month a number, such as January being month 01. The consumer may then enter month, day and year for payment. The programmed voice may be accomplished with a VRU (voice response unit) available from AT&T or other vendors. It may communicate with a data processor to obtain consumer information. At the end of the consumer's session on the terminal a confirmation number may be sent to the consumer, providing a record of the transaction.

In FIG. 3 the steps are shown for the creation of the consumer pay table 38 and making updates to it. The consumer's files may be received at the service provider on a front end processor 40 that interfaces with the telecommunications network. The consumer's records may be edited 44 for validity by comparing to the merchants' account scheme. Any new merchant records are added to the consumer's pay table. New merchants are compared to the MMF 42 and appropriately cross-referenced to the pay table to check if a merchant record already exists. If no merchant record exists, a merchant record will be created on the MMF 42.

Payment records may also be received on the service provider's processor. The payment may first go through a validation process against the pay table. The validation process checks for duplicate payments and if duplicates are found they are sent to a reject file. The validation process also verifies that merchants are set up and may check for multiple payments to be paid to a particular merchant. Orders for payment go to the consumer pay table to determine when the payment should be released and how it will be released for payment.

The service provider may pay merchants by a draft or check (paper) or by electronic funds transfer. To create a draft that will pass through the banking system, it must be specially inked. This may be accomplished by a printer which puts a micr code on drafts, like standard personal checks. For example, as shown in FIG. 5, the front end processor 40 may be a DEC VAX which is connected to an IBM main frame 46 Model 4381. Consumers may call by telephone 35, a number that passes through the private bank exchange (PBX) 39 and contacts a voice response unit 41 in association with the front end processor 40. After the consumer's payment instructions are received an analysis is performed to determine the most cost effective and least risk mode of payment for the service provider to use. One preferred mode of payment is electronic funds transfer through the Federal Reserve Automated Clearing House (ACH) Network 47. If the service provider is not a bank, a bank intermediary may be needed to be connected to the Federal Reserve Network. Another payment mode is a charge to the consumer's credit card through the RPS Network 49. Additionally, an IBM Laser Printer attached to a micr post printer 48 may be used by the service provider to send drafts 76 or consolidated checks 78 to merchants. The main frame 46 has data storage means 50 and runs the FIF 24 and MMF 42 programs. It may also have a tape drive or

US 7,853,524 B2

5

telecommunication interface for accomplishing electronic funds transfer. It should be recognized that various other hardware arrangements could be used to accomplish the present invention. FIG. 6 illustrates a similar arrangement for use when the consumer is using a personal computer 37 to instruct the service provider. The personal computer may access the front end processor 40 through the standard X.25 Network 43.

Referring now to FIGS. 4a, 4b and 4c, the payment process is shown. The payment process may be cycled 56 each day or more or less frequently. The first step is to establish when payment items are to be processed. This may be accomplished through a processing calendar 58. A processing calendar 58 may be built into the system. The calendar 58 enables the system to consider each date, including weekends and the Federal Reserve holidays. Payments are released from the consumer pay table 38 using the due date. Any bank date, payments, or payments within a period such as four business days may be released the same day. All future payment dates would be stored in the consumer pay table 38. On-line inquiry may be made on the consumer pay table 38. The service provider has on-line capability to make changes to the consumer payment upon request until the day the payment is released. A consumer's merchant change may also affect the consumer's payment on the pay table 38.

The method of payment to the merchant may be either paper (draft or check) or electronic. There are several factors in the process used to determine if a payment will be released as a paper item, or an ACH electronic transaction (automated clearing house; service provider is a party to transaction). Each consumer may be assigned a status such as: active=good; inactive=bad; and, pending=uncertain, risky. If a consumer's status is pending 60, when reviewing the payment file with the processing calendar 58, the payment should go out as a draft paper to protect the service provider. When payment is made by draft, the service provider is not a contractual party to the transaction. The consumer's bank account codes are actually encoded onto the draft prepared by the service provider and act much like the consumer's personal check. The draft has been specially designed for this process. The draft is payable to either the service provider or the particular merchant. This allows the draft to be delivered to the merchant for payment and depositing, but allows the draft to be legally payable by the bank, with proper authorization. Additionally, posting information for the merchant is contained on the body of the draft. To the applicant's knowledge, it is the first time a draft has been used in such a manner and with this unique design to accomplish this. If the consumer's bank transit number does not indicate an electronic bank 62 (i.e., a banking institution that will accept electronic funds transfer), the program associated with FIF 24 sends the payment as a draft. A pre-note 28 is required any time 64 new banking information is entered on a consumer and the bank shows on FIF 24 as an electronic receiving bank. The pre-note period is ten (10) days under federal law. Any payments released during this period are sent as paper.

The third manner in which the service provider may pay bills is by a check written on the service provider's account. A consolidated check may be written if many customers have asked the service provider to pay the same merchant. Under this method of payment the service provider assumes some risk since the service provider writes the check on its own account. The service provider is later reimbursed by the (consumer's) banking institution.

As a means of minimizing risk to the service provider, any transaction may be compared to the MMF 42 credit limit. For example, if the check limit is greater than zero and the pay-

6

ment is $50.00 or less 66, the item may be released as electronic 74 or by service provider check 78. If the payment is greater than $50.00 but less than or equal to the merchant credit limit 68, the payment may be released as electronic payment 74 or check 78. Any payments within the merchant's credit limit 70 are added to the consumer's monthly ACH balance 72. This provides a monthly total billing day to billing day summary of the consumer's electronic payment activity. Any transaction may be compared to the consumer's database credit limit parameters. If a payment amount is greater than the consumer's credit limit, the item is released as a draft 76 which is written on the consumer's account. If the payment amount plus the total of electronic payments in a particular month is greater than the consumer's credit limit, the item is released as a draft 76. Items not released as paper are initiated as an ACH debit against the consumer's account.

The consumer database may be reviewed for proper electronic funds transfer (EFT) routing. Payment to the merchant may be accomplished one of three ways, depending on the merchant's settlement code. Various merchant's settlement codes may be established. For example, a merchant set up with a settlement code "01" results in a check and remittance list 78 being mailed to the merchant. Merchants with a settlement code, such as "10" produce an ACH customer initiated entry (CIE). Merchants with a settlement code, such as, "13" produce a remittance processing system (RPS) credit.

In the consumer pay table, for fixed payments, a payment date gets rolled to the next scheduled payment date on the pay table. The number of remaining payments counter is decreased by one for each fixed payment made. For variable payments once made, the payment date is deleted on the consumer pay table. The schedule date and amount on the consumer pay table roll to zero. A consumer payment history may also be provided which show items such as process date as well as collection date, settlement method, and check number in addition to merchant name and amount.

The software of the present invention is designed in part to make several decisions relating to particular transactions for consumers. The following example is provided to more fully describe the software. This example is not intended to limit the application to the details described in the example and is only provided to further enhance the description of the invention already stated above.

For this example, assume that a consumer has five transactions of varying amounts for which the consumer has asked the service provider to arrange payment. For simplicity, assume that the five payments are to be made on the same day. First, the consumer database 22 is edited to validate the status, banking institution, and pre-note flags associated with the consumer's requested payments. The account numbers provided by the consumer for the merchants to be paid, are also checked to determine if they are valid. Assuming the merchant account numbers are valid, the program begins with the first dollar analysis.

For purposes of this example, the five payments the consumer has requested are in the amounts of: $25.00; $75.00; $150.00; $250.00; and $1,000.00. The program will consider each dollar amount individually as it goes through the various edit modes. The first edit may be called a $50.01 edit. In this example, any transaction that is less than $50.01 is automatically sent as an ACH debit to the consumer's account. This means that the service provider uses ACH to electronically transfer funds from the consumer's account to the service provider's clearing account.

In this example, the initial payment of $25.00 will satisfy the $50.01 edit and therefore will be paid without any further edits being conducted for this particular payment. Continuing

7

with the example, the next edit may be a merchant dollar edit that is established for the specific merchant to which the transaction is being sent. For purposes of this example, this edit is set at $100.00 for all merchants. Different dollar edits can be incorporated for different merchants. In the example, the second payment request of the consumer, for $75.00, meets the $100.00 merchant edit parameter and is sent as an ACH debit to the consumer's account. Note that the $75.00 payment would not have satisfied the $50.01 edit and therefore would have passed on to the second edit which in this case, is the merchant dollar edit.

The remaining three payments in the example exceed both the $50.01 edit and the merchant $100.00 edit and therefore, go to the next edit. In the example, the next edit is for a consumer individual transaction limit set at $200.00. The $150.00 payment is less than the $200.00 consumer individual transaction limit and is, therefore, sent as an ACH debit to the consumer's account and paid. The other two remaining payments yet to be made exceed the $200.00 limit in this example and pass to the next edit.

In the next edit, which happens to be the last edit in the example, the consumer's month-to-date "unqualified" risk limit is checked. In the example, the month-to-date limit is set at $1,500. Assume that for this particular consumer $400.00 of month-to-date payments have already been made on the consumer's behalf. Added to the $400.00 would be the three payments made above for $25.00, $75.00 and $150.00. So an additional $250.00 is added to the $400.00 month-to-date for a total of $650.00 "unqualified" risk for the current month-to-date amount. The next payment to be made is for $250.00 and would fall within the $1,500 month-to-date limit when added to the current $650.00 risk amount. Therefore, the $250.00 payment is made and an ACH debit is sent to the consumer's account. This brings the total month-to-date "unqualified" risk amount to $900.00. The final $1,000 payment has not been paid and would send the "unqualified" risk amount over $1,500 when added to the $900.00. Since the final payment of $1,000 in the example fails the consumer month-to-date limit edit, the $1,000 payment would be sent as a paper draft drawn on the consumer's account, and as for which the service provider has no liability. In the example, the final step would be updating the consumer month-to-date current total to $900.00.

The apparatus for and method of bill payment of the present invention and many of its attendant advantages will be understood from the foregoing description. It will be apparent that various changes may be made in the form and steps thereof without departing from the spirit and scope of the invention or sacrificing all of its advantages.

We claim:

1. A computer-implemented method for directing a payment, comprising:

receiving, at a payment service provider, a request to pay a payee on behalf of a payer;

selecting, by at least one payment service provider computer prior to a debiting of a financial account of the payer, a form for crediting the payee, wherein the selection is based on at least one of:

(i) comparing a payer account number associated with the payer and the payee to a merchant account scheme associated with the payee, or

(ii) comparing a payment amount associated with the received request to a merchant credit limit associated with the payee; and

directing, by the at least one payment service provider computer, a payment to the payee in accordance with the selected form for crediting.

8

2. The method of claim 1, wherein the form for crediting comprises at least one of (i) a check payable to the payee and written on an account of the payment service provider, (ii) an electronic credit, or (iii) a paper draft payable to the payee and written on an account of the payer.

3. The method of claim 2, wherein the selected form for crediting is a check written on an account of the payment service provider, and wherein the check is a consolidated check.

4. The method of claim 3, wherein the request is a first request and the payer is a first payer, and further comprising:

receiving a second request to pay the payee on behalf of a second payer; and

selecting, by the at least one payment service provider computer, a check written on an account of the payment service provider as the form for crediting the payee on behalf of the second payer;

wherein the consolidated check combines payment of the first request and payment of the second request.

5. The method of claim 3, further comprising:

transmitting, by the at least one payment service provider computer, a remittance list associated with the consolidated check to the payee.

6. The method of claim 2, wherein the electronic credit comprises at least one of (i) an Automated Clearing House (ACH) credit or (ii) a remittance processing system credit.

7. The method of claim 2, wherein the selected form for crediting is a paper draft, and the paper draft comprises posting information for the payee.

8. The method of claim 1, wherein selecting the form for crediting the payee is further based at least in part on an examination of a settlement code associated with the payee.

9. The method of claim 1, wherein selecting the form for crediting includes comparing the payment amount associated with the received request to a merchant credit limit associated with the payee, and further comprising:

selecting, by the at least one payment service provider computer, an electronic credit as the form for crediting the payee if the payment amount is less than or equal to the merchant credit limit.

10. The method of claim 1, wherein selecting the form for crediting includes comparing the payer account number associated with the payee to a merchant account scheme associated with the payee, and further comprising:

selecting, by the at least one payment service provider computer, a paper draft as the form for crediting the payee if the payer account number with the payee fails to correspond to the merchant account scheme.

11. A system, comprising:

an interface to a network configured to receive a request to make a payment to a payee on behalf of a payer; and

a processor configured (i) to select, prior to a debiting of a financial account of the payer, a form for crediting the payee based on at least one of (1) a comparison of a payer account number associated with the payer and the payee to a merchant account scheme associated with the payee, or (2) a comparison of a payment amount associated with the received request to a merchant credit limit associated with the payee, and (ii) to direct issuance of a payment to the payee in accordance with the selected form for crediting.

12. The system of claim 11, wherein the form for crediting comprises at least one of (i) a check payable to the payee written on an account of the payment service provider, (ii) an electronic credit, or (iii) a paper draft payable to the payee written on an account of the payer.

US 7,853,524 B2

9

13. The system of claim 12, wherein the selected form for crediting is a check written on an account of the payment service provider, and wherein the check is a consolidated check.

14. The system of claim 13, wherein the request is a first request and the payer is a first payer, and wherein:

the interface is further configured to receive a second request to pay the payee on behalf of a second payer; and

the processor is further configured to select a check written on an account of the payment service provider as the form for crediting the payee on behalf of the second payer;

wherein the consolidated check combines payment of the first request and payment of the second request.

15. The system of claim 13, wherein:

the processor is further configured to direct the transmission of a remittance list associated with the consolidated check to the payee.

16. The system of claim 12, wherein the electronic credit comprises at least one of (i) an Automated Clearing House (ACH) credit or (ii) a remittance processing system credit.

17. The system of claim 12, wherein the selected form for crediting is a paper draft, and the paper draft contains posting information for the payee.

18. The system of claim 11, wherein the processor is further configured to select the form for crediting the payee based at least in part on an examination of a settlement code associated with the payee.

19. The system of claim 11, wherein the processor selects the form for crediting based at least in part on a comparison of

10

the payment amount associated with the received request to a merchant credit limit associated with the payee, and

wherein the processor is further configured to select an electronic credit as the form for crediting if the payment amount is less than or equal to the merchant credit limit.

20. The system of claim 11, wherein the processor selects the form for crediting based at least in part on a comparison of the payer account number associated with the payee to a merchant account scheme associated with the payee,

wherein the processor is further configured to select a paper draft as the form for crediting if the payer account number with the payee fails to correspond to the merchant account scheme.

21. A system comprising:

means for receiving, at a payment service provider, a request to pay a payee on behalf of a payer;

means for selecting, prior to a debiting of a financial account of the payer, a form for crediting the payee, wherein the selection is based on at least one of:

(i) comparing a payer account number associated with the payer and the payee to a merchant account scheme associated with the payee, or

(ii) comparing a payment amount associated with the received request to a merchant credit limit associated with the payee; and

means for directing a payment to the payee in accordance with the selected form for crediting.

*   *   *   *   *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,853,524 B2
APPLICATION NO.   : 10/025897                                    Page 1 of 1
DATED             : December 14, 2010
INVENTOR(S)       : Kight et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the title page, after Related U.S. Application Data, item (63), please insert the following:

--Continuation of Application No. 09/250,711, filed on February 16, 1999, now abandoned, which is a continuation--.

At Column 1, line 8, after "This is", insert --a continuation of Application for U.S. Patent Ser. No. 09/250,711, filed February 16, 1999, now abandoned, which is--.

At Column 1, line 9, replace "will issue" with --issued--.

Signed and Sealed this
Twenty-eighth Day of June, 2011

David J. Kappos
Director of the United States Patent and Trademark Office

# EXHIBIT C



US007383223B1

(12) **United States Patent**
Dilip et al.

(10) Patent No.: **US 7,383,223 B1**
(45) Date of Patent: **Jun. 3, 2008**

(54) **METHOD AND APPARATUS FOR MANAGING MULTIPLE ACCOUNTS**

(75) Inventors: **Venkatachari Dilip**, Cupertino, CA (US); **Sanjeev Dheer**, Scarsdale, NY (US)

(73) Assignee: **CashEdge, Inc.**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 567 days.

(21) Appl. No.: **09/665,919**

(22) Filed: **Sep. 20, 2000**

(51) Int. Cl.
*G06Q 40/00* (2006.01)

(52) U.S. Cl. ............................ **705/39**; 705/35; 705/40; 705/26

(58) Field of Classification Search ................. 705/26, 705/35–45
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,346,442 A | 8/1982 | Musmanno | |
| 4,694,397 A | 9/1987 | Grant et al. | |
| 5,481,720 A | 1/1996 | Loucks et al. | |
| 5,644,727 A | * 7/1997 | Atkins | .............. 705/40 |
| 5,745,706 A | 4/1998 | Wolfberg et al. | |
| 5,787,427 A | 7/1998 | Benantar et al. | |
| 5,805,719 A | 9/1998 | Pare, Jr. et al. | |
| 5,826,243 A | * 10/1998 | Musmanno et al. | .......... 705/35 |
| 5,855,020 A | 12/1998 | Kirsch | |
| 5,884,285 A | 3/1999 | Atkins | |
| 5,893,078 A | 4/1999 | Paulson | |
| 5,895,838 A | 4/1999 | Harjunmaa et al. | |
| 5,940,809 A | * 8/1999 | Musmanno et al. | .......... 705/35 |
| 6,012,048 A | 1/2000 | Gustin et al. | |
| 6,018,722 A | 1/2000 | Ray et al. | |
| 6,038,603 A | 3/2000 | Joseph | |
| 6,058,378 A | * 5/2000 | Clark et al. | .............. 705/37 |
| 6,108,641 A | * 8/2000 | Kenna et al. | .............. 705/35 |

| | | | |
|---|---|---|---|
| 6,108,788 A | 8/2000 | Moses et al. | |
| 6,199,077 B1 | 3/2001 | Inala et al. | |
| 6,226,623 B1 | * 5/2001 | Schein et al. | .................. 705/35 |
| 6,240,399 B1 | 5/2001 | Frank et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

GB          2392262          2/2004

(Continued)

OTHER PUBLICATIONS

Dartmouth Research & Consulting Glossaries, 2000 (pp. 1-9).

(Continued)

*Primary Examiner*—Richard Weisberger
(74) *Attorney, Agent, or Firm*—Courtney Staniford & Gregory LLP

(57) **ABSTRACT**

A withdrawal of assets is initiated from a first account at a first financial institution. A deposit of the assets withdrawn from the first account is initiated to a second account at a second financial institution. The first account and the second account have a common account holder. The withdrawal and deposit of assets may be initiated after analyzing multiple accounts of the account holder and determining whether an adjustment of funds among the multiple accounts would benefit the account holder. A debit instruction is used to initiate the withdrawal of assets and a credit instruction is used to initiate the deposit of the withdrawn assets. The withdrawal and deposit of assets can be implemented using one or more payment networks, debit networks, or a wire transfer between the two financial institutions.

**8 Claims, 19 Drawing Sheets**



# US 7,383,223 B1

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,317,783 B1 | 11/2001 | Freishtat et al. | |
| 6,321,334 B1 | 11/2001 | Jerger et al. | |
| 6,324,523 B1 * | 11/2001 | Killeen et al. | 705/35 |
| 6,374,231 B1 * | 4/2002 | Bent et al. | 705/40 |
| 6,381,592 B1 | 4/2002 | Reuning | |
| 6,405,245 B1 | 6/2002 | Burson et al. | |
| 6,412,073 B1 | 6/2002 | Rangan | |
| 6,473,800 B1 | 10/2002 | Jerger et al. | |
| 6,510,451 B2 | 1/2003 | Wu et al. | |
| 6,513,019 B2 * | 1/2003 | Lewis | 705/35 |
| 6,567,850 B1 | 5/2003 | Freishtat et al. | |
| 6,594,766 B2 | 7/2003 | Rangan et al. | |
| 6,598,028 B1 * | 7/2003 | Sullivan et al. | 705/35 |
| 6,606,606 B2 | 8/2003 | Starr | |
| 6,609,113 B1 * | 8/2003 | O'Leary et al. | 705/39 |
| 6,609,128 B1 | 8/2003 | Underwood | |
| 6,633,910 B1 | 10/2003 | Rajan | |
| 6,697,860 B1 | 2/2004 | Kung | |
| 6,721,716 B1 | 4/2004 | Gross | |
| 6,792,082 B1 | 9/2004 | Levine | |
| 6,799,167 B1 | 9/2004 | Gullen et al. | |
| 6,802,042 B2 | 10/2004 | Rangan et al. | |
| 7,013,310 B2 | 3/2006 | Messing et al. | |
| 7,031,939 B1 | 4/2006 | Gallagher | |
| 2002/0010768 A1 | 1/2002 | Marks et al. | |
| 2002/0019753 A1 | 2/2002 | Boden | |
| 2006/0015450 A1 | 1/2006 | Guck et al. | |

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 10149404 A | * | 6/1998 |
| WO | WO 97-19406 | | 5/1997 |
| WO | WO 01-88674 A2 | | 11/2001 |

## OTHER PUBLICATIONS

Bruce Schneier, Applied Cryptography, Second Edition, Protocols, Algorithms, and Source Code in C, pp. 30-32.

* cited by examiner



*Fig. 1*



*Fig. 2*



*Fig. 3*



220 — FINANCIAL MANAGEMENT SYSTEM

222 — COMMUNICATION INTERFACE

224 — CUSTOMER DATA

226 — FINANCIAL INSTITUTION DATA

228 — MARKET INFORMATION

230 — ASSET ANALYSIS AND RECOMMENDATION MODULE

232 — DEBT ANALYSIS AND RECOMMENDATION MODULE

234 — BALANCE SHEET ANALYSIS AND RECOMMENDATION MODULE

236 — REPORT GENERATOR

238 — TRANSACTION EXECUTION MODULE

240 — ACCOUNT VERIFICATION MODULE

*Fig. 4*



*Fig. 5*



Fig. 6



*Fig. 7*



320 — Analyze User's Asset Accounts

322 — Determine Best Available Asset Accounts

324 — Are there Better Accounts for the User's Assets?    No

Yes

326 — Identify the Best Alternative Accounts and Make New Account Recommendations to the User

328 — Should the Assets in the User's Asset Accounts be Adjusted?    No

Yes

330 — Identify Best Adjustment of the User's Asset Accounts and Make Asset Adjustment Recommendations to the User

332 — Allow the User to Automatically Execute any Recommendations

*Fig. 8*



*Fig. 9*



Fig. 10



400 — Determine the Best Adjustment of the User's Asset Accounts

402 — Determine the Best Adjustment of the User's Debt Accounts

404 — Determine the Best Adjustment of the User's Balance Sheet

406 — Identify the Financial Institutions Involved in the Adjustment of the User's Accounts

408 — Contact the Appropriate Financial Institutions (and/or Payment Networks) and Execute the Necessary Financial Transfers

410 — Generate a Report to the User Identifying the Financial Transfers Executed

412 — Update the User's Account Information for the Affected Accounts

Fig. 11

430

| Financial Institution Name | ABA and Routing Info | Internet URL | Account Offerings | Acct Type | Account Interest Rate | Minimum Account Balance |
|---|---|---|---|---|---|---|
| Bank of America | xxxxxxxxxx xxxxxxxxxx | www.bofa.com | Savings | Asset | 2.00 | Min. 200.00 |
| | | | Non-Interest Checking | Asset | 0.00 | Min. 100.00 |
| | | | Interest Checking | Asset | 1.50 | Min. 1000.00 |
| | | | CD - 3 Months | Asset | 5.00 | Min. 500.00 |
| | | | Home Equity | Debt | 12.50 | N/A |
| | | | Credit Card | Debt | 18.00 | N/A |
| | | | Overdraft Protection | Debt | 16.00 | N/A |
| Charles Schwab | xxxxxxxxxx xxxxxxxxxx | www.schwab.com | Money Market | Asset | 4.75 | Min. 2000.00 |
| | | | ABC Mutual Fund | Asset | N/A | Min. 1000.00 |
| · · · | · · · | · · · | · · · | · · · | · · · | · · · |

Fig. 12

440 —

| Customer Name | Financial Institution | Account Number, Username, P/W | Active Accounts | Account Balance | User Preferences |
|---|---|---|---|---|---|
| John Smith | Bank of America | xxxxxxxxxx xxxxxxx xxxxxx | Savings | 2208.63 | Make all recommendations; Maintain minimum balance of $1500 in Interest Checking; Do not transfer more than $4000 per week; Pay down Overdraft Protection first; Do not withdraw funds from Rainbow Credit Union Savings account. |
| | Bank of America | xxxxxxxxxx xxxxxx xxxxxx | Interset Checking | 4126.87 | |
| | Bank of America | xxxxxxxxxx | Home Equity | 12,240.32 | |
| | Bank of America | xxxxxxx xxxxxx | Credit Card | 3,566,45 | |
| | Bank of America | xxxxxxxxxx xxxxxxx xxxxx | Overdraft Protection | 821.54 | |
| | Charles Schwab | xxxxxxxxxxx xxxxxxxxxx | Money Market | 3628.94 | |
| | Rainbow Credit Union | xxxxxxxxxx | Savings | 562.34 | |
| Jane Doe | Bank One | xxxxxxxxxx xxxxxx xxxxxx | Savings | 261.79 | Do not recommend opening new accounts. |
| | Bank One | xxxxxxxxxx xxxxxx xxxxxx | Non-Interest Checking | 8245.21 | |
| | . . . | . . . | . . . | . . . | . . . |

*Fig. 13*



Fig. 14



Fig. 15



*Fig. 16*



*Fig. 17*



*Fig. 18*



*Fig. 19*

US 7,383,223 B1

1

# METHOD AND APPARATUS FOR MANAGING MULTIPLE ACCOUNTS

## TECHNICAL FIELD

The present invention relates to the handling of financial transactions and, more particularly, to the transfer of funds between accounts at different financial institutions.

## BACKGROUND

Customers of financial institutions (both individual customers and businesses) typically maintain multiple financial accounts at one or more financial institutions. Financial institutions include, for example, banks, savings and loans, credit unions, mortgage companies, lending companies, and stock brokers. A customer's financial accounts may include asset accounts (such as savings accounts, checking accounts, certificates of deposit (CDs), mutual funds, bonds, and equities) and debt accounts (such as credit card accounts, mortgage accounts, home equity loans, overdraft protection, and other types of loans).

In many situations, a user's asset accounts may not be earning the best available interest rate or the user's debt accounts may not be at the most competitive rate. It would be to the user's benefit to adjust the funds between different accounts to maximize the interest earned in the asset accounts and/or minimize the interest paid in the debt accounts. For example, a user may have a checking account that pays no interest, but has a high balance. A portion of the funds in the checking account could be transferred to a savings account or other asset account that pays interest on the funds in the account. Similarly, a user with a high credit card balance could save money if a portion of the credit card balance was transferred to a home equity line of credit at a lower interest rate.

If a user identifies funds to be transferred between different accounts, the user is then required to execute the necessary transactions. To execute these transactions, the user may need to visit one or more financial institutions and request the appropriate fund transfers. However, if one or more of the financial institutions is located in a distant town, the fund transfers may need to be processed by check or bank wire. Alternately, the user may execute some of the transactions through an online banking service, if the financial institution supports online banking. However, typical online banking services do not permit the transfer of funds between two different financial institutions. Thus, if a user wants to transfer funds, for example, from a checking account at a bank to a money market account at a stock broker, the user cannot generally execute the transfer using online banking.

Instead, the user needs to withdraw funds manually using, for example, a check and manually deposit the funds in the second account (either in person or by mail). Since the second account may place a hold on the deposit, the actual fund transfer may not occur for a week (or longer) depending on the amount of the check, the policies of the financial institutions, and any delays involved with mailing the check. A bank wire provides a faster method of transferring funds between financial institutions, but is not generally cost-effective for small transfers (e.g., transfers of less than a few thousand dollars), due to the costs associated with the bank wire. For small transfers, the costs associated with the bank wire may exceed the interest savings generated by the transfer.

2

Furthermore, to execute a particular transaction between two financial institutions that support the online transfer of funds, the user must configure a particular transaction for each possible combination of accounts that may have funds transferred between them. This is tedious and requires the user to remember the differences between the online interfaces at the different financial institutions.

If a user's financial institutions support online transfers of funds, before performing any transfers between two financial institutions that support the online transfer of funds, the user must configure a particular transaction for each possible combination of accounts that may have funds transferred between them. This is tedious and requires the user to remember the differences between the online interfaces at the different financial institutions.

Thus, the systems and procedures available today do not provide a convenient mechanism for transferring funds between accounts at different financial institutions.

The systems and methods described herein addresses these and other problems by allowing a user to transfer funds between accounts at different financial institutions.

## SUMMARY

The system and methods described herein initiate a withdrawal of assets from a first account at a first financial institution and initiate a deposit of the withdrawn assets to a second account at a second financial institution. The first account and the second account have a common account holder.

Another embodiment analyzes multiple accounts having a common account holder and determines whether an adjustment of funds among the multiple accounts would benefit the account holder. Funds are transferred among the multiple accounts if such a transfer would benefit the account holder.

In one embodiment, multiple financial accounts are registered at a single point, thereby allowing the transfer of funds between any pair of registered accounts.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates an exemplary network environment in which various servers, computing devices, and financial management systems exchange data across a network, such as the Internet.

FIG. 2 illustrates an example of the interaction between a particular pair of financial institution servers, a market information service, a client computer, and a financial management system.

FIG. 3 is a block diagram showing pertinent components of a computer in accordance with the invention.

FIG. 4 is a block diagram showing exemplary components and modules of a financial management system.

FIG. 5 is a block diagram showing exemplary components and modules of an asset analysis and recommendation module.

FIG. 6 is a block diagram showing exemplary components and modules of a debt analysis and recommendation module.

FIG. 7 is a block diagram showing exemplary components and modules of a balance sheet analysis and recommendation module.

FIG. 8 is a flow diagram illustrating a procedure for identifying financial transactions to optimize a user's asset account balances.

US 7,383,223 B1

3

FIG. 9 is a flow diagram illustrating a procedure for identifying financial transactions to optimize a user's debt account balances.

FIG. 10 is a flow diagram illustrating a procedure for identifying financial transactions to optimize a user's balance sheet.

FIG. 11 is a flow diagram illustrating a procedure for automatically optimizing a user's asset accounts, debt accounts, and balance sheet.

FIG. 12 is a table illustrating various information associated with different financial institutions.

FIG. 13 is a table illustrating various customer information related to financial accounts and user preferences.

FIGS. 14-15 illustrate exemplary user interface screens illustrating various account entry fields and account recommendations.

FIG. 16 illustrates an exemplary environment in which funds are transferred between various financial institutions using a payment network.

FIG. 17 is a flow diagram illustrating a procedure for transferring funds between two financial institutions.

FIG. 18 illustrates another exemplary environment in which funds are transferred between various financial institutions using multiple payment networks.

FIG. 19 illustrates another environment in which funds are transferred between various financial institutions.

DETAILED DESCRIPTION

The system and methods described herein automatically analyze multiple financial accounts to determine whether the account balances are optimized based on the best available interest rates, the interest rates associated with the multiple financial accounts, and the balances of the multiple financial accounts. After analyzing the accounts, recommendations are provided, if necessary, for adjusting account funds to allow the account holder to earn greater interest in asset accounts and/or pay less interest in debt accounts. If authorized by the user, fund transfers are initiated to automatically execute the recommended fund adjustments. The systems and methods described herein may operate in a proactive manner, such that the various recommendations are generated without any action or request by the user. The financial management system described herein may regularly analyze a user's accounts and make recommendations, if appropriate, on its own initiative, without any prompting from the user.

As used herein, the terms "account holder", "customer", "user", and "client" are interchangeable. "Account holder" refers to any person having access to an account. A particular account may have multiple account holders (e.g., a joint checking account having husband and wife as account holders or a corporate account identifying several corporate employees as account holders. Various financial account and financial institution examples are provided herein for purposes of explanation. However, it will be appreciated that the system and procedures described herein can be used with any type of asset account and any type of debt account. Example asset accounts include savings accounts, money market accounts, checking accounts (both interest-bearing and non-interest-bearing), certificates of deposit (CDs), mutual funds, bonds, and equities. Example debt accounts include credit card accounts, mortgage accounts, home equity loans, overdraft protection, margin accounts, personal loans, and other types of loans. Exemplary financial insti-

4

tutions include banks, savings and loans, credit unions, mortgage companies, mutual fund companies, lending companies, and stock brokers.

Various attributes associated with an asset account and/or a debt account are discussed herein. These attributes are used to analyze various accounts and make recommendations that would benefit the account holder. Example attributes include interest rate, loan repayment terms, minimum balance, type of collateral, etc. Although particular examples are discussed herein with reference to interest rates, it will be appreciated that the methods and systems described herein are applicable to any type of attribute.

FIG. 1 illustrates an exemplary network environment 100 in which various servers, computing devices, and financial management systems exchange data across a data communication network. The network environment of FIG. 1 includes multiple financial institution servers 102, 104, and 106 coupled to a data communication network 108, such as the Internet. A market information service server 110 and a financial management system 118 are also coupled to network 108. Additionally, a wireless device 112 and a client computer 114 are coupled to network 108. Wireless device 112 may be a personal digital assistant (PDA), a handheld or portable computer, a cellular phone, a pager, or any other device capable of communicating with other devices via a wireless connection. A financial information provider 116 is coupled between network 108 and client computer 114.

Network 108 may be any type of data communication network using any communication protocol. Further, network 108 may include one or more sub-networks (not shown) which are interconnected with one another.

The communication links shown between the network 108 and the various devices (102-106 and 110-118) shown in FIG. 1 can use any type of communication medium and any communication protocol. For example, one or more of the communication links shown in FIG. 1 may be a wireless link (e.g., a radio frequency (RF) link or a microwave link) or a wired link accessed via a public telephone system or another communication network. Wireless device 112 typically accesses network 108 via a wireless connection to another communication network that is coupled to network 108. Certain devices, such as servers, may be coupled to a local area network (LAN), which is coupled to network 108. Client computer 114 may access network 108 in different ways. First, client computer 114 may directly access network 108, for example, by using a modem to access a public telephone network (e.g., a public switched telephone network (PSTN)) that is coupled to network 108. Alternately, client computer 114 may access financial information provider 116, which establishes a connection to network 108. Financial information provider 116 may act as a "buffer" between network 108 and client computer 114, or may allow commands and data to simply pass-through between the network 108 and the client computer 114.

Each of the financial institution servers 102, 104, and 106 are typically associated with a particular financial institution and store data for that financial institution, such as customer account data. The market information service server 110 may represent one or more services that collect and report information regarding current financial market conditions. For example, a particular market information service may collect information from many financial institutions to generate a report identifying the average interest rates for savings, checking, or other accounts. The report may also identify the highest rates for each type of account and the financial institution offering those rates. Multiple market

US 7,383,223 B1

5

information service servers 110 may be coupled to network 108, each server providing a different type of market data.

Financial management system 118 performs various account analysis functions to determine whether a user's financial accounts (e.g., both asset accounts and debt accounts) are optimized. Additionally, financial management system 118 is capable of initiating the automatic transfer of funds between accounts at one or more financial institutions. This analysis and fund transfer functions are discussed in greater detail below. Wireless device 112 and client computer 114 allow a user to access information via the network 108. For example, the user can access account information from one of the financial institution servers 102, 104, or 106, access current interest rate data from market information service server 110, or send a request for an analysis of the user's financial accounts to financial management system 118. Financial information provider 116 acts as an intermediary between client computer 114 and other devices coupled to network 108. For example, client computer 114 generates a request for data or account analysis and communicates the request to the financial information provider 116. The financial information provider 116 then retrieves the requested data or initiates the requested account analysis on behalf of the user of client computer 114.

FIG. 2 illustrates an example of the interaction between a particular pair of financial institution servers 132 and 134, a market information service server 140, a client computer 136, and a financial management system 138. In this example, each financial institution server 132 and 134 is associated with a different financial institution. Client computer 136 is capable of accessing financial institution server 132 via a communication link 142 and accessing financial institution server 134 via a communication link 144. For example, the user of client computer 136 may retrieve account information or interest rate information from one or both of the financial institution servers 132, 134. Client computer 136 is also capable of interacting with financial management system 138 via a communication link 146. The user of client computer 136 may access financial management system 138, for example, to have the system analyze the user's financial accounts and automatically initiate the transfer of funds between accounts.

Financial management system 138 is coupled to the two financial institution servers 132 and 134 via two communication links 148 and 150, respectively. Communication links 148 and 150 allow the financial management system 138 to retrieve information from the financial institution servers 132, 134, and execute transactions on the financial institution servers on behalf of the user of client computer 136. Financial management system 138 is also coupled to market information service server 140 through a communication link 152, which allows the financial management system to retrieve various information regarding market interest rates and other market data. Financial institution servers 132 and 134 are capable of communicating with one another via a communication link 154, which allows the servers to exchange data and other information with one another.

Communication links 142-154 may be dial-up connections and/or connections via one or more networks of the type discussed above with respect to FIG. 1.

FIG. 3 is a block diagram showing pertinent components of a computer 180 in accordance with the invention. A computer such as that shown in FIG. 3 can be used, for example, to perform various financial analysis operations such as accessing and analyzing a user's financial account information to make account recommendations. Computer

6

180 can also be used to access a web site or other computing facility to access the various financial analysis functions. The computer shown in FIG. 3 can function as a server, a client computer, or a financial management system, of the types discussed herein.

Computer 180 includes at least one processor 182 coupled to a bus 184 that couples together various system components. Bus 184 represents one or more of any of several types of bus structures, such as a memory bus or memory controller, a peripheral bus, and a processor or local bus using any of a variety of bus architectures. A random access memory (RAM) 186 and a read only memory (ROM) 188 are coupled to bus 184. Additionally, a network interface 190 and a removable storage device 192, such as a floppy disk or a CD-ROM, are coupled to bus 184. Network interface 190 provides an interface to a data communication network such as a local area network (LAN) or a wide area network (WAN) for exchanging data with other computers and devices. A disk storage 194, such as a hard disk, is coupled to bus 184 and provides for the non-volatile storage of data (e.g., computer-readable instructions, data structures, program modules and other data used by computer 180). Although computer 180 illustrates a removable storage 192 and a disk storage 194, it will be appreciated that other types of computer-readable media which can store data that is accessible by a computer, such as magnetic cassettes, flash memory cards, digital video disks, and the like, may also be used in the exemplary computer.

Various peripheral interfaces 196 are coupled to bus 184 and provide an interface between the computer 180 and the individual peripheral devices. Exemplary peripheral devices include a display device 198, a keyboard 200, a mouse 202, a modem 204, and a printer 206. Modem 204 can be used to access other computer systems and devices directly or by connecting to a data communication network such as the Internet.

A variety of program modules can be stored on the disk storage 194, removable storage 192, RAM 186, or ROM 188, including an operating system, one or more application programs, and other program modules and program data. A user can enter commands and other information into computer 180 using the keyboard 200, mouse 202, or other input devices (not shown). Other input devices may include a microphone, joystick, game pad, scanner, satellite dish, or the like.

Computer 180 may operate in a network environment using logical connections to other remote computers. The remote computers may be personal computers, servers, routers, or peer devices. In a networked environment, some or all of the program modules executed by computer 180 may be retrieved from another computing device coupled to the network.

Typically, the computer 180 is programmed using instructions stored at different times in the various computer-readable media of the computer. Programs and operating systems are often distributed, for example, on floppy disks or CD-ROMs. The programs are installed from the distribution media into a storage device within the computer 180. When a program is executed, the program is at least partially loaded into the computer's primary electronic memory. As described herein, the invention includes these and other types of computer-readable media when the media contains instructions or programs for implementing the steps described below in conjunction with a processor. The invention also includes the computer itself when programmed according to the procedures and techniques described herein.

7

For purposes of illustration, programs and other executable program components are illustrated herein as discrete blocks, although it is understood that such programs and components reside at various times in different storage components of the computer, and are executed by the computer's processor. Alternatively, the systems and procedures described herein can be implemented in hardware or a combination of hardware, software, and/or firmware. For example, one or more application specific integrated circuits (ASICs) can be programmed to carry out the systems and procedures described herein.

FIG. 4 is a block diagram showing exemplary components and modules of a financial management system 220. A communication interface 222 allows the financial management system 220 to communicate with other computing systems, such as servers, client computers, and portable computing devices. In one embodiment, communication interface 222 is a network interface to a LAN, which is coupled to another data communication network, such as the Internet.

The financial management system 220 stores customer data 224, such as customer account information, online banking login name and password, and user preferences. Financial management system 220 also stores financial institution data 226 and market information 228. Financial institution data 226 includes, for example, transaction routing data, account offerings, account interest rates, and minimum account balances. Market information 228 includes data such as average interest rates for different types of accounts (both asset accounts and debt accounts), the best available interest rates for each type of account, and the financial institutions offering the best available interest rates.

An asset analysis and recommendation module 230 analyzes various asset accounts to determine whether the accounts are earning the best available interest rates (or is close to the best interest rates) and whether the fund allocation among the asset accounts is optimal or close to optimal. If fund adjustments would benefit the account holder, then module 230 makes the appropriate recommendations to the account holder. The asset accounts analyzed may be associated with two or more different financial institutions. A debt analysis and recommendation module 232 analyzes various debt accounts to determine whether the accounts are paying the most competitive (i.e., the lowest) interest rates or close to the best interest rates. Module 232 also determines whether the allocation of funds among the debt accounts is optimal or close to optimal, and makes recommendations, if necessary, to adjust funds in a manner that reduces the overall interest payments. The debt accounts analyzed may be associated with two or more different financial institutions.

A balance sheet analysis and recommendation module 234 analyzes both asset accounts and debt accounts to determine whether the allocation of funds among all of the accounts is optimal or close to optimal. If fund adjustments would benefit the account holder, then the balance sheet analysis and recommendation module 234 makes the appropriate recommendations to the account holder.

A report generator 236 generates various types of reports, such as account activity history, current recommendations to adjust funds among accounts, or a report comparing the current market interest rates to the interest rates of a user's current accounts. A transaction execution module 238 executes financial transactions on behalf of account holders. For example, an account holder may request that the financial management system 220 execute the recommendations generated by one or more of the three analysis and recom-

8

mendation modules 230, 232, and 234. In this example, transaction execution module 238 identifies the recommendations and executes the financial transactions necessary to implement the recommendations. An account verification module 240 verifies that the user accessing financial management system 220 is authorized to access a particular account.

FIG. 5 is a block diagram showing exemplary components and modules of asset analysis and recommendation module 230. An asset account information collection module 250 collects information about a user's asset accounts. When a user accesses the financial management system and requests an analysis of the user's asset accounts, the system prompts the user to enter account information for all of the user's asset accounts. The information provided for each account may include the name of the financial institution, the account number, and the login name and password for online access to the account. This information is typically stored by the financial management system to avoid asking the user to re-enter the same information in the future. Based on the information provided by the user, the asset account information collection module 250 is able to access the user's accounts and determine the balance of each account as well as other information such as the interest rate and minimum balance for the account.

After collecting the user's asset account information, the collection module 250 organizes the account information into a common format and communicates the information to an asset analysis and recommendation engine 254 for processing.

A financial institution and market data collection module 256 collects information about particular financial institutions (e.g., transaction routing information and account offerings) and information about current market interest rates. The information about financial institutions may be retrieved from the financial institutions themselves or from one or more market information services that provide information about various financial institutions. The information relating to current market interest rates is collected from one or more market information services. After collecting the financial institution information and the market data, the collection module 256 communicates the collected information and data to the asset analysis and recommendation engine 254.

A default asset analysis logic 258 defines a default set of logic rules used to analyze a user's asset accounts. These default logic rules are used if the user does not create their own set of logic rules and does not select from one of several sets of alternate asset analysis logic rules 260 and 262. The alternate logic rules 260 and 262 may provide different approaches to asset account analysis (e.g., a conservative approach, a moderate approach, or an aggressive approach). In particular embodiments, at least one of the alternate logic rules 260, 262 is associated with a financial and/or investment celebrity, who defines the particular set of logic rules based on their financial and/or investment expertise.

The particular logic rules selected for each user may be different based on the sets of logic rules chosen by the user. Additionally, the logic rules selected for a particular user may change over time as the financial management system learns more about the user's payment or spending habits. For example, if the user regularly makes a $1000 payment from a particular checking account on the 15th of each month, a rule may be created by the financial management system to ensure that the checking account has at least a $1000 balance on the 14th of each month. If the checking account does not have a sufficient balance, then the financial management

9
10

system may recommend a fund transfer to raise the balance of the checking account to cover the anticipated $1000 payment on the 15th. This type of user-specific logic rule may be stored with the other user data in the financial management system.

Asset analysis and recommendation engine 254 analyzes the user's asset account information by applying the various asset analysis logic rules to the asset account information. The asset analysis and recommendation engine 254 also considers market data collected by collection module 256 when analyzing the user's asset accounts. After analyzing the user's asset accounts, the asset analysis and recommendation engine 254 generates one or more recommendations to adjust the fund allocation among the asset accounts. The recommendation may also include opening a new asset account (e.g., an account that pays a higher interest rate) and/or closing an existing asset account (e.g., an account that pays a low interest rate). The recommendations and analysis results are output on communication link 264 for use by other modules or components in the financial management system.

FIG. 6 is a block diagram showing exemplary components and modules of debt analysis and recommendation module 232. A debt account information collection module 270 collects information about a user's debt accounts. When a user accesses the financial management system and requests an analysis of the user's debt accounts, the system prompts the user to enter account information for each of the user's debt accounts. The information provided for each account may include the name of the financial institution, the account number, and information necessary to access the account online. This information is typically stored by the financial management system to avoid asking the user to re-enter the same information in the future. Based on the information provided by the user, the debt account collection module 270 accesses the user's debt accounts and determines the balance of each account as well as other information, such as the interest charged and the maximum balance for the account.

After collecting the user's debt account information, the collection module 270 organizes the account information into a common format and communicates the account information to a debt analysis and recommendation engine 274 for processing.

A financial institution and market data collection 276 collects information regarding particular financial institutions and information about current market interest rates. The information relating to financial institutions may be retrieved from the financial institutions themselves or from one or more market information services that provide information about various financial institutions. The information relating to current market interest rates is collected from one or more market information services. After collecting the financial institution information and the market data, the collection module 276 communicates the collected information and data to the debt analysis and recommendation engine 274.

A default debt analysis logic 278 defines a default set of logic rules used to analyze a user's debt accounts. These default logic rules are used if the user does not create their own set of logic rules and does not select from one of the several sets of alternate debt analysis logic 280 and 282. The alternate logic rules 280 and 282 may provide different approaches to debt account analysis, such as a conservative approach, a moderate approach, or an aggressive approach. In a particular embodiment, at least one of the alternate logic rules 280, 282 is associated with a financial and/or invest-

ment celebrity, who defines the particular set of logic rules based on their financial and/or investment expertise.

The particular logic rules selected for each user may be different based on the sets of logic rules chosen by the user. Additionally, the logic rules selected for a particular user may change over time as the financial management system learns more about the user's payment or spending habits. For example, if the user has too many expenses (i.e., the current month's expenses exceed the user's typical monthly income), then the logic rules (applied by the analysis engine) may suggest a short term loan to cover the expenses, thereby avoiding a situation in which the user has insufficient funds to pay bills as they become due. Additionally, if the loan will only be required for a short period of time, the rules may suggest opening (or taking advantage of an existing) overdraft protection account.

Different debt logic rules may be applied depending on a user's opinions regarding debt. One user might use the majority of available assets to pay down debts, thereby minimizing the user's level of debt. Another user might want to maintain a larger "cushion" of cash and only pay down debts if the available assets exceed a predetermined amount (e.g., $10,000). Debt rules from, for example, a celebrity or well-known financial analyst might recommend setting aside savings at the beginning of the month to "force" the appropriate monthly savings. The remainder of the assets are then used to pay monthly bills and other expenses. Other financial analysts may use different sets of logic rules to define the analysis and handling of asset accounts and debt accounts.

Debt analysis and recommendation engine 274 analyzes the user's debt account information by applying the various debt analysis logic rules to the debt account information. The debt analysis and recommendation engine 274 also considers market data collected by collection module 276 when analyzing the user's debt accounts. After analyzing the user's debt accounts, the debt analysis and recommendation engine 274 generates one or more recommendations to adjust the fund allocation among the debt accounts. The recommendation may also include opening a new debt account (e.g., an account with a lower interest rate) and/or closing an existing debt account (e.g., an account with a high interest rate). The recommendations and analysis results are output on communication link 284 for use by other modules or components in the financial management system.

FIG. 7 is a block diagram showing exemplary components and modules of balance sheet analysis and recommendation module 234. An account information collection module 290 collects information about a user's asset accounts and debt accounts. When a user accesses the financial management system and requests an analysis of the user's balance sheet, the system prompts the user to enter account information for each of the user's asset accounts and debt accounts. The information provided for each account may include the name of the financial institution, the account number, and information necessary to access the account online. This information is typically stored by the financial management system to avoid asking the user to re-enter the same information in the future. Based on the information provided by the user, the account collection module 290 accesses the user's debt accounts and determines the balance of each account as well as other information, such as the interest charged or earned, and the maximum balance or credit limit associated with the account.

After collecting the user's asset and debt account information, the collection module 290 organizes the account information into a common format and communicates the

11                                                                        12

account information to a balance sheet analysis and recommendation engine 294 for processing.

A financial institution and market data collection 296 collects information regarding particular financial institutions and information about current market interest rates for both asset accounts and debt accounts. The information relating to financial institutions may be retrieved from the financial institutions themselves or from one or more market information services that provide information about various financial institutions. The information relating to current market interest rates is collected from one or more market information services. After collecting the financial institution information and the market data, the collection module 296 communicates the collected information and data to the balance sheet analysis and recommendation engine 294.

A default balance sheet analysis logic 298 defines a default set of logic rules used to analyze a user's balance sheet. These default logic rules are used if the user does not create their own set of logic rules and does not select from one of the several sets of alternate balance sheet analysis logic 300 and 302. The alternate logic rules 300 and 302 may provide different approaches to debt account analysis, such as a conservative approach, a moderate approach, or an aggressive approach. In a particular embodiment, at least one of the alternate logic rules 300, 302 is associated with a financial and/or investment celebrity, who defines the particular set of logic rules based on their financial and/or investment expertise.

The particular logic rules selected for each user may be different based on the sets of logic rules chosen by the user. Additionally, the logic rules selected for a particular user may change over time as the financial management system learns more about the user's payment or spending habits. For example, if the user has funds earning a low interest rate in a savings account and carries a balance on a credit card with a high interest rate, the logic rules may suggest applying some or all of the funds in the savings account to pay off all or a portion of the balance on the credit card.

Different balance sheet logic rules may be applied depending on a user's opinions regarding assets and debts. One user might prefer to use the majority of available assets to pay down debts, thereby minimizing the user's level of debt. Another user might want to maintain a larger "cushion" of cash and only pay down debts if the available assets exceed a predetermined amount (e.g., $5,000).

Balance sheet analysis and recommendation engine 294 analyzes the user's balance sheet information by applying the various balance sheet analysis logic rules to the balance sheet information. The balance sheet analysis and recommendation engine 294 also considers financial institution and market data collected by collection module 296 when analyzing the user's balance sheet. After analyzing the user's balance sheet, the balance sheet analysis and recommendation engine 294 generates one or more recommendations to adjust the fund allocation among the user's asset accounts and debt accounts. The recommendation may also include opening one or more new accounts and/or closing one or more existing accounts. The recommendations and analysis results are output on communication link 304 for use by other modules or components in the financial management system.

FIG. 8 is a flow diagram illustrating a procedure for identifying financial transactions to optimize a user's asset account balances. The procedure begins by analyzing the user's asset accounts (block 320). The procedure then determines the best available asset accounts (block 322), for example, by using market interest rate information from a

market information service. Next, the procedure determines whether there are better accounts for the user's assets (block 324). These "better" accounts may include asset accounts that earn higher interest rates than the user's current asset accounts.

If the procedure identifies better accounts for the user's assets, then the procedure selects the best alternative account (or accounts) and makes a recommendation that the user open the alternative account (block 326). If the procedure does not identify any better accounts for the user's assets, then the procedure continues to block 328, where the procedure determines whether the assets in the user's accounts should be adjusted. If the user's asset accounts should be adjusted, then the procedure identifies the best adjustment of the user's asset accounts and makes asset adjustment recommendations to the user (block 330). Finally, the user is provided the opportunity to automatically execute any of the recommendations, such as opening one or more new asset accounts and/or moving funds between asset accounts (block 332). If the user chooses to have the recommendations executed automatically, the financial management system executes the necessary financial transactions to implement the system's recommendations as discussed in greater detail below. The procedure described above with respect to FIG. 8 may be implemented, for example, by asset analysis and recommendation module 230.

FIG. 9 is a flow diagram illustrating a procedure for identifying financial transactions to optimize a user's debt account balances. The procedure analyzes the user's debt accounts (block 350) and determines the best available debt accounts (block 352). The best available debt accounts are determined, for example, by using market interest rate information from one or more market information services. Next, the procedure determines whether there are better accounts for the user's debts (block 354). These "better" accounts may include debt accounts that charge lower interest rates than the user's current debt accounts.

If better accounts are identified for the user's debts, then the procedure selects the best alternative account (or accounts) and makes a recommendation that the user open the alternative account (block 356). If the procedure does not identify any better accounts for the user's debts, then the procedure continues to block 358, to determine whether the debts in the user's accounts should be adjusted. If the user's debt accounts should be adjusted, then the procedure identifies the best adjustment of the user's debt accounts and makes asset adjustment recommendations to the user (block 360). Finally, the user is provided the opportunity to automatically execute any of the recommendations, such as opening one or more new debt accounts and/or moving funds between debt accounts (block 362). If the user chooses to have the recommendations executed automatically, the financial management system executes the necessary financial transactions to implement the system's recommendations, as discussed below. The procedure described above with respect to FIG. 9 can be implemented, for example, by debt analysis and recommendation module 232.

FIG. 10 is a flow diagram illustrating a procedure for identifying financial transactions to optimize a user's balance sheet. The procedure analyzes the user's balance sheet (block 370) and determines whether there is a better distribution of assets and debts across the user's balance sheet (block 372). For example, a "better distribution" of assets and debts may result in greater interest earned by the user or less interest paid by the user. If there is a better distribution of assets and debts across the user's balance sheet, then the

US 7,383,223 B1

13

procedure identifies the optimal allocation of assets and debts and makes recommendations to the user (block 374).

If the procedure does not identify any better distribution of assets and debts, then the procedure continues to block 376, to determine whether the amounts in the user's asset and debt accounts should be adjusted. If the user's accounts should be adjusted, then the procedure identifies the best adjustment of the user's asset and debt accounts and makes adjustment recommendations to the user (block 378). Finally, the user is provided the opportunity to automatically execute any of the recommendations (block 380), such as moving funds between accounts to maximize interest earned or minimize interest paid. If the user chooses to have the recommendations executed automatically, the financial management system executes the necessary financial transactions to implement the system's recommendations. The procedure described above with respect to FIG. 10 can be implemented, for example, by balance sheet analysis and recommendation module 234.

A user may choose to have the financial management system 220 (FIG. 4) analyze and make recommendations regarding the user's asset accounts, while ignoring the user's debt accounts. FIG. 8 illustrates an example procedure for this type of analysis and recommendation. Additionally, the user may select specific asset accounts to ignore during the analysis procedure. For example, the user may have a savings account for a special purpose. Even though the savings account may earn a below-average interest rate, the user does not want funds transferred into or out of that savings account. In this example, the user would instruct the financial management system to ignore that particular savings account.

The user may also choose to have the financial management system analyze and make recommendations regarding the user's debt accounts, while ignoring the user's asset accounts. FIG. 9 illustrates an example procedure for this type of analysis and recommendation. Additionally, the user may select specific debt accounts to ignore during the analysis procedure. For example, the user may want to pay-off and close a particular debt account even though the account has a favorable interest rate. In this example, the user would instruct the financial management system to ignore that particular debt account when performing its analysis.

The user can also choose to have the financial management system analyze and make recommendations regarding both the user's asset accounts and debt accounts (i.e., analyze the user's balance sheet). FIG. 10 illustrates an example procedure for this type of analysis and recommendation. Additionally, the user may select one or more asset accounts or debt accounts to ignore during the analysis procedure. Thus, the user has the option of selecting the types of accounts to consider, as well as specific accounts to consider or ignore, when the financial management system performs its analysis and makes recommendations.

FIG. 11 is a flow diagram illustrating a procedure for automatically optimizing a user's asset accounts, debt accounts, and balance sheet. Initially, the procedure determines the best adjustment of the user's asset accounts (block 400). The best adjustment of the user's asset accounts may include opening a new account, closing an existing account, and/or transferring funds between accounts (new accounts or existing accounts). If the user's asset accounts are already optimized, or almost optimized, the procedure determines that no adjustment of asset accounts is necessary.

Next, the procedure determines the best adjustment of the user's debt accounts (block 402) and the best adjustment of

14

the user's balance sheet (block 404). The best adjustment of the user's debt accounts and the user's balance sheet may include opening one or more new accounts, closing one or more existing accounts, and/or transferring funds between accounts (new accounts or existing accounts). If the user's debt accounts are already optimized, or almost optimized, the procedure determines that no adjustment of debt accounts is necessary. Similarly, if the user's balance sheet is already optimized, or almost optimized, then the procedure determines that no adjustment of asset accounts or debt accounts is necessary.

The various logic rules discussed above, which are used by the financial management system to determine whether funds should be adjusted between accounts, may define how to determine whether accounts are "almost optimized." Typical factors that may be considered in determining whether accounts are "almost optimized" include: the savings (extra interest earned or less interest paid) that would result from an adjustment of funds, the difference in interest rates, the time required to implement the adjustment of funds, fees associated with the adjustment of funds, and the "risk" associated with the adjustment. The "risk" may be overdrawing an account by leaving insufficient funds to cover unexpected expenses (or expenses that are greater than expected).

For example, if a particular adjustment of funds would result in an increase in interest earnings of three cents per week, most logic rules will consider this situation "almost optimized." In this situation, the financial management system will not recommend the adjustment of funds because the additional interest is insignificant.

After the procedure has determined the best adjustment of the user's accounts (blocks 400, 402, and 404), the procedure identifies the financial institutions involved in the adjustment of the user's accounts (block 406). The financial institutions are determined from the information entered by the user when identifying the user's accounts to the financial management system. Next, the procedure contacts the appropriate financial institutions and/or payment networks and executes the financial transfers necessary to implement the recommended adjustments to the user's accounts (block 408). A payment network may be, for example, the Federal Automated Clearing House (ACH), a debit network, a credit network, the federal wire system, or an ATM network. The financial management system is able to automatically access the user's accounts by using the login name and password for the account, which is provided by the user when identifying the user's accounts to the financial management system.

After executing the financial transactions necessary to implement the recommended adjustments to the user's accounts, the a report is generated for the user that identifies the financial transfers executed (block 410). Finally, the user's account information is updated in the financial management system such that the system has accurate account balance information for all of the user's accounts (block 412).

The procedure described above with respect to FIG. 11 can be modified based on the user's preferences with respect to the types of accounts to be analyzed. For example, if the user selects only asset accounts for analysis, then the functions associated with blocks 402 and 404 of the procedure are not performed.

FIG. 12 shows a table 430 illustrating various information associated with different financial institutions. The information contained in table 430 may be obtained from the financial institution itself or from one or more market

US 7,383,223 B1

15

information services. The information contained in table 430 is periodically updated by comparing the information stored in the table against the current financial institution information.

The first column of table 430 identifies the name of the financial institution and the second column identifies the American Banking Association (ABA) number and routing number. The third column indicates an Internet uniform resource locator (URL) associated with the financial institution. The fourth column of table 430 identifies the various account offerings from a particular financial institution. In this example, Bank of America offers a savings account, two types of checking accounts (interest bearing and non-interest bearing), a three month certificate of deposit (CD), a home equity loan, a credit card account, and overdraft protection for a checking account. The next column indicates the type of account (e.g., an asset account or a debt account).

The sixth column of table 430 indicates the current interest rate associated with each account. In the case of an asset account, the interest rate is the interest paid to a customer based on the balance in the account. In the case of a debt account, the interest rate is the interest charged to a customer based on the outstanding balance of the debt. The last column in table 430 indicates the minimum balance associated with each account. In this example, the debt accounts do not have a minimum balance. However, a debt account may have a maximum balance (e.g., the maximum value that can be loaned). Although not shown in FIG. 12, additional account information may be stored in table 430, such as monthly service charges, per-check charges, service charges for ATM transactions, or service charges if the minimum balance is not maintained.

FIG. 13 shows a table 440 illustrating various customer information related to financial accounts and user preferences. Most information contained in table 440 is obtained from the user during an account setup procedure. The current account balance information is typically retrieved from the financial institution by the financial management system. The account balance information is periodically updated by retrieving current information from the financial institution.

The first column of table 440 identifies the customer name (the table contains customer information for multiple customers accessing the same financial management system). The second column identifies a financial institution and the third column identifies an account number as well as an online username and password associated with the account number. The username and password are used to access the account to perform online banking functions such as executing fund transfers or retrieving current account balances. The fourth column of table 440 identifies the accounts that the customer has with the financial institution (i.e., active accounts). For example, John Smith has five active accounts with Bank of America (savings, interest checking, home equity, credit card, and overdraft protection), one active account with Charles Schwab (money market account), and one active account with Rainbow Credit Union (savings account). The next column in table 440 indicates the current account balance for each active account. The last column indicates user preferences. The user preferences are determined by the user based on the manner in which the user wants information displayed, the manner in which accounts should be analyzed, and the types of recommendations the user desires. Additionally, the user preferences may specify certain minimum balances or other requirements for all accounts or for specific accounts. For example, the user preferences for John Smith specify that a minimum balance

16

of $1500 should be maintained in the interest checking account. These user preferences are typically incorporated into the logic rules, discussed above, which are used to determine when and how to adjust funds between accounts.

Other types of user preferences include a maximum number of transactions per month in a particular account (e.g., some money market accounts set limits on the number of transactions in a particular month). By setting a user preference (or a logic rule) to limit the number of monthly transactions, the financial management system will not recommend (or attempt to execute) too many transactions in a particular month. A user may also set a preference that requires the financial management system to predict expenses for the next seven days (e.g., based on historical expenses during similar periods) and maintain a "buffer" in the account equal to the predicted expenses for the next seven days. Further, a user may set a preference indicating that funds should not be adjusted unless the adjustment results in a savings of at least five dollars per day.

FIGS. 14-15 illustrate exemplary user interface screens illustrating various account entry fields and account recommendations. FIG. 14 illustrates an example screen 500 generated by a web browser or other application that allows a user to enter account information and preferences. Each entry identifies an institution 502 associated with the account and an account number 504. The user may select whether the financial management system has access to move funds into the account, out of the account, or both, by selecting the appropriate check boxes 506. The user may also set a maximum amount that can be withdrawn from the account at a particular time or during a particular time period by entering the amount in field 508. The credit routing number for the account is entered in field 510 and the debit routing number for the account is entered in field 512.

Although not shown in FIG. 14, other fields may be provided in the user interface to allow the user to enter additional preferences or information, such as interest rate, minimum balance the user wants maintained, etc. Certain account information (such as interest rate and routing numbers) may be obtained from the bank directly, thereby minimizing the information required to be entered by the user.

FIG. 15 illustrates another example screen 550 generated by a web browser or other application that allows a user to review recommendations generated by the financial management system. In the example of FIG. 15, one recommendation 552 is shown—to transfer funds from the Wells Fargo Checking account into the Chase Savings account. A recommended amount to transfer 554 has also been identified. If the recommendation is executed, the projected savings 556 over the next six months is $26. The reasoning or analysis supporting the recommendation and the projected savings is provided at 558. The user can execute the recommendation by activating the "Execute" button 560 on the screen. After activating the "Execute" button, the financial management system automatically performs the necessary steps to transfer the recommended funds between the two accounts.

In an alternate embodiment, the user is given the option to modify the amount to be transferred between the two accounts. For example, the user may only want to transfer $500 instead of the recommended $877. In this situation, the financial management system is still able to automatically perform the steps necessary to transfer $500 between the two accounts.

The systems and procedures discussed perform various financial analysis and generate one or more financial rec-

US 7,383,223 B1

17

ommendations. To implement the financial recommendations, such as transferring funds between accounts, one or more of the systems and/or procedures discussed below may be utilized. Furthermore, the systems and procedures discussed below can be used to transfer funds between accounts at the user's request, and not necessarily based on any financial analysis or financial recommendations. For example, the user may want to transfer funds between two accounts in anticipation of a known withdrawal from the account receiving the funds. Thus, the systems and procedures discussed below are useful to transfer funds between accounts for any reason.

FIG. 16 illustrates an exemplary environment 570 in which funds are transferred between various financial institutions using a payment network 572. Payment network 572 can be, for example, an ACH network, a debit network, a credit card network, or a wire transfer network. Three different financial institutions 574, 576, and 578 are coupled to payment network 572, thereby allowing the three financial institutions to exchange funds among one another. A commercial payment processor 580 is coupled to financial institution 578 and a financial management system 582. Financial management system 582 may be similar to the financial management system 220, discussed above. Financial management system 582 is typically a neutral third party that performs various financial transactions on behalf of a user. Thus, financial management system 582 is not necessarily associated with any financial institution.

Financial management system 582 initiates the transfer of funds between financial institutions based on user instructions and/or recommendations based on analysis of the user's accounts. Additionally, financial management system 582 provides a common application or interface for accessing all accounts for a particular user. Thus, the user can access the financial management system 582 in a common manner and retrieve information and execute fund transfers using common commands, etc., regardless of the financial institutions involved. Furthermore, financial management system 582 registers multiple financial accounts for one or more account holders. Thus, financial management system 582 provides a single point for registering multiple financial accounts. A user may register multiple accounts associated with different financial institutions at this single point. After registering all accounts, the user can execute transactions between any of the registered accounts, regardless of whether the accounts are with the same or different financial institutions. Thus, the user is not required to establish account information for every pair of financial institutions that funds may be transferred between. Instead, the user registers the information associated with each account (e.g., account number, bank name, account password, etc.) once, which allows each registered account to exchange funds with any other registered account, regardless of the financial institutions associated with the accounts. The receiving and storing of the registered account information may be performed, for example, by financial management system 582.

Although only three financial institutions 574, 576, and 578 are shown in FIG. 18, a particular environment may include any number of financial institutions coupled to payment network 572. Furthermore, as discussed below, the financial institutions 574, 576, and 578 may be coupled to one another via multiple payment networks.

Typically, payment network transactions are performed by financial institutions that are members of the payment network 572. Thus, financial management system 582 is not able to initiate transactions directly on the payment network 572 unless it is a member of the payment network. Instead,

18

financial management system 582 initiates transactions through commercial payment processor 580 and financial institution 578. Financial institution 578 is capable of executing the requested financial transactions using payment network 572. Commercial payment processor 580 provides another interface to the payment network 572.

In an alternate embodiment, payment processor 580 is not required. Instead, financial management system 582 sends instructions directly to financial institution 578, which executes the instructions using payment network 572. In another embodiment, financial institution 578 is not required. Instead, financial management system 582 sends instructions to commercial payment processor 580, which executes the instructions on payment network 572.

Some financial institutions, such as certain brokerage firms and credit unions, are not coupled to the payment network 572. These financial institutions use an intermediate financial institution to gain access to payment network 572. For example, in the environment of FIG. 16, a brokerage firm may gain access to payment network 572 through financial institution 574 or 576.

FIG. 17 is a flow diagram illustrating a procedure for transferring funds between two financial institutions. Initially, a user's account information is registered with the financial management system (block 588). After analyzing a user's asset accounts and/or debt accounts as discussed above (or based on a user's request to transfer funds between two accounts), the financial management system generates a fund transfer instruction (block 590). The fund transfer instruction can be divided into two separate transactions: a debit instruction (for the account from which the funds are to be withdrawn) and a credit instruction (for the account to which the funds are to be deposited). The debit instruction and the credit instruction are communicated to a payment processor (block 592). The payment processor initiates the requested debit and credit transactions through an intermediate financial institution (e.g., financial institution 578 in FIG. 16) that is coupled to the payment network (block 594). The debit transaction and/or the credit transaction can be performed in real-time or deferred. The debit transaction is received and executed by the appropriate financial institution (block 596) and the credit transaction is received and executed by the appropriate financial institution (block 598). If the financial management system has additional fund transfers to execute (block 600), the procedure returns to block 590 to execute the next transfer. The procedure terminates after executing all fund transfers.

For example, in the environment of FIG. 16, the financial management system 582 receives user account information during a user registration process. Next, the financial management system 582 analyzes the user's accounts and determines whether funds should be transferred from the user's checking account at financial institution 574 to the user's savings account at financial institution 576. To initiate this fund transfer, financial management system 582 generates a debit instruction to withdraw the appropriate funds from the user's checking account at financial institution 574. Additionally, financial management system 582 generates a credit instruction to deposit the appropriate funds (equal to the funds withdrawn by the debit instruction) into the user's savings account at financial institution 576. The instructions are then communicated via payment processor 580 and financial institution 578 onto the payment network 572.

Alternatively, fund transfers can occur as one-time transfers initiated by the user (e.g., transfer $500 from the user's savings account to the user's checking account) or as periodic transfers (e.g., transfer $750 from the user's money

**19**

market account to the user's checking account on the 12th day of each month). Additionally, fund transfers can occur based on one or more rules, such as transfer $600 from the user's savings account to the user's checking account if the checking account balance falls below $300.

FIG. 18 illustrates another exemplary environment 620 in which funds are transferred between various financial institutions using multiple payment networks 626 and 628. In this example, a first financial institution 622 is coupled to payment network 626 and a second financial institution 624 is coupled to payment network 628. A third financial institution 630 is coupled to both payment networks 626 and 628. A financial management system 632 is coupled to financial institution 630. Financial management system 632 is similar to the financial management system 220, discussed above.

If a fund transfer is required between accounts at the two financial institutions 622 and 624, the financial management system 632 generates a fund transfer instruction. The fund transfer instruction may include the account information and financial institution information for the accounts involved, the value to be transferred, and other information. In this example, the transfer instruction is separated into two different transactions: a first transaction that withdraws the appropriate funds from an account at one financial institution and a second transaction that deposits those funds into an account at the second financial institution. Although two different transactions occur, the fund transfer appears as a single transaction to the user or account holder.

The environment shown in FIG. 18 may be referred to as a "hub-and-spoke" arrangement in which financial management system 632 is the "hub", and financial institutions 622 and 624 each represent a "spoke". In alternate embodiments, the environment in FIG. 18 can be expanded to include any number of spokes coupled to any number of financial institutions via any number of payment networks. This configuration allows financial management system 632 to control the execution of transactions between any of the financial institutions.

FIG. 19 illustrates another exemplary environment 650 in which funds can be transferred between various financial institutions using a payment network 652. In this example, a pair of financial institutions 654 and 656 are coupled to the payment network 652. A financial management system 658 is also coupled to the payment network 562 and a third financial institution 660. In this example, the financial management system 658 is capable of executing certain transactions directly on payment network 652, but requires a financial institution (or commercial payment processor) to execute other transactions on payment network 652. Thus, financial institution 660 is utilized for those transactions that cannot be executed directly by the financial management system 652.

Thus, a system and method has been described that analyzes multiple user accounts to determine whether those accounts are optimized, or close to optimized, and adjusts accounts based on this analysis or based on instructions from

**20**

the user. This system provides a single point of registration for a user to register all financial accounts. The system also provides a common login process and common log of transactions relating to all registered accounts.

Although the description above uses language that is specific to structural features and/or methodological acts, it is to be understood that the invention defined in the appended claims is not limited to the specific features or acts described. Rather, the specific features and acts are disclosed as exemplary forms of implementing the invention.

The invention claimed is:

1. A method for executing a funds transfer in response to a user input, the method comprising:

receiving an electronic funds transfer request from the user comprising an identification of a source account, an identification of a destination account and a transfer amount;

in a first transaction, a third-party financial management system executing a debit transaction from the source account at a first financial institution, comprising withdrawing funds from the source account, wherein the source account is owned by the user, the third-party system having no financial relationship with the user, and depositing the funds from the debit transaction in an intermediate account, wherein the intermediate account is not owned by the user; and

in a second transaction, the third-party system executing a debit transaction comprising withdrawing the funds from the intermediate account, and depositing the funds in a second account owned by the user at the second financial institution, wherein the amount of funds deposited equals the transfer amount.

2. The method of claim 1, wherein the funds are withdrawn from the source account via a first payment network, and the funds are deposited in the second account via a second payment network.

3. The method of claim 1, wherein the funds are withdrawn from the source account via an automated clearing house (ACH) network, and the funds are deposited in the second account via an ACH network.

4. The method of claim 1, wherein the funds are withdrawn from the source account via a capitalized EFT network comprising a NYCE network and a STAR network.

5. The method of claim 1, wherein the funds are deposited into the second account via a capitalized EFT network comprising a NYCE network and a STAR network.

6. The method of claim 1, wherein the funds are deposited in the second account via a wire transfer.

7. The method of claim 1, wherein the withdrawal of funds from the source account comprises a loan from the source account.

8. The method of claim 1, further comprising opening the second account, and wherein depositing the funds in the second account comprises initially funding the second account.

* * * * *